

KEN PAXTON

ATTORNEY GENERAL OF TEXAS

January 19, 2026

**Opinion No. KP-0505**

Re: "Diversity, Equity, and Inclusion" in Texas

The worth of a person cannot be measured by race, sex, or any other immutable feature bestowed at birth—beyond the reach of individual choice. Rather, people are to be judged by the quality of their character and skill they have worked to obtain. Ours is a merit-based society.

This moral imperative preexists any political or legal document. Still, the concept is engrained within each of the sovereign charters under which Texans conduct all affairs: the U.S. and Texas Constitutions. Over the course of decades, however, some people have become obsessed with the notion that race and sex are to shape every opportunity in public and private life. Under the tacit guise of sociological reparations, this broken worldview—better known as "Diversity, Equity, and Inclusion" or "DEI," under which immutable traits have become the currency of advancement—has invaded academia, the halls of government, and virtually every corner of private industry. But no one can be freed by the hand of injustice that once bound them.

To make matters worse, when given an opportunity to confront DEI in the context of higher education, then-Attorney General Cornyn not only declined to give an answer but withdrew the only actionable guidance on the topic. *See generally* Tex. Att'y Gen. Op. No. JC-0107 (1999) (withdrawing Tex. Att'y Gen. LO-97-001 (1997)). Adding insult to injury, he deferred to a pending Fifth Circuit court decision without any guidelines with which to navigate the legal morass that is DEI. *Id.* This was as wrong then as it is now, and the opinion is overruled.[1]

As the "chief law officer of the State" with solemn duties "involving at all times the exercise of broad judgment and discretion," *Webster v. Comm'n for Law. Discipline*, 704 S.W.3d 478, 495 (Tex. 2024) (citation omitted), the Attorney General is dutybound to clarify the current state of the law and right the wrongs of prior administrations. Doing so compels that we observe the obvious: DEI has no place in our Republic, and the time for evaluating any candidate, employee, or recipient of government largesse based on their skin color or sex has come to an end. We therefore begin by detailing the arc of our nation's commitment to first principles, *see infra* Part I, and then analyze the extent to which DEI has unlawfully invaded both the public and private sectors alike, *see infra* Parts II–III (addressing each, respectively).

---

[1] For similar reasons, Attorney General Opinions JC-0315 (2000), DM-226 (1993), and DM-184 (1992) are also overruled to the extent inconsistent with this opinion. *See infra* Part II.A.

## I. Historical and legal backdrop

### A. First principles among the United States

The Declaration of Independence consecrated the American revolution with "self-evident" truths—rooted in equal liberty, not feigned equity. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776). It declared that "one people" could "dissolve the political bands [that] ha[d] connected them with another[] . . . to assume . . . [their] separate and equal station" *because* "all men are created equal." *Id.* All were likewise united in their "unalienable rights," including that to "Life, Liberty and the pursuit of Happiness." *Id.* But these were "not . . . new principles[] or new arguments, never before thought of." Letter from Thomas Jefferson to Henry Lee (Monticello May 8, 1825), https://tjrs.monticello.org/letter/436#X3184736. Instead, the Declaration embodied a "common sense . . . expression of the American mind." *Id.*

That shared consciousness was steeped in a familiar reality: "[N]othing [was] more evident" than mankind's endowment to "the same advantages of nature" and "the use of the same faculties[] . . . without subordination or subjection." JOHN LOCKE, SECOND TREATISE OF GOVERNMENT ch. 2, § 4 (1690). Over a century of Jurisprudence—from Locke to Hobbes, Blackstone, and Montesquieu—observed that all were born into "a state of perfect freedom" and thus "equality, wherein all . . . power and jurisdiction is reciprocal." *Id.*; *accord* 1 MONTESQUIEU, The SPIRIT OF LAWS bk. VIII, ch. 3 (1777) (noting "[i]n the state of nature, indeed, all men are born equal"); 1 WILLIAM BLACKSTONE, COMMENTARIES *127 (1765) (noting "[t]he absolute rights of every Englishman . . . are founded on nature and . . . are coeval with our form of government"); THOMAS HOBBES, LEVIATHAN 76 (1651) (noting "[n]ature hath made men so equal in the faculties of body and mind . . . that" none can "claim to himself any benefit to which another may not pretend as well as he"). This sat comfortably beside mankind's accepted "inequalit[ies] . . . [in] virtue, talents, taste, and acquirements" because "all . . . [were] equal" in "natural rights and duties," meaning "the weak and artless" could not be deprived of "their small acquisitions" any more than "the strong and artful" could be loosed of "their large ones." JAMES WILSON, LECTURES ON LAW (1789–1791), *in* 1 THE WORKS OF THE HONOURABLE JAMES WILSON 283, 308 (Bird Wilson ed., 1804) (highlighting that none could validly "claim, in preference to another, superior right" or "authority"); *accord* JAMES WILSON, CONSIDERATIONS ON THE NATURE AND EXTENT OF THE LEGISLATIVE AUTHORITY OF THE BRITISH PARLIAMENT 3 (1774) (observing "[a]ll . . . are, by nature, equal and free"). At bottom, the "equal rights of nature" could not justify "exalting one man . . . above the rest" and betrayed the traditional "distinction of men into *kings* and *subjects*." THOMAS PAINE, COMMON SENSE (1776), *reprinted in* THE GREAT WORKS OF THOMAS PAINE 12 (D.M. Bennett 1878); *accord* ALEXANDER HAMILTON, THE FARMER REFUTED (1775), *reprinted in* 1 THE WORKS OF ALEXANDER HAMILTON (Henry Cabot Lodge ed., Fed. ed. 1904).

Of course, this backdrop was not lost by the summer of 1787. Statesmen drawn from the newly united states—some of whom had shaped the Declaration itself,[2] *cf.* VA DECLARATION OF RIGHTS, § 1 (June 12, 1776)—convened to frame the Declaration's "apple of gold" with a constitutional "picture of silver." 4 COLLECTED WORKS, *supra*, at 168–69. To that end, the Framers did not vault *equity* of condition over the Lockean *equality* that called them to Philadelphia; they openly acknowledged that "inequality" would "result from" and "exist as long as . . . liberty itself."[3] THE FEDERAL CONVENTION AND THE FORMATION OF THE UNION OF THE AMERICAN STATES 166 (Winton U. Solberg ed., 1958). Free society came with "diversity in the faculties of men," which in turn produced unequal fruits of their labor as well as "division . . . into different interests and parties." THE FEDERALIST NO. 10, at 73 (James Madison) (C. Rossier ed., 1999); *see also, e.g.*, JAMES WILSON, LECTURES ON LAW (1789–1791), *in* 1 THE WORKS OF THE HONOURABLE JAMES WILSON, *supra*, at 308 (disclaiming equality of "virtues," "talents," "dispositions," or "acquirements"). Yet "the mortal disease[] under which popular governments . . . perished" did not lie in the cause of these factions; it was the "factious spirit [that] tainted . . . public administrations." FEDERALIST NO. 10, *supra*, at 71–72 (James Madison); *accord* NOAH WEBSTER, THE REVOLUTION IN FRANCE (1794), in 2 Political Sermons of the American Founding Era, 1730–1805, at 1271 (Ellis Sandoz ed., 1991) (observing the French and Roman revolutions also revealed the "faction" as "death to the existing government" (emphasis omitted)).

"[W]hether amounting to a majority or a minority of the whole," factions were no less "united and actuated by some common impulse of passion[] . . . adversed to the rights of *other citizens*[] or . . . [the] aggregate interests of *the community*." FEDERALIST NO. 10, *supra*, at 72 (emphases added); *see also id.* at 79 (forecasting these "wicked project[s]" could include a "rage for paper money, for an abolition of debts, [and] for an equal division of property"). A government held captive to this self-interested spirit could not be ransomed "by destroying the liberty . . . essential to its existence" or "by giving to every citizen the same opinions," "passions," and "interests." *Id.* at 72–73. The latter was "as impracticable as the first . . . unwise." *Id.* at 73. Neither could the nation rely on "enlightened statesmen" to "adjust these clashing interests[] and render them all subservient to the public good" when, ultimately, "statesmen [would] not always be at the helm." *Id.* at 75. As a result, "the diseases most incident to republican government" called for a democratic republic that could "break and control the violence of faction," *id.* at 71, 78–79—to

---

[2] Thomas Jefferson famously began with George Mason's draft of the Virginia Declaration of Rights, which first professed "that all men are born equally free and independent." PAULINE MAIER, AMERICAN SCRIPTURE: MAKING THE DECLARATION OF INDEPENDENCE 104 (1997) (citing GEORGE MASON, FIRST DRAFT OF THE VIRGINIA DECLARATION OF RIGHTS § 1 (1776)).

[3] Other influential figures—like John Adams, who was then serving as Ambassador to Great Britain—also expressed the same view, going as far to suggest it was "gross . . . fraud" to teach "that all Men are born with equal Powers and Faculties," "to equal Influence," or "to equal property and Advantages through Life." Letter from John Adams to John Taylor (Apr. 19, 1814), FOUNDERS ONLINE, NAT'L ARCHIVES, https://founders.archives.gov/documents/Adams/99-02-02-6282; *see also, e.g.*, 6 CHARLES FRANCIS ADAMS, THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 8–9 (Charles C. Little & James Brown eds., 1851) (observing a government set on "making all things common to all" would be "scandal fastened by the cunning of the common enemy upon this kind of government").

secure the blessings of liberty. *See also, e.g.*, FEDERALIST NO. 51, *supra*, at 317–22 (James Madison) (highlighting how the government's architecture guards against "majority faction").

Unsurprisingly, the Declaration's proto-constitutional force continued in the years ahead. Various states echoed Lockean equality in their own declarations, *e.g.*, DEL. DECLARATION OF RIGHTS OF 1776, § 10; N.C. DECLARATION OF RIGHTS OF 1776, arts. I, III; PA. DECLARATION OF RIGHTS OF 1776, art. I; VT. DECLARATION OF RIGHTS OF 1777, art. I, or constitutional preambles— New York going as far as to incorporate the entire Declaration, N.Y. CONST. OF 1777, pmbl.; *see also, e.g.*, PA. CONST. OF 1776, pmbl.; VT. CONST. OF 1777, pmbl. Yet more placed corresponding provisions into their full constitutions. *E.g.,* MD. CONST. OF 1776, § 10; N.H. CONST. OF 1784, arts. I–II. In the public square, too, America's statesmen commended the degree to which these sovereign charters were "conformable to the Declaration." *Letter from Thomas Paine to the Citizens of Pennsylvania, on the Proposal for Calling a Convention* (Aug. 1805), *in* 2 THE POLITICAL AND MISCELLANEOUS WORKS OF THOMAS PAINE 161, 169 (London, R. Carlile 1819) (commenting on the Pennsylvania Constitution); *see also, e.g.*, John Quincy Adams, *Letter to the Editors of the Old Colony Memorial, the Hingham Patriot, and the Quincy Patriot, in the Twelfth Congressional District of Massachusetts, July 23 1841*, LIBERATOR, Aug. 20, 1841, at 134 (highlighting Massachusetts' shared foundation in "universal human liberty"). Thus while Europe had embraced "charters of liberty . . . granted by power," the United States championed "charters of power *granted by* liberty." JAMES MADISON, CHARTERS (Jan. 19, 1792), *in* JAMES MADISON— WRITINGS 733, 736 (Jack N. Rakove ed., 1999) (emphasis added).

But the foundation on which early America was first united would become a battlefield. The Declaration had not professed equality "in color, size, intellect, moral developments, or social capacity" any more than "the obvious untruth[] that all were then actually enjoying" or could immediately receive the right to "life, liberty, and the pursuit of happiness." 2 COLLECTED WORKS, *supra*, at 405–06. Neither did the U.S. Constitution immediately do away with slavery; compromises were made to secure the support of southern delegates.[4] *See generally* U.S. CONST. art. I, §§ 2, cl.3 (Three-Fifths Clause), 9, cl.1 (Importation Clause); *id.* art. IV, § 2, cl.3 (Fugitive Slave Clause). The tension between the founding principles and slavery grew as the nation expanded, and the Supreme Court—with its first foray into substantive due process—vitiated Congress' effort to quarantine slavery with the Missouri Compromise. *See generally Dred Scott v. Sandford*, 60 U.S. 393 (1857). A "want of national spirit" plagued the country and, as Madison

---

[4] Far from enshrining a right *to* slavery, however, these constitutional compromises provided a means by which the Declaration's promise of liberty "might follow as fast as circumstances should permit." 2 COLLECTED WORKS, *supra*, at 405–06 (Lincoln). Even Frederick Douglass eventually observed that the Three-Fifths Clause practically diminished the southern states' representative power and created a constitutional incentive for "becoming a free State." FREDERICK DOUGLASS, THE AMERICAN CONSTITUTION AND THE SLAVE, Speech in Glasgow, Scotland (Mar. 26, 1860), *in* 3 THE FREDERICK DOUGLASS PAPERS, SERIES ONE: SPEECHES, DEBATES, AND INTERVIEWS: 1855– 1863, at 359 (John W. Blassingame et al. eds., 1985). Even more, the Importation Clause—a compromise that required Congress wait "twenty years" before it "may terminate forever" the "unnatural traffic" that had "so long and so loudly upbraided the barbarism of modern policy," FEDERALIST NO. 42, *supra*, at 262–63 (James Madison) (describing this "as a great point gained in favor of humanity")—presaged the immediate prohibition of the American slave trade in 1808. *See generally* Act Prohibiting Importation of Slaves, ch. 22, 2 Stat. 426 (1807) (outlawing slavery once the twenty-year window closed).

had forecast, the young nation was torn apart by the South's fixation on "their peculiar interests and institutions in preference to those which they had in common with the rest of the American people." S. Exec. Doc. No. 2, 39th Cong., 1st Sess. (1865). Ultimately, it would take civil war to sharpen the reality that the Constitution was made "*for* the [Declaration's] apple—*not* the apple for [its] picture." 4 Collected Works, *supra*, at 168–69.

## B.     Reconstruction efforts

The Reconstruction Era was marked by the federal government's color-blind effort to secure equality in the aftermath of war. To start, the Thirteenth Amendment commanded that "[n]either slavery nor involuntary servitude[] . . . shall exist within the United States." U.S. CONST. amend. XIII, § 1. This served not only to emancipate slaves then existing but, to the same extent, "forb[ade] any other kind of slavery . . . [even if] the party interested may not be of African descent." *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 72 (1872). Congress also established the Freedman's Bureau—an entity charged with serving "refugees and freedmen" alike. Act of Mar. 3, 1865, ch. 90, 13 Stat. 507–09; *accord* Act of July 16, 1866, ch. 200, 14 Stat. 173–77. As Congress had been warned by President Johnson, "the future peace and harmony of the Union" required that the South "not [be] permitted to build up another 'peculiar institution' whose spirit is in conflict with the fundamental principles of [the nation's] political system." S. Exec. Doc. No. 2, 39th Cong., 1st Sess. (1865). The foundation of that political system, of course, recognized the inherent station of all mankind—equal in *rights*.

Former confederate states nonetheless passed defiant legislation, better known as "Black Codes," that aimed to limit the newfound freedom of black Americans. *See generally* 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 273–311 (1906) (excerpting laws in Alabama, Arkansas, Florida, Louisiana, Mississippi, North Carolina, and Tennessee). These laws made use of the Thirteenth Amendment's exception for conviction-based servitude, U.S. CONST. amend. XIII, § 1, and preserved "slave trade under the guise of vagrancy and apprenticeship laws," W.E.B. DU BOIS, BLACK RECONSTRUCTION IN AMERICA 167 (1935). Mississippi, for example, outlawed blacks from being "found . . . with no lawful employment or . . . unlawfully assembling . . . together either in the day or nighttime" and also provided that "all white persons so assembling . . . or usually associating with freedmen[] . . . shall [also] be deemed vagrants." MISSISSIPPI VAGRANCY LAW, 1865 MISS. LAWS §§ 2, 5 (imposing race-based tiers of punishment and mandating that convicted freedmen be "hire[d] out . . . to any person who will, for the shortest period of service, pay said fine"), *reprinted in* 1 DOCUMENTARY HISTORY OF RECONSTRUCTION, *supra*, 284–85. Further, states disarmed "freedmen" by outlawing the possession of "fire-arms of any kind" and similarly prohibited "any white person" from supplying such weapons. 1 DOCUMENTARY HISTORY OF RECONSTRUCTION, *supra*, 289–90 (quoting CERTAIN OFFENSES OF FREEDMEN, 1865 MISS. LAWS §§ 1, 3); *see also, e.g.*, *id.* 279–80 (quoting similar offenses in Louisiana); EDWARD MCPHERSON, THE POLITICAL HISTORY OF THE UNITED STATES OF AMERICA DURING THE PERIOD OF RECONSTRUCTION 33, 40 (1871) (quoting similar offenses in Alabama and Florida, respectively). Suffice it to say these laws were "consciously conceived methods of resurrecting the incidents of slavery," *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 386–87 (1982), and "curtailed . . . the pursuit of life, liberty, and property to such an extent that . . . freedom was of little value" in the South, *Slaughter-House Cases*, 83 U.S. (16 Wal.) at 70.

*See generally* Cong. Globe, 39th Cong., 1st Sess. 399, 1124, 1151–1152, 1159, 1785, 1839 (1866) (Reps. Cook, Thayer, Windom, Stewart, and Clarke).

Congress responded with statutory and constitutional force. First came the Civil Rights Act of 1866, which aimed "to carry into effect the [Thirteenth] amendment." CONG. GLOBE, 39th Cong., 1st Sess. 474 (1866) (Senator Trumbull). The Act confirmed "[t]hat *all persons* born in the United States and not subject to any foreign power[] . . . are . . . citizens . . . and such citizens, of *every* race and color," possessed the "same right[s]" in various fora—*e.g.*, the right to make and enforce contracts, acquire and dispose of property, as well as testify in court. Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (1866) (emphases added); *see also, e.g.*, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976) (explaining that "the language and history of [§] 1981" reveals it "is applicable to racial discrimination in private employment against white persons" just as it is against "nonwhites"). By "extending the right of citizenship and equality before the law to persons of every race and color," Justice Bradley observed while riding circuit, Congress refuted the insidious claim "that none but the white race were entitled to the rights of citizenship in this country." *United States v. Cruikshank*, 25 F. Cas. 707, 711 (C.C.D. La. 1874) (Bradley, J.), *aff'd*, 92 U.S. 542 (1875); *accord* CONG. GLOBE, 39th Cong., 1st Sess. 399, 474 (1866) (Senator Trumbull) (professing "to secure equal rights to *all* the citizens" and thereby vindicate the Thirteenth Amendment's "declar[ation] that all persons in the United States should be free" (emphasis added)). Other justices on circuit likewise recognized that, without the Act, the "simple abolition" of slavery "would have been a phantom of delusion." *United States v. Rhodes*, 27 F. Cas. 785, 794 (C.C.D. Ky. 1866) (Swayne, J.); *see also, e.g.*, *In re Turner*, 24 F. Cas. 337 (C.C.D. Md. 1867) (Chase, C.J.) (holding an apprenticeship contract violated the Act's equal protection clause).

That same year gave birth to the Fourteenth Amendment. Beyond eliminating any question as to whether the 1866 Civil Rights Act reached beyond the Legislature's station—as well as eliminating any remaining taint of *Dred Scott*—the Amendment "facilitated the enforcement of rules that had *already existed* but . . . could not have [been federally] enforced on their own." William Baude et al., *General Law and the Fourteenth Amendment*, 76 STAN. L. REV. 1185, 1208–10 (2024) (emphasis added) (describing how "[i]t facilitated the federal enforcement of basic rights without nationalizing the rights themselves"); *see also, e.g.*, ROBERT J. KACZOROWSKI, THE POLITICS OF JUDICIAL INTERPRETATION: THE FEDERAL COURTS, DEPARTMENT OF JUSTICE, AND CIVIL RIGHTS, 1866-1876 (2005) (highlighting the importance of federal enforcement during Reconstruction). Chief among its terms was an unmistakable command: "No state shall make or enforce any law . . . abridg[ing] the privileges or immunities *of citizens* of the United States;" "deprive *any person* of life, liberty, or property[] without due process of law; nor deny to *any person* within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1 (emphasis added). In doing so, the Constitution guaranteed "equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights." *Barbier v. Connolly*, 113 U.S. 27, 31 (1884).

Congress next championed the 1875 Civil Rights Act. Though ultimately held unconstitutional by the Supreme Court,[5] *The Civil Rights Cases*, 109 U.S. at 24–25, the 1875 Act provided unique insight into the scope of the Fourteenth Amendment: Both "[s]upporters and opponents of the [1875 Act] alike agreed that the Fourteenth Amendment had no bearing on 'social rights,'" given the "universally accepted . . . but [now] forgotten . . . [distinction] between civil rights, political rights, and social rights." Michael W. McConnell, *Originalism and the Desegregation Decisions*, 81 VA. L. REV. 947, 1016 (1995). "To the Republicans of the Reconstruction period," of course, "equality of civil rights was not necessarily linked to equality in general" or "social equality" but rather the "realization of an ideal of . . . citizens who were equal in their rights *before the law*, however unequal they might be in other respects." *Id.* (emphasis added).

### C. The Jim Crow era

The Supreme Court nonetheless ushered a new era of *de jure* segregation by endorsing the social and constitutional myth of "separate but equal" in *Plessy v. Ferguson*, 163 U.S. 537 (1896). Abandoning the text and spirit of the Fourteenth Amendment, the Court upheld a Louisiana statute that consecrated "separate railway carriages for the white and colored races." *Id.* at 540–42. In addition to rejecting a challenge brought under the Thirteenth Amendment, the Court upheld the statute under the Fourteenth Amendment's Equal Protection Clause because, according to the Court, the amendment "could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either." *Id.* at 544. But as Justice Harlan correctly explained in his forceful dissent, there can be no claim that the Constitution leaves room for a "superior, dominant, ruling class of citizens." *Id.* at 559 (Harlan, J., dissenting). "Our constitution is color-blind," he continued, and that charter "neither knows nor tolerates classes among citizens." *Id.* (Harlan, J., dissenting). Put simply, "[t]he law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved." *Id.* (Harlan, J., dissenting).

Over a half-century would pass before the Court would come to vindicate Justice Harlan's position with *Brown v. Board of Education*, 347 U.S. 483, 491 (1954). The Court embraced appellants' constitutional reliance on the equality principle—arguing that any "racial criterion is a constitutional irrelevance," Brief for Appellants at 7, *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) (No. 1)—and held that "the doctrine of 'separate but equal' has no place" in public education. *Brown*, 347 U.S. at 495. "To separate [black students] from others of similar age and qualifications solely because of their race," the Court explained, "generates a feeling of inferiority as to their

---

[5] Ironically, the Supreme Court invalidated the 1875 Act because "[i]t applie[d] equally to cases arising in States which have the justest laws respecting the personal rights of citizens, and whose authorities [were] ever ready to enforce such laws, as to those which arise in States that may have violated the prohibition of the [Fourteenth] amendment." *The Civil Rights Cases*, 109 U.S. 3, 14 (1883). There was no question of Congress's "full power to afford a remedy under [the Fourteenth] amendment" where "the laws themselves make any unjust discrimination," but the Court held the federal government had no power to interfere in the local domain "without referring in any manner to any supposed action of the state or its authorities." *Id.* at 23–25.

status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id.* at 494. Regardless of whether the facilities were of equal quality, segregating races in separate facilities was "inherently unequal." *Id.* at 495. *Brown* therefore proved pivotal in recognizing the constitutional promise of equal protection.

### D. The Civil Rights Act of 1964

Still, black Americans faced segregated spaces in public accommodations, interstate and intrastate transportation, restaurants, theaters, hotels, public parks, and swimming pools. The Civil Rights Movement, under the leadership of Dr. Martin Luther King, Jr., thus sought to dismantle this system of *de jure* and *de facto* segregation. And the movement would achieve incredible success, in part because Dr. King was committed to the goal of a color-blind society in which race would become legally irrelevant. Drawing upon "the magnificent words of the Constitution and Declaration of Independence," which Dr. King described as "a promissory note to which every American was to fall heir," he publicly championed "a dream" of a nation where his children would "not be judged by the color of their skin but by the content of their character." Martin Luther King, Jr., I Have a Dream (Aug. 28, 1963), *in* I HAVE A DREAM: WRITINGS AND SPEECHES THAT CHANGED THE WORLD 102–04 (James M. Washington ed., 1992). Just as the founding statesmen before him, *see supra* pp. 2–3, Dr. King fought for "a society in which all men are equal, not in the sense that they have the same talents, but in the sense that they have an equal opportunity to develop whatever talents they have." Martin Luther King, Jr., Commencement Address at Wesleyan University (June 7, 1964), *in* THE PAPERS OF MARTIN LUTHER KING, JR., VOLUME VII: TO SAVE THE SOUL OF AMERICA 408, 410 (Clayborne Carson et al. eds., 2014).

Dr. King's embrace of a color-blind society was likewise reflected in the landmark legislation of the Civil Rights Movement: The Civil Rights Act of 1964. Broken into titles that address public accommodations, public facilities, public education, federally assisted programs, and equal employment opportunities, 42 U.S.C. §§ 2000a–2000a-6 ("Public Accommodations"), 2000b–2000b-3 ("Public Facilities"), 2000c–2000c-9 ("Public Education"), 2000d–2000d-7("Federally Assisted Programs"), 2000e–2000e-17 ("Equal Employment Opportunities"), the Act erected a federal civil rights regime to serve as a bulwark against unfair exclusion or discrimination by virtue of *any person's* race or protected characteristic. *See, e.g.*, *id.* §§ 2000a(a) ("*All persons* shall be entitled to the *full and equal enjoyment* of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national origin." (emphases added)), 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer[] . . . to fail or refuse to hire or to discharge *any individual*, or otherwise to discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[] . . . ." (emphases added)).

The principal architects of the Act made clear that it provided for absolute, unflinching *equality* under the law—not preferential treatment for certain races. During a debate regarding Title VII, for example, Senator Hubert Humphrey offered to "start eating the pages one after another" if his senate colleague could "find . . . any language which provides that an employer will

have to hire on the basis of percentage or quota related to color, race, religion, or national origin." 110 Cong. Rec. 7420 (1964) (statement of Sen. Humphrey); *accord* 110 Cong. Rec. 7247 (1964) (memorandum of Sens. Clark & Case) (explaining that Title VII "expressly protects the employer's right to insist that any prospective applicant[] . . . meet the applicable job qualifications . . . [and] does not provide that any preferential treatment in employment shall be given to Negroes or to any other persons or groups"). Indeed, the bipartisan congressional leadership that enacted the Civil Rights Act of 1964 understood that the Act did precisely what it said: mandating equal treatment without regard to race, not equality of condition or result, wrought from racial quotas or preferential treatment for the chosen few. ANDREW KULL, THE COLOR-BLIND CONSTITUTION 180–86 (1992). Suffice it to say that Congress forbid "[d]iscriminatory preference for any group, minority or majority," and thereby mandated "the removal of artificial, arbitrary, and unnecessary barriers . . . [that] operate invidiously to discriminate on the basis of racial or other impermissible classification." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (commenting on Title VII).

### E. Texas' independent pursuit of equality

Texas also made its own contributions to the national pursuit of genuine equality. In 1972, Texans "adopted [the Equal Rights Amendment] by a four to one margin." *In re McLean*, 725 S.W.2d 696, 696–98 (Tex. 1987). This constitutional provision, better known as the "ERA," makes clear "that '[e]quality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin.'" *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 257 (Tex. 2002) (quoting TEX. CONST. art. I, § 3a). Far from a constitutional "exercise in futility," the ERA memorialized a "more extensive and . . . more specific protection" than that found in our national charter. *McLean*, 725 S.W.2d at 697; *accord Bell*, 95 S.W.3d at 262 (highlighting that sex is "elevat[ed] . . . to a suspect class" and therein "subject[ed] . . . to heightened strict-scrutiny review"). Thus "[e]ven the loftiest goal does not justify . . . discrimination" in Texas, and *all* forms of this pernicious enterprise receive equal treatment: They are invalid unless "no other manner" can protect a "compelling interest." *Id.* at 697–98. Even more, the ERA also catalyzed several legislative efforts to remove sex-based discrimination as it related to property and labor rights. Sherilyn Brandenstein, *The Texas Equal Rights Amendment: A Historical Overview*, TEX. STATE HIST. ASS'N (Feb. 1, 1996).

The next load-bearing pillar of Texas's effort took shape with the Texas Commission on Human Rights Act ("TCHRA") of 1983. *See* Brooks William Conover, III, *Jurisdictional and Procedural Issues Under the Texas Commission on Human Rights Act*, 47 BAYLOR L. REV. 683, 686 (1995) (explaining the TCHRA's history and development). Among the TCHRA's "general purposes" is "the execution of . . . Title VII['s policies] and . . . subsequent amendments." TEX. LAB. CODE § 21.001(1); *accord, e.g.*, *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 504 (Tex. 2012) ("The TCHRA was 'enacted to address the specific evil of discrimination and retaliation in the workplace,' as well as to coordinate and conform with federal anti-discrimination and retaliation laws under Title VII." (quoting *City of Waco v. Lopez*, 259 S.W.3d 147, 153–55 (Tex. 2008))). But the TCHRA and Title VII are not identical in all respects. While the TCHRA was "patterned after Title VII," Texas law reaches farther than its federal counterpart and imposes liability where any protected characteristic—including "age and disability," which Title VII does

not protect—served as a "motivating factor" for an unlawful employment practice. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476–80 (Tex. 2001) (adhering to the Labor Code's "plain meaning" over federal precedent on Title VII).

### F.  Backslide into demographic-based preferences and carveouts

Unfortunately, this progress would soon be overtaken by a nationwide embrace of policies that treated *certain forms* of racism as "politically acceptable." *Metro Broad., Inc. v. FCC*, 497 U.S. 547, 610 (1990) (O'Connor, J., dissenting).

### 1.  Federal contracts and "affirmative action"

In the Fall of 1965, President Lyndon B. Johnson issued Executive Order 11246—one of the earliest steps in the proliferation of federal affirmative action policies and programs. *See generally* Exec. Order No. 11246, 30 Fed. Reg. 12319 (Sept. 24, 1965), *revoked by* Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025); *see also* Exec. Order No. 11375, 32 Fed. Reg. 14303 (Oct. 13, 1967) (expanding affirmative action to include sex as a protected category). This executive order not only mandated that federal contractors and subcontractors refrain from discriminating based on race, color, religion, or national origin but also required these entities take "affirmative action" to ensure equal employment opportunities for minorities. Exec. Order No. 11246, 30 Fed. Reg. at 12320. This directive, enforced by the Department of Labor, compelled contractors to develop written affirmative action plans with goals and timetables related to hiring and promoting certain groups over others. *Id.* at 12320, 12325; *see also* 41 C.F.R. §§ 60-1.40, 60-2.1–.36. While the order directly bound only federal contractors, its ripple effects caused state agencies and universities engaged in federal contracting to align their own procurement and employment practices with the new federal standards—fearing forfeiture of lucrative contracts tied to national defense, infrastructure, and research initiatives.

President Nixon inherited and expanded upon his predecessor's framework and used express racial quotas as a means of consecrating tangible benchmarks. Northern trade unions had been a major obstacle in achieving Johnson's goals for representative employment in federal contracting, as the unions had long excluded black workers from skilled construction jobs through closed-shop practices and apprenticeship barriers. *See* James A. Hardgrove, *Philadelphia Plan*, 45 NOTRE DAME L. REV. 678, 679 (1970) (discussing the exclusionary practices of northern trade unions). Those exclusionary practices meant that federal contractors could not comply with Johnson's Executive Order 11246 unless the union bottleneck was addressed and, in turn, the Nixon Administration imposed its own affirmative action plans. *See id.* The most notable example was the Philadelphia Plan of 1969, which required contractors in six major trades in the Philadelphia Area to meet specific, numeric benchmarks for minority participation in federal contracting. *See id.* at 682–83. Nixon's Labor Department reframed the issue as one of economic efficiency: With federal spending on infrastructure surging, the government could not afford an artificially restricted labor supply. *See Contractors Ass'n of E. Pa. v. Sec'y of Lab.*, 442 F.2d 159, 171 (3d Cir. 1971); *see also* Hardgrove, *supra*, at 696 n. 115. When challenged, the Third Circuit upheld the policy. *See Contractors Ass'n*, 442 F.2d at 174. The Philadelphia Plan thus marked the first large-scale use of numerical diversity targets in federal contracting and created "[a]ffirmative

action as we know it today[,] [defined as] 'any measure[] . . . beyond simple termination of a discriminatory practice, adopted to correct or compensate for past or present discrimination or to prevent discrimination from recurring in the future.'" Anthony M. Platt, *The Rise and Fall of Affirmative Action*, 11 NOTRE DAME J.L. ETHICS & PUB. POL'Y 67, 72 (1997) (quoting U.S. Comm'n on Civil Rights, Statement of Affirmative Action 2 (1977)).

In the 1970s, the federal commitment to race-conscious policies expanded beyond federal procurement into business development, most notably through the Small Business Administration's Section 8(a) program. That program was rooted in the Small Business Act of 1953, which authorized the SBA to enter into contracts with federal agencies and subcontract to small businesses. *See* Pub. L. No. 83-163, 67 Stat. 230, 232 (1953) (codified as amended at 15 U.S.C. §§ 631 *et seq.*). However, a decisive turn occurred in 1970, as the program was reoriented to assist small businesses "owned by disadvantaged persons" so that these enterprises might "become self-sufficient, viable businesses capable of competing effectively in the market place." 13 C.F.R. § 124.8-1(b) (1970). Three years later, a definition of "disadvantaged persons" was adopted that specifically included "black Americans, Spanish-Americans, oriental Americans, Eskimos, and Aleuts," accompanied by a rebuttable presumption that such individuals were indeed "disadvantaged." 13 C.F.R. § 124.8(c) (1973). Notably, this entire initiative operated in a statutory vacuum until 1978, when Congress ratified the program to continue benefitting "disadvantaged" firms in federal procurement. Pub. L. No. 95-507, 92 Stat. 1757 (1978) (codified at 15 U.S.C. § 637). In so doing, Congress defined "socially disadvantaged individuals" to include those "subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities," *id.* at 1762 (codified at 15 U.S.C. § 637(a)), and set forth mandatory contractual language requiring contractors to "presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, and other minorities," *id.* at 1767 (codified at 15 U.S.C. § 637(d)). States then began to mirror these efforts in their own procurement processes. *See, e.g.*, MISS. CODE § 57-75-21; N.C. GEN. STAT. § 143-128.2. This harmonization effectively tied state policies to federal race-conscious frameworks, as non-compliance could disadvantage states in broader economic competition.

The federal government next extended race-conscious policies into infrastructure with the Department of Transportation's Disadvantaged Business Enterprise (DBE) program. Established in 1983 through the Surface Transportation Assistance Act, the DBE program adopted by reference Section 8(a)'s definition of "socially and economically disadvantaged individuals." Pub. L. No. 97-424, § 105(f), 96 Stat. 2097, 2100 (1983) (codified at 49 U.S.C. § 47113(a)(2)). The program required that recipients of Department of Transportation funds—primarily states, localities, and transit authorities—ensure at least ten percent of federal highway and transit dollars go to small businesses owned by socially and economically disadvantaged individuals. 49 U.S.C. § 47113(b). The program also imported Section 8(a)'s racial presumptions, with regulations providing that "Black Americans," "Hispanic Americans," "Native Americans," "Asian-Pacific Americans," and "Subcontinent Asian Americans" are "rebuttably presumed to be socially and economically disadvantaged." 49 C.F.R. § 26.5. Even more, this DBE program required that those receiving funding take "race-conscious measures" when race-neutral alternatives are deemed insufficient. *Id.* §§ 26.5, .45, .47, .51. Recipients that failed to achieve DBE participation goals would bear the

burden of conducting analyses of those shortfalls, on pain of suspension or termination of federal funding. *Id.* §§ 26.47, .101. This regime therefore coupled continued access to billions in transportation aid with state adoption of race-conscious programs—prompting nearly every state to create DBE offices and integrate racial considerations into bidding processes. Put simply, the program cemented federal affirmative action policies into subnational governance and fundamentally reshaped states' approach to public works.

### 2. Supreme Court

Even the U.S. Supreme Court endorsed the constitutionally pernicious notion of racial carveouts for a season. In *Fullilove v. Klutznick*, 448 U.S. 448 (1980), for example, the Court confronted whether Congress could lawfully set aside no less than ten percent of federal public-works for minority-owned businesses under Public Works Employment Act of 1977. *Id.* at 453. Chief Justice Burger's narrow plurality opinion reasoned that Congress could remedy the effects of past discrimination given its remedial power under section 5 of the Fourteenth Amendment and broad spending power. *See id.* at 472–78, 480–82 (noting that the program was a "strictly remedial measure" and outlining the conditions that prevented a pure racial quota). Justice Powell concurred separately, stressing that Congress had developed an adequate factual record and that the program was flexible and temporary. *See id.* at 495–517 (Powell, J., concurring); *see also id.* at 516 ("[T]he use of racial classifications, which are fundamentally at odds with the ideals of a democratic society implicit in the Due Process and Equal Protection Clauses, cannot be imposed simply to serve transient social or political goals, however worthy they may be."). Though no single opinion commanded a majority, let alone more than three votes, *Fullilove* broadly stood for the proposition that Congress could use racial preferences to remedy historic discrimination in federal spending.

A narrow majority in *Regents of University of California* v. *Bakke*, 438 U.S. 265, 272–276 (1978) (plurality op.) also upheld the consideration of race within the context of higher education. The case arose from the U.C. Davis Medical School's admissions program, which gave priority to minority applicants through a separate admissions track. *Id.* at 269–70. Allan Bakke, a white man, was denied admission while minority applicants with lower grade point averages and standardized test scores were admitted through the special admissions program. *Id.* at 276–77. Bakke responded by challenging the university's race-based preferences under the Title VI as well as the California and U.S. Constitutions. *Id.* at 277–78. Though the California Supreme Court concluded the admissions program was unlawful and ordered Bakke to be admitted, *id.* at 280–81, the U.S. Supreme Court reversed and partially upheld the admissions program to the extent "the State has a substantial interest that legitimately may be served by . . . involving the competitive consideration of race and ethnic origin." *Id.* at 320 (opinion of Powell, J.).

The case nonetheless fractured the Court. Four justices believed Bakke's exclusion was unlawful under Title VI because "[r]ace cannot be the basis of excluding anyone from participation in a federally funded program," *id.* at 418–21 (joint opinion of Stevens, Stewart, Rehnquist, JJ., Burger, C.J., concurring in judgment in part and dissenting in part), and this contingent declined to address the issue under the Equal Protection Clause on grounds of constitutional avoidance. *id.* at 411–12 (joint opinion of Stevens, Stewart, Rehnquist, JJ., Burger, C.J. concurring in judgment in part and dissenting in part). Another four justices believed the admissions program was lawful

and concluded that U.C Davis could use race for the purpose of "remedying the effects of past societal discrimination." *Id.* at 362 (joint opinion of Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part). But it was Justice Powell who ultimately provided the decisive fifth vote and controlling opinion, announcing the Court's judgment. He accepted only one of the rationales offered by U.C. Davis in support of its affirmative action program—a First Amendment right "to make its own judgments as to education" in pursuit of "a diverse student body," *id.* at 312—and concluded that "race or ethnic background" as "a 'plus' in a particular applicant's file" was "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant."[6] *Id.* at 317.

*Bakke*'s limited endorsement of a "diversity" interest reared its head twenty-five years later in *Grutter v. Bollinger*, 539 U.S. 309 (2003), which upheld yet another university's race-conscious admissions program. The Court "endorse[d] Justice Powell's view that student body diversity is a compelling state interest that can justify the use of race in university admissions." *Id.* at 325. With that came an examination of the professed diversity rational and its associated "benefits." *See id.* at 327–33. The Court explained that "[t]hese benefits are not theoretical but real" given that "major American businesses have made clear that the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Id.* at 330. So the Court deferred to the university's "educational judgment that such diversity is essential to its educational mission." *Id.* at 328. Just as Justice Powell had done twenty-five years earlier, the Court rooted its deference in the university's First Amendment claim to academic freedom and concluded the pursuit of a "critical mass" was flexible enough to avoid constitutional criticism as an impermissible quota.[7] *Id.* at 328–29, 335–38. But this constitutional volley came with a chronological boundary.

The Court emphasized that "race-conscious admissions policies must be limited in time" precisely because a "core purpose of the Fourteenth Amendment was to do away with *all* governmentally imposed discrimination based on race." *Id.* at 341–42; *see also id.* at 343 (highlighting deference to the university's representation that "it would 'like nothing better than to find a race-neutral admissions formula' and will terminate its race-conscious . . . program as soon as practicable"). This non-negotiable "termination point" served to "assure[] all citizens that

---

[6] Justice Powell nonetheless made clear that strict scrutiny applied to *any* racial classification, whether burdening a majority or minority class, and acknowledged that "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Bakke*, 438 U.S. at 289–90 (adding that "if both are not accorded the same protection, then it is not equal"). "We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations," he continued, and the notion of prior societal discrimination was itself an "amorphous concept of injury" that could prove "ageless in . . . reach." *Id.* at 307. Likewise, Justice Powell explained that U.C. Davis's goal of "reducing the historic deficit of traditionally disfavored minorities in medical schools and in the medical profession" was little more than "discrimination for its own sake" and thus "facially invalid." *Id.* at 306–07.

[7] A companion case decided on the same day, however, confronted the outer limit of permissible consideration of race—holding that another university's point-based admissions system failed constitutional scrutiny for want of "individual consideration" and because it "ha[d] the effect of making 'the factor of race . . . decisive.'" *Gratz v. Bollinger*, 539 U.S. 244, 271–72 (2003) (alteration in original) (quoting *Bakke*, 438 U.S. at 317).

the deviation from the norm of equal treatment of *all* racial and ethnic groups is a temporary . . . measure taken in the service of . . . equality itself." *Id.* at 342 (citation omitted). Yet a quarter century had passed "since Justice Powell first approved the use of race . . . in the context of public higher education," and, "[s]ince that time, the number of minority applicants with high grades and test scores ha[d] indeed increased." *Id.* at 343. As such, the Court offered an unambiguous forecast: "We expect that [twenty-five] years from now, the use of racial preferences *will no longer* be necessary to further the interest approved today." *Id.* (emphasis added).

### 3.        Corporate Diversity Movement

This malignant fixation on "diversity" also spread to the private sector. Corporate diversity initiatives first arose as institutional reactions to expanding federal mandates and the threat of litigation—ushering "an era of training" that included "recitations on the law and company policies." Rohini Anand & Mary-Frances Winters, *A Retrospective View of Corporate Diversity Training from 1964 to the Present*, in 7 ACAD. OF MGMT. LEARNING & EDUC. 356, 357 (2008); *see also, e.g.*, Lauren B. Edelman, *Legal Ambiguity and Symbolic Structures: Organizational Mediation of Civil Rights Law*, in 97 AM. J. OF SOCIO. 1531, 1535, 1545 (1992). Yet the effort slowly shifted from proactive compliance to the pursuit of financial advantage, Anand & Winters, *supra*, at 358–59, presaging the eventual "business case for diversity." Alison M. Konrad, *Leveraging Workplace Diversity in Organizations*, in 3 ORG. MGMT. J. 164, 166 (2006).

The 1980s confronted a "startling revelation" in a publication, commissioned by the Department of Labor and dubbed *Workforce 2000*, that found eighty-five percent of net new entrants to the workforce between 1985 and 2000 would be women and minorities.[8] Anand & Winters, *supra*, at 358. *See generally* WILLIAM B. JOHNSTON & ARNOLD E. PACKER, HUDSON INST., WORKFORCE 2000: WORK AND WORKERS FOR THE TWENTY-FIRST CENTURY 14, 21–22, 122 (1987). While this "was commonly misinterpreted in the press as intimating that there would be a *total* rather than a *marginal* change in ethnic and gender diversity," Anand & Winters, *supra*, at 358 (emphases added), the publication "[n]onetheless" started a conversation about the "future composition of the workforce" and is even credited with adding "'workplace diversity' into the business lexicon." *Id. Workforce 2000* is thus described as "the first document to argue that workplace diversity was a topic deserving the attention of business managers, not for moral . . .

---

[8] Fortuitously, academic theories like "Critical Race Theory" also arose during the 1970s and 1980s. *See generally* RICHARD DELGADO & JEAN STEFANCIC, CRITICAL RACE THEORY: AN INTRODUCTION 4 (1st ed. 2001). Originating as an offshoot of Critical Legal Studies—a radical, overtly leftist movement within the academy that reduced law to little more than an ideological instrument for advancing the interests of the powerful and privileged— early critical-race theorists sought to remedy the "insufficient attention" that had been paid "to racial domination." Kimberle Williams Crenshaw, *Race, Reform, and Retrenchment: Transformation and Legitimation in Antidiscrimination Law*, 133 HARV. L. REV. 1331, 1350 (1988). Put simply, this academic franchise deemed white supremacy as the central principle of American society: insisting that racism is normal and permanent rather than aberrational, DELGADO & STEFANCIC, *supra*, at 8–10; that neutral principles of colorblind objectivity and merit serve as ideological weapons for advancing racial subordination, Crenshaw, *supra*, at 1346, 1367–81; and that incremental reform is structurally inadequate, DERRICK A. BELL, JR., AND WE ARE NOT SAVED: THE ELUSIVE QUEST FOR RACIAL JUSTICE 48–64 (1987). CRT therefore championed "equality as a result" or *in outcome*—as opposed to the sense of equality on which the nation was founded, *see supra* Part I.A—to be measured by wealth, employment, education, and goods. *See* Crenshaw, *supra*, at 1341.

but . . . business reasons, and its conclusions formed the basis of what was to become the business case for diversity." Konrad, *supra*, at 166.

The rhetoric that diversity is essential for "business survival" continued to take form and brought with it a cottage industry of diversity training programs, networking, and mentoring programs that fixated on the advancement of women and minorities. Frank Dobbin & Alexandra Kalev, *The Origins and Effects of Corporate Diversity Programs* at 40 (June 6, 2013), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2274946. Eventually, companies began institutionalizing diversity in and of itself with the creation of the "Chief Diversity Officer," a role often responsible for "linking diversity strategy with the company's overall business strategy" and a "diversif[ied]" workforce. Anand & Winters, *supra*, at 368–69; Lucy Buchholz, *The Rise and Impact of Chief Diversity Officers*, SUSTAINABILITY MAG. (July 7, 2023), https://sustainability mag.com/articles/breaking-barriers-the-rise-and-impact-of-chief-diversity-of; *see also* Sonari Glinton, *The Real History Behind DEI and Workplace Equity in America*, FORBES (June 26, 2025), https://www.forbes.com/sites/sonariglinton/2025/06/26/the-real-history-behind-dei-and-workplac e-equity-in-america/. "Equity" and "inclusion" joined the list of corporate buzzwords, and companies developed even more formalized, comprehensive programs, policies, and goals under the heading of DEI, Glinton, *supra*—including mandatory training, recruiting, and hiring practices based at least in part on an individual's membership in chosen demographics. *See, e.g.*, Matthew Lavietes, *'Watershed Moment': Corporate America Looks to Hire More Black People*, REUTERS (Aug. 19, 2020), https://www.reuters.com/article/us-usa-race-hiring-idUSKCN25F2SY/ (exemplifying that companies have promised a certain percentage of positions would be filled with individuals of specific demographic groups); Lauren Feiner, *Tech Companies Made Big Pledges to Fight Racism Last Year—Here's How They're Doing So Far*, CNBC (June 6, 2021), https://www.cnbc.com/2021/06/06/tech-industry-2020-anti-racism-commitments-progress-check .html (exemplifying race-based practices in the workplace in the name of committing to diversity and inclusion efforts); Rachel Minkin, *Diversity, Equity and Inclusion in the Workplace*, PEW RSCH. CTR. (May 17, 2023), https://www.pewresearch.org/social-trends/2023/05/17/diversity-equity-and-inclusion-in-the-workplace/ (referring to DEI initiatives involving hiring, pay, promotions measures, affinity groups, and trainings). Thus what started as a compliance-focused initiative by companies had since transformed into a multi-billion dollar industry with virtually every Fortune 500 company maintaining some variety of internal DEI infrastructure by 2024, Jonathan Butcher, *Restoring Equality in Employment: Sinking the DEI Ship*, HERITAGE FOUND. (Nov. 27, 2024), https://www.heritage.org/progressivism/report/restoring-equality-employment-sinking-the-dei-ship; *Global Diversity & Inclusion (D&I) Strategic Research Report: Market to Reach $24.4 Billion 2030* (Mar. 1, 2024), https://www.prnewswire.com/news-releases/global-diversity-and-inclusion-di-strategic-research-report-2024-market-to-reach-24-4-billion-by-2030--top-diversity-equity-and-inclusion-trends-for-2023-and-beyond-302077414.html, replacing the ideal of equal opportunity with a perversely ironic system of exclusion.

The U.S. Supreme Court's decisions in *Bakke* and *Grutter*, *see supra* Part I.F.2, added fuel to the trending rhetoric that permissible discrimination can exist in a business setting for the sake of "diversity." The Court's recognition of diversity as a compelling government interest sparked discourse as to whether such a justification can extend *beyond* higher education and into the employment context. *See, e.g.*, Richard N. Appel et al., *Affirmative Action in the Workplace Forty*

*Years Later*, 22 HOFSTRA LAB. & EMP. L. J. 549, 570–74 (2005); Eric A. Tilles, *Lessons From Bakke: The Effect of Grutter on Affirmative Action in Employment*, 6 UNIV. PA. J. OF BUS. L. 451, 459–63 (2004); *see also, e.g.*, *Petit v. City of Chicago*, 352 F.3d 1111, 1112, 1114–15 (7th Cir. 2003) (applying "the *Grutter* standards" to public employment). *Grutter* openly relied on amicus briefs submitted by the American business community to validate the avowedly exclusive link between diversity and "the skills needed in [an] increasingly global marketplace," *Grutter*, 539 U.S. at 330, and was thus widely understood as effectively "endors[ing] the 'business case for diversity' itself," Cynthia L. Estlund, *Putting* Grutter *to Work: Diversity, Integration, and Affirmative Action in the Workplace*, 26 BERKELEY J. OF EMP. & LAB. L. 1, 20 (2005); *see also, e.g.*, David B. Wilkins, *From "Separate is Inherently Unequal" to "Diversity is Good for Business": The Rise of Market-Based Diversity Arguments and the Fate of the Black Corporate Bar*, 117 HARV. L. REV. 1548, 1558 (2004) (explaining *Grutter* put "strong pressure" on "future advocates for racial justice in both the court of law and the court of public opinion" to "not only . . . argue in the language of diversity but also to justify diversity in terms of the efficient functioning of institutions and the market"). In short, these decisions begged whether the Court would prove equally receptive to affirmative action as a corporate lodestar that the colorblind text of the 1964 Civil Rights Act would otherwise prohibit. *See, e.g.*, Rebecca Hanner White, *Affirmative Action in the Workplace: The Significance of Grutter?*, 92 KY. L.J. 263, 278 (2003) (concluding that "*Grutter*'s impact on the workplace" created "an open question," including how it fits within the framework of statutory claims).

The decades following *Grutter* saw corporations increasingly embrace discriminatory employment practices under the banner of promoting workplace "diversity and inclusion." Race- and sex-based recruitment, hiring, and promotion became standard practice. Nat'l Ass'n of Colls. & Emps., 2010 Recruiting Benchmarks Report (2010), https://files.eric.ed.gov/fulltext/ED526916.pdf; *see also, e.g.*, Wei Cai et al., *Diversity Targets*, 29 REV. ACCT. STUD. 2157, 2157, 2169, 2171–72 (2024); NAT'L ASS'N OF COLLS. & EMPS., 2023 RECRUITING BENCHMARKS REPORT (2023), https://www.naceweb.org/store/2023/2023-recruiting-benchmarks-report-and-dashboard; Nat'l Ass'n of Colls. & Emps., 2017 Recruiting Benchmarks Report (2017), https://www.naceweb.org/uploadedFiles/files/2018/about-us/2017-nace-annual-report.pdf; Graduate Mgmt. Admission Council, Diversity Recruiting: Why It's Important—for Companies and Schools—and What Really Works (Nov. 14, 2016), https://www.gmac.com/market-intelligence-and-research/research-insights/recruitment-and-marketing/diversity-recruiting-why-its-important. A corporate arms race in virtue signaling also ensued—reaching recent heights of nearly $340 billion in "racial equity commitments" by Fortune 1000 companies, Earl Fitzhugh et al., *It's Time for a New Approach to Racial Equity*, MCKINSEY & CO. (Dec. 2, 2020), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/its-time-for-a-new-approach-to-racial-equity, and "nearly all Fortune 500 companies . . . list[ing] commitments to DEI on their websites" as of 2024, Johnathan Butcher, *Restoring Equality in Employment: Sinking the DEI Ship*, HERITAGE FOUND., Backgrounder No. 3875 (Nov. 27, 2024). *See also, e.g.*, Atinuke O. Adediran, *Disclosing Corporate Diversity*, 109 VA. L. REV. 307, 345–48 (2023).

Concepts drawn from "Critical Race Theory," *see supra* n. 8, also found greater purchase within business discourse and reoriented the discussion of workforce representation around terms such as "structural racism" and "white privilege." Mark R. Kramer, *The 10 Commitments*

*Companies Must Make to Advance Racial Justice*, HARV. BUS. REV. (June 4, 2020), https://hbr.org/2020/06/the-10-commitments-companies-must-make-to-advance-racial-justice; *see also, e.g.*, Akwasi Opoku-Dakwa & Darryl B. Rice, *A Place for Critical Race Theory and Wokeness in Diversity Strategies*, 38 ACAD. MGMT. PERSP. 214 (2024). Far from mere vernacular, however, CRT advocates themselves entered the corporate setting under the guise of "DEI consultants" paid to provide diversity training, implicit-bias workshops, and help shape hiring practices, SOCIAL JUSTICE VERSUS SOCIAL SCIENCE: WHITE FRAGILITY, IMPLICIT BIAS, AND DIVERSITY TRAINING 2–4, 55–75 (Craig Frisby & Robert Maranto eds., 2023); *see also, e.g.*, ROBIN DIANGELO, WHITE FRAGILITY: WHY IT'S SO HARD FOR WHITE PEOPLE TO TALK ABOUT RACISM 22–25 (2018)—culminating in a $3.8 billion industry that was previously projected to quadruple by 2026. Zak Ali, *With Global Spending Projected to Reach $15.4 Billion by 2026, Diversity, Equity & Inclusion Takes the Lead Role in the Creation of Stronger Businesses*, PR NEWSWIRE (Nov. 3, 2021), https://www.prnewswire.com/news-releases/with-global-spending-projected-to-reach-15-4-billion-by-2026--diversity-equity--inclusion-takes-the-lead-role-in-the-creation-of-stronger-businesses-301413808.html.

### 4.        Affirmative action invades Texas

Texas, unfortunately, was no stranger to this nationwide movement. Affirmative action in Texas began in the late 1980s with race conscious legislation in relation to local government contracting. *See, e.g.*, Act of May 26, 1987, 70th Leg., R.S., ch. 790, § 4, 1987 Tex. Gen. Laws 2774, 2776–77 (codified at TEX. TRANSP. CODE § 451.252) (local transportation authorities); Act of May 27, 1987, 70th Leg., R.S., ch. 1058, § 1, 1987 Tex. Gen. Laws 3590, 3590 (codified at TEX. CIV. PRAC. & REM. CODE § 106.001) (large home-rule municipalities); Act of May 4, 1989, 71st Leg., R.S., ch. 124, § 2, 1989 Tex. Gen. Laws 483, 485 (codified at TEX. TRANSP. CODE § 22.084) (jointly operated airports); Act of May 29, 1989, 71st Leg., R.S., ch. 1060, § 3, 1989 Tex. Gen. Laws 4305, 4307 (codified as TEX. LOC. GOV'T CODE § 381.004) (community and economic development plans for counties). Some measures overtly applied to a "minority business" or "minority business enterprises," with the term "minority" defined to "include[] blacks, Hispanics, Asian Americans, American Indians, and Alaska natives." Act of May 27, 1987, 70th Leg., R.S., ch. 1012, § 4, 1987 Tex. Gen. Laws 3414, 3414–15 (codified at TEX. TRANSP. CODE § 452.201) (regional transportation authorities); Act of May 27, 1987, 70th Leg., R.S., ch. 1058, § 1, 1987 Tex. Gen. Laws 3590, 3590 (codified at TEX. CIV. PRAC. & REM. CODE § 106.001); Act of May 28, 1989, 71st Leg., R.S., ch. 734, § 3, 1989 Tex. Gen. Laws 3296, 3297–98 (codified at TEX. TRANSP. CODE § 451.253) (metropolitan rapid transit authorities); Act of May 29, 1989, 71st Leg., R.S., ch. 1060, § 3, 1989 Tex. Gen. Laws 4305, 4307 (codified at TEX. LOC. GOV'T CODE § 381.004). Other legislation employed euphemisms such as "disadvantaged business" while still defining the enterprises in race-oriented terms, requiring ownership by "socially disadvantaged" persons such as "black Americans, Hispanic Americans, women, Asian Pacific Americans, and American Indians." *See* Act of May 29, 1989, 71st Leg., R.S., ch. 479, § 4, 1989 Tex. Gen. Laws 1650, 1651–52 (codified at TEX. LOC. GOV'T CODE § 351.1035) (contracts with counties for correctional facilities); Act of Mar. 25, 1991, 72d Leg., R.S., ch. 16, § 13.05(a), 1991 Tex. Gen. Laws 244, 347 (codified at TEX. LOC. GOV'T CODE §§ 375.003, .222) (municipal management districts). Seeking to avoid the appearance of imposing racial quotas, many of these measures authorized the relevant governmental entity to establish a "goal" for awarding a certain

proportion of contracts to businesses associated with certain minority groups or women. Act of May 27, 1987, 70th Leg., R.S., ch. 1012, § 4, 1987 Tex. Gen. Laws 3414, 3414–15 (codified at TEX. TRANSP. CODE § 452.201); Act of May 27, 1987, 70th Leg., R.S., ch. 1058, § 1, 1987 Tex. Gen. Laws 3590, 3590 (codified AT TEX. CIV. PRAC. & REM. CODE § 106.001); Act of May 29, 1989, 71st Leg., R.S., ch. 1060, § 3, 1989 Tex. Gen. Laws 4305, 4307 (codified at TEX. LOC. GOV'T CODE § 381.004); Act of May 28, 1989, 71st Leg., R.S., ch. 734, § 3, 1989 Tex. Gen. Laws 3296, 3297–98 (codified at TEX. TRANSP. CODE § 451.253); Act of Mar. 25, 1991, 72d Leg., R.S., ch. 16, § 13.05(a), 1991 Tex. Gen. Laws 244, 347 (codified at TEX. LOC. GOV'T CODE §§ 375.003, .222).

This early focus on local contracting soon expanded to statewide legal frameworks, addressing areas such as agriculture, corrections, and even the administration of the newly created state lottery. Act of May 26, 1989, 71st Leg., R.S., ch. 230, § 18, 1989 Tex. Gen. Laws 1026, 1032–33 (codified at TEX. AGRIC. CODE § 12.029); Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 6, § 2, 1991 Tex. Gen. Laws 197, 203, 206 (codified at TEX. GOV'T CODE §§ 466.107, .151); Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 10, § 19.06, 1991 Tex. Gen. Laws 180, 221 (codified at TEX. GOV'T CODE § 493.012). Likewise, race conscious measures were not confined to government contracting with private entities. Race even became a statutorily required factor in the appointment to certain government positions. *See, e.g.*, Act of May 17, 1991, 72d Leg., R.S., ch. 269, § 1, 1991 Tex. Gen. Laws 1178, 1178–79 (codified at TEX. HEALTH & SAFETY CODE § 103.002) (stating that "the governor shall attempt to appoint members of different minority groups including females, African-Americans, Hispanic-Americans, Native Americans, and Asian-Americans" to the Texas Diabetes Council); Act of May 17, 1991, 72d Leg., R.S., ch. 768, § 1, 1991 Tex. Gen. Laws 2735, 2735–37 (codified at TEX. OCC. CODE § 252.001) (same, State Board of Dental Examiners); Act of Aug. 25, 1991, 72d Leg., 2nd C.S., ch. 8, § 1.03, 1991 Tex. Gen. Laws 137, 137 (codified at TEX. GOV'T CODE § 2152.052) (same, State Purchasing and General Services Commission).

The Legislature attempted to soften affirmative racial targets as public criticism of racial quotas grew. For example, the Legislature began requiring that "good faith efforts" be undertaken toward predetermined numerical goals. *See* Act of Aug. 25, 1991, 72d Leg., 2nd C.S., ch. 10, § 19.06, 1991 Tex. Gen. Laws 180, 221 (codified at TEX. GOV'T CODE § 493.012) (mandating "a good faith effort to assist disadvantaged businesses to receive at least [twenty] percent of the total value of each construction contract"); Act of May 23, 1991, 72d Leg., R.S., ch. 677, § 5, 1991 Tex. Gen. Laws 2457, 2458 (codified at TEX. GOV'T CODE § 2161.181) (mandating "a good faith effort to assist disadvantaged businesses to receive at least [ten] percent of the total value of all contract awards"); Act of May 12, 1993, 73d Leg., R.S., ch. 242, § 1.15, 1993 Tex. Gen. Laws 502, 505–06 (codified at TEX. NAT. RES. CODE § 161.131) (mandating "a good faith effort to award to minority-owned businesses" at least twenty percent of bond-related contracts). The Legislature also implemented subjective "best value" criteria—infusing race and sex within the government contracting arena, Act of Mar. 7, 1995, 74th Leg., R.S., ch. 3, § 3, 1995 Tex. Gen. Laws 23, 24–25 (codified at TEX. EDUC. CODE § 73.115) (requiring the M.D. Anderson Cancer Center to "consider the impact on the ability of the institution to comply with laws and rules relating to historically underutilized businesses" in determining the "best value" for acquiring goods and

services); Act of May 27, 1995, 74th Leg., R.S., ch. 736, § 1, 1995 Tex. Gen. Laws 3846, 3847 (codified at TEX. EDUC. CODE § 51.9335) (medical and dental units of a public institution of higher education); Act of May 31, 1997, 75th Leg., R.S., ch. 1045, §§ 1–2, 4–5, 1997 Tex. Gen. Laws 3975, 3975–80 (codified at TEX. GOV'T CODE § 2155.144; TEX. HUM. RES. CODE § 32.043; TEX. HEALTH & SAFETY CODE §§ 12.055, 533.016) (governmental units, public hospitals, and agencies related to health and human services).

The statutory language of affirmative action continued to evolve, with the concept of a "historically underutilized business" (*i.e.*, "HUB") becoming the favored term across various statutory frameworks. *See* Act of May 28, 1993, 73d Leg., ch. 684, § 1, 1993 Tex. Gen. Laws 2537, 2537–38 (amending the predecessor to Chapter 2161 of the Government Code from "disadvantaged business" to "historically underutilized business"); Act of May 31, 1993, 73d Leg., R.S., ch. 881, §§ 1–5, 1993 Tex. Gen. Laws 3503, 3502–04 (codified at TEX. GOV'T CODE §§ 2252.121–.125) (public contracts with HUBs); Act of May 30, 1993, 73d Leg., R.S., ch. 906, § 1.06, 1993 Tex. Gen. Laws 3811, 3812–13 (codified at TEX. GOV'T CODE § 2161.063) (requiring state agencies to prepare a written plan for increasing the use of HUBs); Act of May 28, 1993, 73d Leg., R.S., ch. 988, § 4.07, 1993 Tex. Gen. Laws 4274, 4300–01 (amending section 493.012 of the Government Code from "disadvantaged businesses" to "historically underutilized businesses"). Similarly, grants for parks and recreational areas were newly directed to "recreation, conservation, or education programs for underserved populations," with such populations defined to include "any group of people that is . . . minority . . . or female." Act of May 14, 1999, 76th Leg., ch. 267, §§ 1–2, 1999 Tex. Gen. Laws 1130, 1130–31 (codified at TEX. PARKS & WILD. CODE §§ 24.001, .005).

Despite legal scrutiny, the 2000s saw affirmative action policies expand still further into new areas such as navigation districts, clean energy projects, and water funds. *See* Act of May 25, 2003, 78th Leg., R.S., ch. 307, § 1, 2003 Tex. Gen. Laws 1287, 1290 (codified at TEX. WATER CODE § 60.458); Act of May 29, 2007, 80th Leg., R.S., ch. 1277, § 1, 2007 2003 Tex. Gen. Laws 4261, 4261–62 (codified at TEX. GOV'T CODE § 447.013); Act of May 21, 2013, 83d Leg., R.S., ch. 207, § 2.02, 2013 Tex. Gen. Laws 877, 881–83 (codified at TEX. WATER CODE §§ 15.009, .435). However, those efforts slowed significantly in the last decade—perhaps reflecting legal risks and public skepticism about the efficacy of these policies. Very little race-conscious legislation has been enacted since 2015. *See generally* Act of Mar. 30, 2015, 84th Leg., R.S., ch. 1, § 3.1335, 2015 Tex. Gen. Laws 1, 557–58 (codified at TEX. HEALTH & SAFETY CODE § 533A.016) (allowing consideration of compliance with laws and rules relating to HUBs as part of "best value" determination for public expenditures related to intellectual disability services); Act of May 21, 2019, 86th Leg., R.S., ch. 577 (S.B. 300), § 1, 2019 Tex. Gen. Laws 1615, 1615 (codified at TEX. NAT. RES. CODE § 31.069) (requiring the General Land Office to observe laws and rules relating to HUBs when awarding indefinite quantity contracts in disaster areas); Act of May 26, 2025, 89th Leg., R.S., ch. 603, § 1, 2025 Tex. Gen. Laws 1403, 1403–04 (codified at TEX. LAB. CODE § 352.060) (allowing consideration of compliance with laws and rules relating to HUBs as part of "best value" determination for contracts related to provision of vocational rehabilitation services).

### G.  A return to first principles

Eventually, however, the nation embarked on a return to the first principles on which it was founded.

### 1.  U.S. Supreme Court

Less than a decade after endorsing racial carveouts within federal government contracting, *see supra* pp. 11–13, the Court in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (plurality op.), the Court rejected the practice at the state level. The city of Richmond, Virginia had adopted an ordinance requiring prime contractors on city projects to subcontract at least thirty percent of construction costs to minority-owned firms. *See id.* at 477–78. Justice O'Connor's plurality opinion reasoned that *Fullilove*'s lesser scrutiny did not extend to Richmond's program because the Fourteenth Amendment grants remedial power to the Federal Government while *restricting* state government action based on race. *See id.* at 490 (explaining "[t]hat Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori*, the States and their political subdivisions are free to decide that such remedies are appropriate" because "Section 1 of the Fourteenth Amendment is an explicit *constraint on state power*, and the States must undertake any remedial efforts in accordance with that provision" (emphasis added)). Justice O'Connor also emphasized that "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy," *id.* at 498, and the City did not provide a "strong basis in evidence" of its own past discrimination that would justify a race-based remedy, *id.* at 500. The plurality therefore rejected Richmond's claim that "past societal discrimination alone can serve as the basis for rigid racial preferences." *Id.* at 505.

In 1995, the Court closed the loop—overruling *Fullilove* and extending strict scrutiny to racial classifications in the context of federal contracting—in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). There, a Colorado subcontractor challenged a U.S. Department of Transportation program that gave prime contractors financial incentives to hire "socially and economically disadvantaged" subcontractors, as determined by "race-based presumptions." *Id.* at 204. The Court held that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Id.* at 227. Remanding rather than striking down the program outright, the Court left open the possibility that a narrowly tailored, evidence-based remedial program could survive review. *Id.* at 237–39. But the Court reiterated what it had held repeatedly: the Equal Protection Clause protects *all* races equally, and those who have been "disadvantaged by the government because of his or her race, whatever that race may be," without doubt "suffer[] an injury." *Id.* at 230.

Justice Scalia, who provided the fifth vote, explained that "government can never have a 'compelling interest' in discriminating on the basis of race in order to 'make up' for past racial discrimination in the opposite direction." *Id.* at 239 (Scalia, J., concurring). While "[i]ndividuals who have been wronged by unlawful racial discrimination should be made whole[,] . . . under our Constitution there can be no such thing as either a creditor or a debtor race" because "[t]hat concept is alien to the Constitution's focus upon the individual." *Id.* (citing U.S. CONST. amend. XIV, § 1).

He went on to explain that "pursu[ing] the concept of racial entitlement—even for the most admirable and benign of purposes—is to reinforce and preserve for future mischief the way of thinking that produced race slavery, race privilege and race hatred." *Id.* "In the eyes of government," he continued, "we are just one race here. It is American." *Id.* Justice Scalia thus concluded "[i]t is unlikely, if not impossible, that the challenged program would survive under this understanding of strict scrutiny." *Id.*

The Court next turned to the public education context in *Parents Involved in Community. School v. Seattle School District No. 1*, 551 U.S. 701 (2007), and rejected race-based decision making in the absence of a valid remedial interest. Two public school districts in Washington and Kentucky had "relie[d] upon an individual student's race in assigning [them] . . . to a particular school" in pursuit of "racial balance . . . within a predetermined range." *Id.* at 710. Applying strict scrutiny, the Court noted that "prior cases, in evaluating the use of racial classifications in the school context, have recognized two interests that qualify as compelling." *Id.* at 720. The first, "remedying the effects of past intentional discrimination," did not apply because Seattle had never segregated schools and Jefferson County had been released from a desegregation decree many years prior and did not advance a remedial interest. *Id.* at 720–21. The second, "the interest in diversity," was limited to higher education and "was not focused on race alone but encompassed 'all factors that may contribute to student body diversity.'" *Id.* at 722 (quoting *Bakke*, 438 U.S. at 337). "In the present cases, by contrast, race is not considered as part of a broader effort to achieve 'exposure to widely diverse people, cultures, ideas, and viewpoints,' race, for some students, is determinative standing alone." *Id.* at 723 (citation omitted). Ultimately, the Court held that diversity in primary and secondary education does not justify explicit racial classifications— signaling the Court's continued return toward a colorblind constitutional baseline, which recognizes that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Id.* at 748; *see also, e.g.*, *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291 (2014) (affirming a state's right to adopt color-blind policies like banning affirmative action in public education).

But another sixteen years would pass before the Court fulfilled *Grutter*'s promise in the context of higher education and dealt the final constitutional blow to affirmative action in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) ("*SFFA*"). Harvard and the University of North Carolina used admissions processes where race sometimes decided a student's fate. *Id.* at 192–97. The programs failed strict scrutiny, serving no compelling interests and lacking narrow tailoring. *Id.* at 214–18. The universities' asserted interests—training leaders, fostering pluralism, educating through diversity, refining cross-racial understanding, and others—were of a variety that precluded meaningful judicial review. *Id.* at 214–15. The programs also failed narrow tailoring because the universities "fail[ed] to articulate a meaningful connection between the means they employ and the goals they pursue." *Id.* at 215. Their racial categories proved both overinclusive and underinclusive, again undercutting purported diversity aims. *Id.* at 216. This "mismatch between the means respondents employ and the goals they seek" further hindered judicial scrutiny. *Id.* at 217. The programs further violated the constitutional prohibitions against using race as a "negative" or as a stereotype. *Id.* at 218–21. College admissions operate as "zero-sum," so advantages for some racial groups inherently disadvantage others. *Id.* at 218–19.

Race-based admissions thus acted as a "negative" because some racial groups would have gained more benefits without racial considerations. *Id.* at 219. Such programs also presumed uniform thinking by members of the same race, perpetuating stereotypes that subordinate individual merits to racial ancestry. *Id.* at 220–21.

*SFFA* also relied heavily on the "one final limit on race-based admissions programs" imposed by *Grutter*: "At some point, the Court held, they must end." *Id.* at 212 (citing *Grutter*, 539 U.S. at 342). Indeed, that "critical" requirement "was the reason the Court was willing to dispense temporarily with the Constitution's unambiguous guarantee of equal protection." *Id.* That willingness ended with *SFFA*, as the lack of a logical end point doomed Harvard and UNC's race-based admissions programs. *Id.* at 221–25. Vague pledges to end the programs once achieving "meaningful representation and meaningful diversity" without considering race fell short. *Id.* at 221. Claims that the endpoint would arrive when students could receive the educational benefits of diversity proved unmeasurable. *Id.* at 224. Nor would the Court grant a five-year reprieve tied to *Grutter*'s expectation that racial preferences would be unnecessary in [twenty-five] years, as neither university planned to discontinue race-based admissions within that timeframe. *Id.* Nor could periodic review of their continued necessity salvage the plans, since "*Grutter* never suggested that periodic review could make unconstitutional conduct constitutional." *Id.* at 225. This absence of measurable objectives, inevitable negative use of race, racial stereotyping, and lack of end points rendered the programs unconstitutional. *Id.* at 230.

Two years after rejecting race-based admissions in higher education, the Court in *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025), extended similar principles to the employment context under Title VII, rejecting heightened evidentiary burdens on majority-group plaintiffs alleging discrimination in favor of protected minorities. There, a heterosexual woman challenged her employer's denial of a promotion to a management position in favor of a less experienced lesbian candidate, followed by her demotion in favor of a gay man, both allegedly motivated by sexual-orientation based favoritism. *Id.* at 306. The Court held that Title VII imposes no special requirements on such "reverse discrimination" claims, emphasizing that the statute's disparate-treatment provision protects "any individual" from sex-based discrimination and "draws no distinctions between majority-group plaintiffs and minority-group plaintiffs." *Id.* at 309. The Court thus invalidated the "background circumstances" rule imposed by some circuits, which "effectively requires majority-group plaintiffs (and only majority-group plaintiffs) to produce certain types of evidence . . . that would not otherwise be required to make out a prima facie case" of discriminatory motive. *Id.* at 311. While that step "is not onerous" for most plaintiffs, "plaintiffs who are members of a majority group bear an additional burden" under the background circumstances rule. *Id.* at 309. But "Congress left no room for courts to impose special requirements on majority-group plaintiffs alone." *Id.* at 310. The background circumstances rule thus "flouts [the] basic principle" that "the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group." *Id.* The Court therefore held that "Title VII does not impose such a heightened standard on majority-group plaintiffs," *id.* at 313, punctuating its commitment to symmetrical application of antidiscrimination standards and ensuring consistent protections for all employees, regardless of sex or race.

## 2.     Federal Government

The federal government, too, has made recent progress renewing our national commitment to equality as opposed to feigned equity. Executive Orders 14151 and 14173, for example, aimed to swiftly dismantle DEI programs across both the public and private sectors.[9] The former required termination of DEI "mandates, policies, programs, preferences, and activities in the Federal Government." Exec. Order No. 14151, 90 Fed. Reg. 8339, 8339 § 2(a) (Jan. 20, 2025). It also directed federal agencies to terminate "'equity-related' grants or contracts," along with "all DEI . . . performance requirements for employees, contractors, or grantees." *Id.* at 8339 § 2(b)(i). Meanwhile, Executive Order 14173 targeted DEI programs in federal contracting by revoking Executive Order 11246, Exec. Order No. 14173, 90 Fed. Reg. 8633, 8634 § 3(b)(i) (Jan. 22, 2025), and requiring federal contractors and subcontractors "to comply with . . . civil-rights laws" and certify in "every contract" that they "do[] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," *id.* at 8634 § 3(b)(iv)(B). Executive Order 14173 also aimed to deter DEI programs in the private sector by directing federal agencies to, *inter alia*, "identify up to nine potential civil compliance investigations of publicly traded corporations" and other private employers. *Id.* at 8635 § 4(b)(iii). These executive orders set a clear policy to combat unlawful DEI initiatives and paved the way for further action by government agencies to advance this goal.

Recent actions by the U.S. Equal Opportunity Commission and Department of Justice reflect this shift in policy. The EEOC, for example, issued information requests to twenty major law firms in March 2025 concerning potentially unlawful DEI recruitment, fellowship, and advancement programs operating along race or gender lines. Press Release, U.S. EQUAL EMP. OPPORTUNITY COMM'N, *EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices* (Mar. 17, 2025), https://www.eeoc.gov/newsroom/eeoc-acting-chair-andrea-lucas-sends-letters-20-law-firms-requesting-information-about-dei. While several firms settled with the agency and publicly reaffirmed their commitment to merit based, nondiscriminatory employment practices, the EEOC's actions signal a willingness to aggressively enforce Title VII against unlawful DEI initiatives in the private sector. Press Release, U.S. EQUAL EMP. OPPORTUNITY COMM'N, *In EEOC Settlement, Four 'Big Law' Firms Disavow DEI and Affirm their Commitment to Merit-Based Employment Practices* (Apr. 11, 2025), https://www.eeoc.gov/newsroom/eeoc-settlement-four-biglaw-firms-disavow-dei-and-affirm-their-commitment-merit-based. The EEOC and DOJ have published guidance further confirming that "DEI policies, programs, or practices may be unlawful" under Title VII "if they involve an employer or other covered entity taking an employment action motivated—in whole or in part—by an employee's race, sex, or another protected characteristic." U.S. EQUAL EMP. OPPORTUNITY COMM'N, WHAT TO DO IF YOU EXPERIENCE DISCRIMINATION RELATED TO

---

[9] Executive Orders 14151 and 14173 are, of course, subject to ongoing litigation. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-333 (D. Md. filed Feb. 3, 2025); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. argued Sept. 11, 2025); *Nat'l Urb. League v. Trump*, No. 1:25-cv-00471 (D.D.C. filed Feb. 19, 2025); *Chi. Women in Trades v. Trump*, No. 25 C 2005 (N. D. Ill. filed Feb. 26, 2025). Other than Executive Order 14173's certification provision—an aspect that is subject to preliminary injunction, *Chi. Women in Trades v. Trump*, No. 25 C 2005 (N. D. Ill. Oct. 30, 2025)—both remain in effect.

DEI AT WORK, https://www.eeoc.gov/sites/default/files/2025-03/One_Pagers_2025-2_%28002%29_508.pdf (last visited Dec. 15, 2025) (emphasis omitted); *see also* Memorandum from Pam Bondi, U.S. Att'y Gen., to All Fed. Agencies (July 29, 2025), https://www.justice.gov/ag/media/1409486/dl (listing unlawful DEI practices).

Other federal agencies have followed suit in their respective spheres. The Office of Personnel Management, for instance, directed the closure of all government DEI offices and placed all workers in those offices on leave. Memorandum from Charles Ezell, Acting Dir., U.S. Off. of Pers. Mgmt., to Heads and Acting Heads of Dep'ts and Agencies (Jan. 21, 2025), https://www.opm.gov/media/e1zj1p0m/opm-memo-re-initial-guidance-regarding-deia-executive-orders-1-21-2025-final.pdf. The Department of Education has also acted to eliminate DEI initiatives, instructing educational institutions that receive federal funding to cease using race "as a factor in their admissions, hiring, promotion, compensation, scholarships, prizes, administrative support, sanctions, discipline, and beyond," or risk investigation and loss of federal funding.[10] Press Release, U.S. DEP'T OF EDUC., *U.S. Department of Education Directs Schools to End Racial Preferences* (Feb. 15, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-directs-schools-end-racial-preferences. Such agency actions demonstrate the far-reaching nature of the federal government's renewed commitment to a long-forgotten truth: "Any allocation of benefits and burdens based on a person's race is an anathema to the U.S. Constitution." 49 Op. O.L.C. __ (Dec. 2, 2025).

### 3. Texas

Likewise, Texas has made significant strides toward eliminating all forms of discrimination. For example, in 2023, the Legislature passed Senate Bill 17, which banned DEI programing in higher education. The Education Code now defines DEI office to include those established for the purpose of (1) influencing hiring practices with respect to race, sex, color, or ethnicity; (2) promoting differential treatment based on these protected characteristics; (3) promoting policies or procedures with respect to these characteristics; (4) and conducting training programs and activities implemented in reference to these protected characteristics. TEX. EDUC. CODE § 51.3525(a). This prevents institutions of higher education from maintaining a DEI office, hiring anyone to perform the work of DEI offices, compelling or soliciting DEI statements, giving preference to applicants based on protected characteristics, and requiring students to participate in DEI training. *Id.* § 51.3525(b)(1). The statute also prevents institutes of higher education from spending money appropriated to the institution for a state fiscal year until the governing board of the institution certifies compliance to the Legislature and the Texas Higher Education Coordinating Board. *Id.* § 51.3525(e).

---

[10] To be sure, a district court recently held that the Department of Education's "Dear Colleague Letter" setting out its DEI policy was unconstitutional. *Am. Fed'n of Tchrs. v. U.S. Dep't of Educ.*, 796 F. Supp. 3d 66 (D. Md. 2025). But an appeal of this decision was recently filed in the United States Court of Appeals for the Fourth Circuit, *Am. Fed'n of Tchrs. v. U.S. Dep't of Educ.*, No. 25-2228 (4th Cir. Oct. 15, 2025), and we offer no comment on that ongoing litigation.

The Governor has also acted to curb racial discrimination through executive order. On January 31, 2025, Governor Abbott issued Executive Order No. GA-55, directing state agencies to comply with the "color-blind guarantee of our state and federal Constitutions by prohibiting all forms of government race discrimination." Tex. Gov. Exec. Order No. GA-55, 50 Tex. Reg. 810 (Feb. 14, 2025). The executive order explained that the Texas and U.S. Constitutions "require that state governments always treat people equally regardless of membership in any racial group, refusing to place a thumb on the scale for or against anyone based on race." *Id.* at 1. But "in recent years, there has been a concerted effort to invert this commitment to equal treatment through diversity, equity, and inclusion (DEI), critical race theory (CRT), affirmative action, and other divisive agendas." *Id.* The executive order explained that these "blatant efforts to divide people are just new forms of racism, often weaponized in reverse and rooted in the idea that a person may be inherently good or bad, the oppressed or the oppressor, based on racial identity." *Id.* Moreover, by "promoting ideas like inherent bias, collective guilt, racial superiority, cultural appropriation, and other similar notions," these "racist efforts seek to establish creditor and debtor races," which is "inherently antithetical to a society in which 'all men are created equal.'" *Id.* The executive order also explained that "no state agency" may "employ practices or communicate speech rooted in the unlawful idea that a person is inherently good or bad, blameworthy or innocent, or entitled or disentitled based on race." *Id.* Therefore, the Governor directed "all state agencies to comply with the color-blind guarantee of both the state and federal Constitutions, including by ensuring that all agency rules, policies, employment practices, communications, curricula, use of state funds, awarding of governmental benefits, and all other official actions treat people equally, regardless of race." *Id.* at 2.

This past legislative session, the Legislature again acted to eliminate racial discrimination in education—this time in kindergarten through twelfth grade. Senate Bill 12 amended the Texas Education Code by adding Section 11.005. This provision prohibits DEI duties in public schools. The statute defines those duties to include (1) influencing "hiring or employment practices with respect to race, sex, color, or ethnicity;" (2) "promoting differential treatment of or providing special benefits to individuals" on the basis of these protected characteristics (with noted exceptions); (3) developing policies or procedures that reference these protected characteristics (with exceptions); and (4) requiring or soliciting a DEI statement or giving preferential treatment because of such a statement. TEX. EDUC. CODE § 11.005(a). As such, Texas school districts are forbidden from assigning these duties and must actively prohibit employees, contractors, or volunteers from engaging in such duties. *Id.* § 11.005(a). Like Senate Bill 17, Senate Bill 12 aims to prevent all race-based discrimination, including preferential treatment or benefits tied to race.

Likewise, as of December 2, 2025, the Comptroller announced the removal of women- and minority-owned businesses from Texas' HUB program—focusing instead on HUB certification for businesses owned by disabled veterans. Paul Cobler, *Texas Removes Women and Minorities from Historically Underutilized Business Program for State Contracts*, TEX. TRIBUNE (Dec. 2, 2025), https://www.texastribune.org/2025/12/02/texas-historically-underutilized-business-program-hub-women-minorities/. The Comptroller announced that the change was made to restore "constitutional integrity" to the HUB program and ensure that "Texas' state contracting is free from gender or race discrimination." *Id.* Still, the statutory race- and sex-preferences memorialized

within the HUB program remain in force and are subject to constitutional challenge. *See infra* Part II.A.1 (discussing the HUB program's constitutional infirmities).

## II.     DEI in Texas

It is with the foregoing foundation established that we proceed to apply these principles in Texas. Questions concerning DEI arise in multiple settings, and the law does not treat all alike. Meaningful analysis therefore requires attention to context—particularly the material distinctions between DEI in the public and private sectors, which we treat separately in Parts A and B.

### A.     Public Sector

#### 1.     Texas' HUB programs are unconstitutional

Texas's HUB framework erects a pervasive, discriminatory regime that violates the U.S. Constitution's Equal Protection Clause as well as the Texas Constitution's Equal Rights Amendment through indefensible fixation on sex and race.[11] This statutory scheme defines HUB status (and thus access to lucrative government benefits) by race and sex, rendering the HUB program presumptively discriminatory and triggering strict scrutiny. *See infra* Part II.A.1.i. This scheme mandates "good faith efforts" to meet race- and sex-based targets, which masquerade as goals but function as de facto quotas that want for any legitimate governmental end. *See infra* Part II.A.1.ii. The HUB program also extends these race- and sex-based preferences to subcontractors, further eroding any notion that these government benefits are coupled with any claim of the government's own past direct discrimination. *See infra* Part II.A.1.iii. Likewise, under the guise of "best value" procurement, a variety of statutes empower bureaucrats to disregard lower bids from disfavored bidders while treating race and sex as proxies for competence. *See infra* Part II.A.1.iv. Exclusive training, outreach forums, and insider access further benefit HUBs, while competitors incur penalties for attempting to participate. *See infra* Part II.A.1.v. At bottom, this regime lacks any constitutional foundation on which to legitimately distribute burdens and benefits based on immutable traits like race or sex and requires invalidation—from root to branch.[12]

---

[11] We recognize that "race" and "ethnicity" are distinct concepts that respectively relate to "one's phenotypic constitution" and "one's anthropological and cultural identity." *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 479 n.53 (N.D. Tex. 2024). "Both are protected classes the consideration of which merits strict scrutiny." *Id.*; *see also, e.g.*, *In re Shaw*, 204 S.W.3d 9, 17–18 (Tex. App.—Texarkana 2006, pet. ref'd) ("[L]aws involving government intrusion which impact persons based on their race or ethnicity are subject to strict scrutiny . . . ."). But, like the court in *Nuziard*, we use the term "race" to cover both "simply because precedents use that verbiage more." *Nuziard*, 721 F. Supp. 3d at 479 n.53.

[12] This opinion embraces a unified approach to race- and sex-based discrimination under the strict scrutiny standard that inheres to both the U.S. and Texas Constitutions alike. As detailed earlier, *see supra* Part I.E, sex-based classifications are also subject to strict scrutiny under the Texas Constitution—obviating any need to consider such provisions under the U.S. Constitution's less stringent intermediate scrutiny standard. *Cf., e.g.*, *Richards v. League of United Latin Am. Citizens*, 868 S.W.2d 306, 311 n.3 (Tex. 1993) (recognizing shared scrutiny under both the U.S. Constitution and Texas' Equal Rights Amendment). That said, nothing in this opinion should be taken to suggest that sex-based classifications would survive a less rigorous standard of review.

###### i. Explicit racial and sex-based classifications render HUB programs presumptively discriminatory

Chapter 2161 of the Government Code erects a common scaffolding that resides, to varying degrees, within almost every HUB program in Texas.[13] *See generally* TEX. GOV'T CODE §§ 2161.001–.253. Framed simply, the scheme endows a competitive edge to minority- and women-owned businesses through "preferential treatment" in government contracting and procurement. *See, e.g.*, *Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 870–71 (Tex. App.— Austin 2018, pet. denied); *see also, e.g.*, TEX. GOV'T CODE § 2161.004. This professes to serve those who have "suffered the effects of discriminatory practices or other similar insidious circumstances over which the person has no control." TEX. GOV'T CODE § 2161.001(3)(B).

To this end, the Comptroller of Public Accounts is charged with administering the HUB program, adopting rules,[14] and requiring associated information from state agencies. *Id.* §§ 2161.0012, .002(a). Among the Comptroller's wide-ranging powers and duties is the obligation to "certify" as well as "maximize the number of certified" HUBs through agreements with local governments and nonprofits. *Id.* § 2161.061(a)–(c); *see also id.* § 2161.061(d)–(e) (providing that participating entities must follow Comptroller timelines for certification and maintain searchable databases of HUB information). Additionally, the Comptroller is commanded to "encourage" agencies' use of HUBs by collaborating on "statewide policy for increasing the use of historically underutilized businesses" and "assisting" these agencies "in seeking historically underutilized businesses capable of supplying required goods or services," "identifying and advising historically underutilized businesses on the types of goods and services the agencies need," and "increasing the amount of business placed with historically underutilized businesses."[15] *Id.* § 2161.063(a). The Comptroller is also expected to compile, maintain, and update a HUB directory for state purchasing and public works awards; biannually distribute that compilation to municipalities; and

---

[13] Other statutes incorporate Chapter 2161 and extend its reach. *See, e.g.*, TEX. GOV'T CODE §§ 791.011(g) (purchases or purchasing services pursuant to interlocal contracts), 825.514 (Teacher Retirement System), 2054.381(b) (contracting and procurement related to statewide technology centers). Yet more statutes identify additional entities—like the Texas Economic Development and Tourism Office—who play a key role in HUB programs through the Small Business Advocate and Office of Small Business Assistance. *See id.* §§ 481.0067, .0068. Both entities serve as "the principal focal point in the state" for HUBs, *id.* §§ 481.0067(c)(1), .0068(b)(2), and identify financial and regulatory barriers for HUBs as well as funding sources, *id.* §§ 481.0067(c)(2), .0068(b)(4), (11). These entities also "perform research, studies, and analyses" on HUB issues. *Id.* §§ 481.0067(c)(4), .0068(b)(14); *see also, e.g.*, *id.* § 481.0068(b)(3), (6)–(8) (detailing OSBA-specific endeavors).

[14] The Comptroller recently adopted emergency rules—effective from December 2, 2025 until April 1, 2026, 50 Tex. Reg. 7945, 7953–61 (2025)—substantively altering the regulatory framework for HUBs. *See supra* Part I.G.3. But the propriety of these rules is beyond the scope of this opinion, which speaks to the underlying statutory frameworks that remain in force.

[15] The chapter itself bolsters encouragement by requiring that certain, larger state agencies designate a HUB coordinator to manage training on HUB recruitment and retention, report to the Comptroller, and connect HUBs with staff. TEX. GOV'T CODE § 2161.062(e). Provisions outside the chapter also authorize agencies to dedicate additional resources toward HUBs as well. *See, e.g.*, *id.* § 651.010(b)(1) (authorizing agencies to "hire an entrepreneur-in-residence or contract with an individual, chamber of commerce, or nonprofit entity" to improve HUB outreach).

provide that information to other local governments on request.[16] *Id.* § 2161.064. Additionally, the Comptroller is to create HUB initiatives like the mentor-protégé program and exclusive business forums. *Id.* §§ 2161.065–.066.

Chapter 2161 bases HUB status on one of five criteria linked to "economically disadvantaged persons."[17] *Id.* § 2161.001(2). The chapter expressly defines such persons to include "Black Americans," "Hispanic Americans," "women," "Asian Pacific Americans," and "Native Americans."[18] *Id.* § 2161.001(3)(A). In turn, to qualify as a HUB, an entity must be either a corporation majority-owned by economically disadvantaged persons; a sole proprietorship completely owned and controlled by an economically disadvantaged person; a for-profit partnership majority owned by economically disadvantaged persons; a joint venture in which each entity qualifies as a HUB; or a supplier contract in which the HUB manufactures, distributes, or warehouses and ships supplies and materials. *Id.* § 2161.001(2)(A)–(E). Were there any doubt, Chapter 2161 confirms its fixation on race- and sex-based groups by requiring consolidated reports on contract awards that are themselves categorized "by sex, race, and ethnicity." *Id.* § 2161.125.

Other HUB variants follow suit and incorporate some or all of the five HUB definitional categories.[19] *See, e.g.*, TEX. TRANSP. CODE §§ 284.007(d), 431.109(e) (listing the same five categories); TEX. GOV'T CODE § 493.012(c)(1) (listing two categories of majority-owned for-profit businesses); TEX. TRANSP. CODE § 223.041(b) (referencing Section 2161.001); TEX. GOV'T CODE §§ 2252.121(2), .124 (referencing Section 2161.001 with added requirements). Dispensing with secondary euphemisms like "economically disadvantaged persons," these frameworks openly trace the scope of HUBs with race- and sex-based definitions. *See, e.g.*, TEX. TRANSP. CODE

---

[16] The Comptroller also "maintain[s] a centralized master bidders list" for procurement by state agencies, *id.* §§ 2155.261–.270, which state agencies may supplement with their own list of HUBs to increase the number of HUBs submitting bids to the agency, *id.* § 2155.268(b). Registration for the master bidders list supports Chapter 2161 through the collection of registration fees used to prevent fraud in the HUB program. *Id.* § 2155.266(b).

[17] This definition extends beyond Chapter 2161, as other provisions of state law specifically incorporate that chapter's HUB definition by reference. *See, e.g.*, *id.* § 1232.124(2); TEX. HEALTH & SAFETY CODE § 102.259; TEX. LOC. GOV'T CODE § 335.076(b); TEX. WATER CODE § 15.431(3).

[18] Subsection 2161.001(3)(A) additionally includes "veterans as defined by 38 U.S.C. Section 101(2) who have suffered at least a [twenty] percent service-connected disability as defined by 38 U.S.C. Section 101(16)" as economically disadvantaged persons. *See* Act of May 26, 2013, 83d Leg., R.S., ch. 1255, § 1, 2013 Tex. Gen. Laws 3178, 3178–79 (codified at TEX. GOV'T CODE § 2161.001(3)(A)(vi)). Veterans are not a suspect class, so such a provision is subject to, and easily passes, rational basis review. *See generally Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979). Further, the statute's explicit inclusion of disabled veterans supersedes a previous attorney general's dubious statement that "[b]ecause the term 'historically underutilized business' as defined by [the predecessor statute] is limited to businesses owned by persons identified as members of groups defined by gender, race, or ethnicity, we must conclude that the commission is not authorized to promulgate a rule to deem businesses owned by individuals with disabilities as 'historically underutilized businesses.'" Tex. Att'y Gen. Op. No. DM-328 (1995) at 4.

[19] Of note, some provisions incorporate by reference HUB definitions from statutes that have since been repealed. *See, e.g.*, TEX. GOV'T CODE § 447.013(i) (defining HUBs with reference to "former Section 481.191, as that section existed on January 1, 2015"); TEX. UTIL. CODE §§ 39.909(a), 52.256(a) (same); *see also* Act of May 20, 2015, 84th Leg., R.S., ch. 364, § 1(1), 2015 Tex. Gen. Laws 1554, 1554 (repealing Subchapter N of Chapter 481 of the Government Code, including subsection 481.191(4), which defined HUBs in terms of the first four categories but did not include a supplier contract).

§§ 284.007(d)(1), 431.109(e)(1) (listing "African Americans, Hispanic Americans, women, Asian Pacific Americans, and Native Americans"); TEX. GOV'T CODE § 493.012(c)(1) (listing "women, African Americans, Hispanic Americans, Native Americans, and Asian Americans").

The problem, of course, is that these "[f]acial classifications engender a presumption of discriminatory purpose." *Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 694 (6th Cir. 2006)); *accord, e.g.*, *SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012). Such classifications can only rest upon the narrowly tailored pursuit of a compelling, governmental end. *Lewis v. Ascension Par. Sch. Bd.*, 662 F.3d 343, 348 (5th Cir. 2011); *accord Virdi v. DeKalb Cnty. Sch. Dist.*, 135 F. App'x 262, 267 (11th Cir. 2005). Good intentions fail this exacting standard for the simple reason that "[a] racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Feeney*, 442 U.S. at 272. But virtually every aspect of Texas' approach to HUBs lacks constitutional justification and, as discussed below, the "moral imperative of racial neutrality" thus demands invalidation. *See Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) (quoting *Croson*, 488 U.S. at 518 (Kennedy, J., concurring in part and concurring in judgment)).

    ii.    **Requirements for "good faith efforts" to meet HUB utilization "goals" create a de facto race- and sex-based quota system that fails strict scrutiny**

Chapter 2161 requires that the Comptroller "adopt rules to provide goals for increasing the contract awards" to HUBs based on the results of the 1994 "State of Texas Disparity Study" prepared by the National Economic Research Associates.[20] TEX. GOV'T CODE §§ 2161.002(c), .181–.82. As such, the Comptroller traditionally promulgates "statewide HUB utilization goals." *See, e.g.*, 41 Tex. Reg. 8746, 8772 (2016) (proposing former 34 TEX. ADMIN. CODE § 20.284(b)); *see also* 42 Tex. Reg. 225, 235 (2017) (adopting proposed regulation). The most recent iteration of those regulatory benchmarks targeted "11.2% for heavy construction other than building contracts," "21.1% for all building construction, including general contractors and operative builders contracts," "32.9% for all special trade construction contracts," "23.7% for professional services contracts," "26.0% for all other services contracts," and "21.1% for commodities contracts." 50 Tex. Reg. 7935, 7955–56 (2025). With these starting points, agencies are obligated to develop "strategic plan[s]" that articulate "a policy or mission statement relating to increasing the use of [HUBs]" as well as "goals" and "specific programs" serving these memorialized ends— with the Comptroller's assistance, on request—that are subject to "random periodic monitoring."[21] TEX. GOV'T CODE § 2161.123; *see also id.* § 2161.127(b) (explaining these goals and agencies' compliance therewith are to be submitted in legislative appropriation requests). Other schemes set

---

[20] Those rules are subject to revision "in response to the findings of any updates of the study that are prepared on behalf of the state." TEX. GOV'T CODE § 2161.002(c).

[21] Other statutes sometimes impose additional consequences for failing to reach statewide HUB utilization goals. *See, e.g.*, TEX. WATER CODE § 15.009(o) (requiring the Texas Water Fund Advisory Committee to make recommendations to the Texas Water Development Board for improving HUB participation levels if the "aggregate level of participation" in certain projects funded by bond enhancement agreements "does not meet statewide annual goals adopted under Chapter 2161").

similar goals that are independently linked to other metrics. *See, e.g.*, TEX. TRANSP. CODE §§ 284.007(b), 431.109(c) (involving federal requirements or goals for "disadvantaged businesses" under Section 201.702 of the Transportation Code).

Rather than flagrantly branding this as a quota system, of course, HUB frameworks require "good faith efforts" toward the designated goals. This pertains to both the initial goals articulated in their strategic plans, TEX. GOV'T CODE § 2161.123(d)(5), as well as their attempts to increase fiscal-year contract awards to HUBs, *id.* §§ 2161.181 (contract awards for the purchase of goods and services), .182(a) (contract awards for construction).[22] Sections 2161.181 and 2161.182 influence other frameworks through direct reference to the Comptroller's HUB rules. *See, e.g.*, *id.* § 2155.137(b) (subjecting emergency purchases by a state agency to Section 2161.181); TEX. LOC. GOV'T CODE § 335.076(c)–(d) (referencing sections 2161.181 and 2161.182 with regard to certain sports and venue projects); TEX. TRANSP. CODE § 223.041(b) (requiring transportation expenditures "in accordance with the good-faith-effort procedures outlined in the rules adopted by the comptroller"). Yet more statutes independently mandate good faith efforts toward HUB-related goals as well.[23] *See, e.g.*, TEX. TRANSP. CODE §§ 284.007(a) (contracts for transportation projects in certain counties), 431.109(b) (contracts for public transportation in certain counties). Others simply provide that the government entity "shall consider" contracting with HUBs. *See, e.g.*, TEX. GOV'T CODE § 1232.124(2); TEX. HEALTH & SAFETY CODE § 102.204. Some statutes even set numerical goals directly. *See* TEX. GOV'T CODE § 493.012(a) (requiring "a good faith effort to assist historically underutilized businesses to receive at least [thirty] percent of the total value of" certain contracts).

In terms of constitutional propriety, however, these race- and sex-based utilization goals necessarily fail strict scrutiny's "daunting two-step examination." *See SFFA*, 600 U.S. at 206–07. First, any "effort to alleviate the effects of societal discrimination is not a compelling interest." *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996). Neither can outdated disparity studies support a compelling interest where they rest on "an amorphous claim that there has been past discrimination in a particular industry." *Croson*, 488 U.S. at 499. While "significant statistical disparities can support an inference of discrimination," "disparities [without more] don't cut it." *Nuziard*, 721 F.

---

[22] A prior attorney general concluded that certain state boards were required to comply with a predecessor to Section 2161.181 "when contracting for the services of investment brokers." Tex. Att'y Gen. Op. No. DM-184 (1992) at 4. This opinion observed that the relevant boards of trustees were "required to make a good faith effort to assist disadvantaged businesses to receive at least [ten] percent of the total value of all contract awards." *Id.* Because that requirement is no less unconstitutional today than before, *Miller v. Davis*, 150 S.W.2d 973, 978 (Tex. 1941) ("If an Act is unconstitutional, it is no law at all."), DM-184 is overruled.

[23] Some prove less exacting and require good faith efforts without quantitative goals. *See, e.g.*, TEX. GOV'T CODE §§ 2157.068(c), 2306.5553(a) (both requiring "good faith efforts to provide contracting opportunities for, and to increase contract awards to, historically underutilized businesses"). Even less rigorous standards control in other contexts. *See, e.g.*, TEX. UTIL. CODE § 12.252 (authorizing the Public Utilities Commission to require regulated utilities "to make an effort to overcome the underuse of historically underutilized businesses" without reference to good faith); TEX. INS. CODE § 443.0135(a) (requiring that the bidding process for special deputies to include "procedures to promote the participation" of HUBs); TEX. GOV'T CODE § 447.013(i) (providing that recipients under the advanced clean energy project grant and loan program are "encouraged to purchase goods and services" from HUBs). Regardless, none bears claim to constitutional reprieve for the race- and sex-based preferences therein.

Supp. 3d at 480 (cleaned up). Studies that want for "the who, what, when, where, why, and how of relevant discrimination" provide *nothing* by way of "guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id.* at 480–81 (cleaned up).

Nor is it of any moment that the HUB framework calls for a "good faith effort" when utilization goals serve as de facto quotas that are anything but narrowly tailored. "Whether . . . described as a quota or a goal," these statutory imperatives inescapably reflect "a line drawn on the basis of race and ethnic status." *Bakke*, 438 U.S. at 289. Public institutions "cannot establish quotas for members of certain racial groups or put members of those groups on separate . . . tracks" for government benefits, "insulate applicants who belong to certain racial or ethnic groups from . . . competition," or justify differential treatment in public programs through an interest in achieving "some specified percentage of a particular group merely because of its race or ethnic origin." *Grutter*, 539 U.S. at 334, 329–30 (cleaned up). This system of race- and sex-based benchmarking therefore proves unlawful in that it inescapably treats "two or more classifications of similarly situated persons . . . differently," *Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012), and any "semantic distinction is beside the point," *Bakke*, 438 U.S. at 289. *See also, e.g.*, *W.H. Scott Const. Co. v. City of Jackson*, 199 F.3d 206, 215 (5th Cir. 1999) (explaining "it is irrelevant whether the [program itself] establishes 'goals' or 'quotas' for . . . participation" in a minority- and women-owned business contracting program); *Bras v. Cal. Pub. Utilities Comm'n*, 59 F.3d 869, 874–75 (9th Cir. 1995) (same, emphasizing "the economic realities . . . rather than the label" and holding statutory preferences were not "immunized from scrutiny").

### iii. Race- and sex-based preferences in HUB subcontracting mandate, and fail, strict scrutiny

HUB programs also impermissibly extend race- and sex-based preferential treatment to subcontractors. Some provisions allow state agencies to satisfy utilization goals indirectly through HUB subcontractors. *See, e.g.*, TEX. GOV'T CODE § 2306.5553(c) (providing that the Texas State Affordable Housing Corporation "may achieve annual procurement goals under this section by contracting directly with historically underutilized businesses or by contracting indirectly with those businesses through the provision of subcontracting opportunities"). More commonly, HUB provisions mandate "good faith" efforts to expand HUB subcontracting. *See, e.g.*, *id.* § 2155.505(c) (requiring the Comptroller to "strongly encourage" non-HUB vendors on multiple award schedules to use HUBs or small businesses, with vendors that do not make "a good faith effort" subject to award-schedule exclusion); *see also, e.g.*, TEX. INS. CODE § 443.0135(b) (requiring that bidders seeking selection as special deputies for a receiver rehabilitating or liquidating an insurer detail their "efforts" to engage HUBs as subcontractors and plans for using HUBs to administer the receivership estate).

Under Chapter 2161, agencies must "determine whether there will be subcontracting opportunities" under certain large contracts "before the agency solicits bids, proposals, offers, or other applicable expressions of interest for the contract." TEX. GOV'T CODE § 2161.252(a). If subcontracting appears probable, bidders must submit HUB subcontracting plans to qualify as responsive. *Id.* § 2161.252(a)–(b). Awarded contracts then incorporate these plans as binding

terms, requiring prime contractors to "make good faith efforts to implement the plan."[24] *Id.* § 2161.253(a). Contractor participation in a mentor-protégé program and protégé subcontracting are said to evince such good faith efforts. *Id.*; *see also id.* § 2161.065(a) (requiring the comptroller to "design a mentor-protege program to foster long-term relationships between prime contractors" and HUBs to increase the latter's ability "to receive subcontracts under a state contract"). Moreover, should subcontracts deviate from the plan, the prime contractor must explain the discrepancy to the agency and "describe the good faith efforts made to find and subcontract with another [HUB]." *Id.* § 2161.253(b). Noncompliance ultimately triggers penalties, as agencies may bar prime contractors from future contracting opportunities. *Id.* § 2161.253(d).

Under strict scrutiny, however, a compelling governmental interest demands proof of either "prior discrimination by the governmental unit involved" or "passive participa[tion] in a system of racial exclusion." *Croson*, 488 U.S. at 492 (cleaned up); *Lomack v. City of Newark*, 463 F.3d 303, 307 (3d Cir. 2006) (same). Absent that, "race-based remedial measures violate equal-protection principles." *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021). Yet past discrimination arising from the independent subcontracting decisions of prime contractors will, by its very nature, rarely implicate direct government participation. Discrimination by the government itself would instead involve its refusal to engage prime contractors on the basis of race or sex. Moreover, to the extent that the HUB program purports to remedy the government's own prior direct discrimination, its extension into subcontracting proves "overinclusive" and lacks the requisite "close fit" to the targeted harm—again failing strict scrutiny. *Nuziard*, 721 F. Supp. 3d at 489; *see also Croson*, 488 U.S. at 493 (explaining that strict scrutiny "ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype").

HUB provisions targeting subcontractors also falter on claims of the government's bygone passive participation. The disparity study does not "target a specific episode of past discrimination," *Vitolo*, 999 F.3d at 361, and merely highlights statistical disparities between groups. Neither does the report demonstrate that the government "induce[d], encourage[d] or promote[d] private persons to accomplish what it is constitutionally forbidden to accomplish." *See Norwood v. Harrison*, 413 U.S. 455, 465 (1973); *see also Nuziard*, 721 F. Supp. at 483 (observing the record "contains no concrete evidence of government 'induction, encouragement, or

---

[24] As one opinion by then-Attorney General Cornyn unfortunately demonstrated, such "good faith efforts" oftentimes amount to little more than added costs to taxpayers without any accompanying benefits. Specifically, that administration determined that use of a so-called "pass-through" entity could count toward a vendor's good faith HUB participation goal. *See generally* Tex. Att'y Gen. Op. No. JC-0315 (2000). But these schemes are rightly subject to criminal prosecution at the federal level. *See, e.g.*, *Kousisis v. United States*, 605 U.S. 114, 119 (2025) (observing that participation "as a mere 'pass-through' entity" was fraudulent and "contravened DOT's rule that a contributing disadvantaged business must 'perfor[m] a commercially useful function'"). And even were they not, such practices not only run afoul of the Texas Equal Rights Amendment but may implicate the Texas Gift Clauses as well. *See Borgelt v. Austin Firefighters Ass'n, IAFF Loc. 975*, 692 S.W.3d 288, 301 (Tex. 2024) (providing that an expenditure of public funds must not be "gratuitous" and must have as its "predominant objective" the accomplishment of "a legitimate public purpose, not to provide a benefit to a private party"). This leaves no lawful foundation for contractual arrangements that provide participants with compensation for fulfilling racial or sex-based criteria rather than valid commercial contributions. We therefore overrule JC-0315.

promotion' of credit discrimination"). At bottom, "[p]recedent requires specifics to prove even passive participation." *Nuziard*, 721 F. Supp. 3d at 483. But there are no such specifics on which to shore these subcontracting provisions and, as such, they cannot survive constitutional scrutiny.

iv.     **The procurement process is infused with race- and sex-based priority for HUBs over lower bids by competitors**

HUBs also receive significant advantages in contracting and procurement. Various statutes require that government entities consider their ability to comply with "laws and rules" involving HUBs when dispensing lucrative awards. *See, e.g.*, TEX. EDUC. CODE § 44.031(b)(6) (School Districts); TEX. NAT. RES. CODE § 31.069(f) (General Land Office); TEX. GOV'T CODE § 2269.055(a)(4), (b)(1) (Construction Projects); TEX. WATER CODE § 60.458(6) (Navigation Districts). Yet more graft this express fixation on HUB compliance into the *mandatory* "best value" considerations. *See, e.g.*, TEX. EDUC. CODE §§ 51.9335(b)(6) (Institutions of Higher Education), 73.115(b) (M.D. Anderson Cancer Center), 74.008(b)(6) (University of Texas Medical Branch at Galveston); TEX. LAB. CODE § 352.060(c)(6) (Rehabilitation Council of Texas). Likewise, other statutes provide that government entities "may" choose to do so themselves,[25] TEX. GOV'T CODE § 2155.144(d)(6) (Health and Human Services Agencies); TEX. HEALTH & SAFETY CODE §§ 12.055(c)(6), 533.016(c)(6), 533A.016(c)(6) (Department of State Health Services and Local Health Authorities); TEX. HUM. RES. CODE § 32.043(c)(6) (Public Disproportionate Share Hospitals); TEX. LOC. GOV'T CODE § 252.043(b)(6) (Municipalities)— though this frequently comes with a requirement that the entity document whether they "considered . . . relevant factors" like HUB compliance in making their decision, *see, e.g.*, TEX. GOV'T CODE § 2155.144(c); TEX. HEALTH & SAFETY CODE §§ 12.055(b), 533.016(b), 533A.016(b); TEX. HUM. RES. CODE § 32.043(b). This collectively operates to throw open the public coffers for HUBs that are not "the *lowest* bidder." *Walker v. Univ. of Tex. Med. Branch*, No. 1:08-CV-417, 2009 WL 2461024, at *8 (E.D. Tex. Aug. 7, 2009) (citing TEX. EDUC. CODE § 74.008(b)); *accord E-Transit, Inc. v. City of Eagle Pass*, No. DR-23-CV-00021, 2023 WL 3681722, at *2 (W.D. Tex. Apr. 13, 2023) (citing TEX. LOC. GOV'T CODE § 252.043(b)); *see also, e.g.*, TEX. GOV'T CODE § 2267.053(b-1); TEX. LOC. GOV'T CODE § 252.043(a). Even more, state agencies subject to sunset review find themselves in a situation where HUB consideration takes on existential importance: The Sunset Review Commission evaluates compliance with "state law and applicable rules of any state agency regarding purchasing guidelines and programs for historically underutilized businesses" when determining whether a public need exists for the agency's continued existence. *See, e.g.*, TEX. GOV'T CODE § 325.011(9)(B).

Ultimately, the incorporation of HUB compliance into contracting and procurement decisions unconstitutionally treats race and sex as proxies for merit. This preferential pipeline is nothing short of "discrimination for its own sake, which the Constitution forbids." *SFFA*, 600 U.S. at 209 (cleaned up); *see also* TEX. CONST. art. I, § 3a. Protected characteristics "may never be used

---

[25] Another category of statutes proves similar in focusing on the would-be recipient's own compliance with HUB-related goals. *See, e.g.*, TEX. GOV'T CODE § 2267.053(b-1)(7) (Infrastructure Projects); *see also, e.g.*, TEX. WATER CODE § 15.435(h)(2) (predicating financial assistance related to bond enhancement agreements on an applicant's professed willingness to "comply with . . . law[s] relating to" HUBs).

as a 'negative'" against disfavored groups, and legislative reimagination of what constitutes the "best value" to a governmental entity is "hard to take seriously." *SFFA*, 600 U.S. at 218. Both government contracting and procurement are no different from college admissions in that they are "zero-sum," meaning "[a] benefit provided to some . . . but not . . . others necessarily advantages the former group at the expense of the latter." *Id.* at 218–19; *see also, e.g.*, *Parents Involved*, 551 U.S. at 719. Neither does it matter "whether a statute 'requires' the use of such measures" when the question is instead "whether it authorizes or encourages them." *Bras*, 59 F.3d at 874–75 (emphasizing "economic realities . . . rather than the label" in the context of a minority- and women-owned businesses contracting program); *see also, e.g.*, *W.H. Scott Const.*, 199 F.3d at 215 (describing such labels as constitutionally "irrelevant"). Bidders are, by definition, competing directly against each other for a limited number of opportunities—meaning race- or sex-based winners come with race- or sex-based losers. *See, e.g.*, *Hou. Contractors Ass'n v. Metro. Transit Auth. of Harris Cnty.*, 993 F. Supp. 545, 548 (S.D. Tex. 1997) (invalidating a minority-owned business program because, *inter alia*, it "allows [the government] to take current opportunities from a non-offending [demographic] and allocate them to an uninjured [demographic]"), *vacated and remanded on other grounds sub nom.*, *Hou. Contractors Assoc. v. Metro. Transit Auth. of Harris Cnty.*, 189 F.3d 467 (5th Cir. 1999). This crudely reduces the protected characteristics of those outside the chosen demographic to a *negative* factor when, "in its absence, members of some . . . groups would be [benefitted] in greater numbers than they otherwise would have been." *SFFA*, 600 U.S. at 219; *accord W.H. Scott Const.*, 199 F.3d at 215.

v.      **HUB programs offer exclusive race- and sex-based assistance, training, outreach, and access to the detriment of non-HUBs**

HUB programs also provide targeted assistance, training, outreach, and access that is unavailable to those who want for membership in the chosen race- or sex-based classes. Under Chapter 2161, for example, the Comptroller offers HUBs assistance and training on state procurement procedures, advises them of available state contracts, and encourages registration on the Comptroller's master bidders list. TEX. GOV'T CODE § 2161.062(b)–(c). This extends beyond Chapter 2161 to include specific procurement methods, like reverse auctions. *Id.* § 2155.085(a)(2). The Comptroller even notifies HUBs of contracts that are available using the reverse auction procedure. *Id.* § 2155.085(a)(3). Moreover, HUBs are given assistance with compliance and government relations. For instance, the Small Business Advocate and OSBA assist HUBs in dealing with federal, state, and local governmental agencies and in complying with the laws administered by every level of government. *Id.* §§ 481.0067(c)(3), .0068(b)(5), (13). OSBA also supplies information, training, operational assistance, and other outreach. *Id.* § 481.0068(b)(10), (12), (15)–(16), (18).

Targeted outreach and access are equally prevalent. The Comptroller provides HUBs with orientation packages on certification or recertification with lists of state purchasing personnel, information on electronic commerce opportunities, and procurement process details. *Id.* § 2161.062(d). Outreach extends to local governments and certain highly regulated sectors, like utilities. Certain municipalities, for example, must contact at least two HUBs on a rotating basis for expenditures between $3,000 and $100,000. TEX. LOC. GOV'T CODE § 252.0215. And the

Public Utility Commission and Department of Economic Development inform HUBs of aggregator operation opportunities. TEX. UTIL. CODE § 39.353(h). HUBs are also granted special access to senior managers and procurement personnel through forums held at state agency offices. TEX. GOV'T CODE § 2161.066(a)–(b). Agencies with biennial appropriations over $10 million must participate, send personnel, and notify contractors of subcontracting opportunities. *Id.* § 2161.066(c). Even more, agencies with HUB coordinators must design their own HUB forum program and sponsor HUB presentations at the agency. *Id.* § 2161.066(d). The Comptroller and other agencies must "aggressively identify and notify" HUBs of presentation opportunities and must advertise those opportunities in HUB-targeted trade publications. *Id.* § 2161.066(e).

But this collective scheme runs headlong into the "well established" reality "that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720. Exclusive assistance, training, outreach, and access for HUBs impermissibly distributes benefits based on protected demographics on pain of severe criminal and civil penalties for attempted participation by entities who, for example, cannot qualify as HUBs simply because of their racial or gender composition. *See* TEX. GOV'T CODE §§ 2161.231, 2252.123, 2252.125. Nor can there be any compelling interest in such programs when the disparity study on which they rely does not "target a specific episode of past discrimination," *Vitolo*, 999 F.3d at 361, let alone invoke evidence that Texas directly or passively participated in specific discrimination, *Norwood*, 413 U.S. at 465. As such, the HUB framework openly endorses stripping "current opportunities from a non-offending [demographic] and allocat[ing] them to an uninjured [demographic]," *Hou. Contractors Ass'n*, 993 F. Supp. at 548—without "reasonable durational limits" or "logical end point," which belies any constitutional foundation. *SFFA*, 600 U.S. at 212.

## 2. Texas' DBE programs are unconstitutional

Texas's Disadvantaged Business Enterprise (DBE) programs ostensibly mirror the federal model and regulate transportation contracting across state, regional, and local governments. Yet while federal rules are curated to require case-by-case assessments of social and economic disadvantage, which proves constitutionally critical, Texas DBE programs embrace categorical preferences that are presumptively discriminatory. *See infra* Part II.A.2.i. Not only do these programs openly rely on sweeping race- and sex-based advantages that are unmoored from cognizable claims of past discrimination, but the inclusion of avowedly neutral mechanics does nothing to redeem the programs' facially invalid ends. *See infra* Part II.A.2.ii. In short, Texas' DBE programs prove unconstitutional.

### i. DBE programs rely on facial distinctions between race and sex, triggering strict scrutiny

The Texas Department of Transportation ("TXDOT") administers the statewide DBE program. TEX. TRANSP. CODE § 201.702; 49 C.F.R. §§ 26.1–Pt. 26, App. D. Aiming to award "state or federally funded contracts[] . . . to disadvantaged businesses," TEX. TRANSP. CODE § 201.702(a)(1) (discussing "construction, maintenance, supply, and service contracts"), the program applies to "all department contracts and purchases funded in whole or in part with

[certain] federal funds." 43 TEX. ADMIN. CODE § 9.200(b). *See also, e.g.*, 43 TEX. ADMIN. CODE § 9.201(a) (articulating TXDOT's general policy of accommodating DBEs). Other DBE programs likewise extend to regional and local governance as well. *See, e.g.*, TEX. LOC. GOV'T CODE §§ 351.1035 (county jail facilities), 375.222 (municipal management districts); TEX. TRANSP. CODE §§ 91.053 (state rail facilities), 366.184 (regional tollway authorities), 370.183 (regional mobility authorities), 451.251 (metropolitan rapid transit authorities); TEX. TAX CODE § 311.0101 (county or municipally created reinvestment zones).

Texas DBE programs largely reference, incorporate, and build on aspects of the federal DBE program.[26] *See generally* 43 TEX. ADMIN. CODE § 9.200(a) (professing "compliance with . . . Title 49, Code of Federal Regulations, Part 26"); *Tex. Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, Inc.*, 92 S.W.3d 477, 483 (Tex. 2002) (explaining "it is the federal regulations about DBEs with which TxDOT had to comply to receive federal funding for the project"). TXDOT's annual DBE award goals, for example, must "approximate the federal requirement for federal money used for highway construction and maintenance consistent with other applicable state and federal law." TEX. TRANSP. CODE § 201.702(b). Additionally, federal standards are tied to bidders' good faith efforts to meet DBE contract goals. 43 TEX. ADMIN. CODE §§ 9.226, .227(b)(2), .237(a). TXDOT is also obligated to "assess the availability" of DBEs in Texas, TEX. TRANSP. CODE § 201.702(a)(2); *accord* 49 C.F.R. § 26.45(b), and identify DBEs capable of providing supplies, materials, equipment, or services, TEX. TRANSP. CODE §§ 91.053(a)(2), 201.702(a)(3), 366.184(a)(2), 370.183(a)(2); *accord* 49 C.F.R. § 26.45(c); *see also, e.g.*, TEX. TAX CODE § 311.0101(b)(4) (requiring identical consideration for DBEs in designated zones).

On this backdrop, state and local DBE programs typically define a "disadvantaged business" by reference to "socially and economically disadvantaged" individuals or "socially disadvantaged" persons. 43 TEX. ADMIN. CODE § 9.202(4); *see also, e.g.*, TEX. LOC. GOV'T CODE §§ 351.1035(a), 375.003(4). TXDOT regulations offer two paths to "socially and economically disadvantaged" status: The race- and sex-neutral path follows the federal approach.[27] *See* 43 TEX. ADMIN. CODE § 9.202(15)(A) (defining such individuals as those "whom a recipient finds to be a socially and economically disadvantaged individual on a case-by-case basis"). The second path,

---

[26] Statewide policy also notes that the DBE program is "consistent, to the extent possible, with [the HUB program under] Government Code, Chapter 2161," 43 TEX. ADMIN. CODE § 9.200(a), and thereby prioritizes federal congruence over full HUB integration. *See also, e.g.*, TEX. GOV'T CODE § 2161.004(c) (providing that the HUB program is inapplicable "to a project or contract subject to [Transportation Code] Section 201.702," which governs TXDOT's statewide DBE program). Nevertheless, the memorandum between TXDOT and the Comptroller recognizes TUCP-certified DBEs as HUBs. 43 TEX. ADMIN. CODE § 9.353(a).

[27] Although the federal rules define DBEs as businesses owned by "socially and economically disadvantaged individuals," they prohibit determinations "based in whole or in part on race or sex" and mandate "case-by-case" evaluations. *Id.* § 26.5. This is no accident: The federal DBE framework received significant overhaul in 2025—after the U.S. Solicitor General notified Congress that the program was "unconstitutional to the extent . . . it creates a presumption of social or economic disadvantage based on race or sex," Letter from D. John Sauer, U.S. Solicitor General, to Hon. Mike Johnson, Speaker, U.S. House of Representatives (June 25, 2025), https://www.justice.gov/oip/media/1404871/dl?inline—to ensure DBE programs operate "in a nondiscriminatory fashion." Disadvantaged Business Enterprise Program and Disadvantaged Business Enterprise in Airport Concessions Program Implementation Modifications, 90 Fed. Reg. 47,969 (Oct. 3, 2025) (codified at 49 C.F.R. pts. 23, 26).

on the other hand, sets out a rebuttable presumption that "Black Americans," "Hispanic Americans," "Native Americans," "Asian-Pacific Americans," "Subcontinent Asian Americans," and women are socially and economically disadvantaged individuals. *Id.* § 9.202(15)(B)(i)–(vi). Local Government Code provisions similarly deem "black Americans, Hispanic Americans, women, Asian Pacific Americans, and American Indians" socially disadvantaged by blithely invoking "the effects of discriminatory practices or similar insidious circumstances" beyond their control. TEX. LOC. GOV'T CODE §§ 351.1035(a)(1), 375.003(4)(A).

But these overt race- and sex-based classifications render Texas' DBE framework presumptively discriminatory.[28] *See Communities for Equity*, 459 F.3d at 694; *SECSYS*, 666 F.3d at 685. It bears repeating that government-sponsored sorting "on the basis of race, alienage, or national origin trigger strict scrutiny." *United States v. Skrmetti*, 605 U.S. 495, 510 (2025); *accord McLean*, 725 S.W.2d at 697–98 (same, Texas ERA). As discussed in further detail below, however, this anachronistic approach to DBEs lacks any constitutional foundation and the "moral imperative of . . . neutrality" demands invalidation. *See Bartlett*, 556 U.S. at 21 (citation omitted).

### ii. DBE programs create de facto race- and sex-based quotas and want for any narrowly tailored pursuit of a compelling governmental end

Texas' DBE programs provide preferred access to valuable contracts that are unavailable to, or more difficult to obtain by, similarly situated persons outside of the preferred demographics. *See, e.g.*, 43 TEX. ADMIN. CODE §§ 9.201(a)(4) (limiting DBE participation to firms that fully meet the program's eligibility standards), .202(4) (defining DBEs in terms of socially and economically disadvantaged individuals), .202(15)(B) (defining socially and economically disadvantaged individuals in terms of race and sex); *see also, e.g.*, *id.* § 9.305 (providing that certain DBEs are "automatically certified" for participation in the Small Business Enterprise Program, a supplementary regime for TXDOT contracts that lack a DBE or HUB goal). Municipal management districts, for instance, must increase DBE awards, assess disparities between available DBEs and actual awards, and remedy any gaps. TEX. LOC. GOV'T CODE § 375.222. Various DBE frameworks also set numerical goals for contract or fund shares allocated to DBEs. *See, e.g.*, TEX. TRANSP. CODE §§ 366.184(a)(1), 451.251; 43 TEX. ADMIN. CODE § 9.221(a). Governmental entities may even intensify race-conscious measures by adjusting contract goals if benchmarks seem beyond reach. 43 TEX. ADMIN. CODE § 9.222(b). To enforce these objectives, entities must at times specifically consider DBEs during contract awards and require prime contractors' bids or proposals to demonstrate their intent to utilize DBEs as subcontractors. TEX. LOC. GOV'T CODE § 351.1035(b), (c)(3). Governmental entities may also restrict awards to bidders demonstrating good faith efforts to achieve DBE participation targets. 43 TEX. ADMIN. CODE

---

[28] To be sure, some DBE provisions neither define nor reference race and sex. *See, e.g.*, TEX. TRANSP. CODE §§ 91.053 (state rail facilities), 370.183 (regional mobility authorities); TEX. TAX CODE § 311.0101(a)–(c) (reinvestment zones); *cf. also, e.g.*, TEX. TAX CODE § 311.0101(d) (referencing "minority business enterprises and women-owned business enterprises" without indicating such entities are synonymous with DBEs). While it is unclear whether these provisions follow the federal government's newly refined, case-by-case approach—ignoring race and sex, 49 C.F.R. § 26.5—anything less would confront the same constitutional infirmities discussed herein.

§ 9.226. Further support comes through mandates that DBEs receive targeted notice of opportunities, procedural explanations, and offers of assistance in the overall process. *See* TEX. TRANSP. CODE §§ 201.702(a)(4), 366.184(a)(3); TEX. LOC. GOV'T CODE § 351.1035(c)(1)–(2).

This backdrop raises various problems that betray any claim of constitutional propriety. First, the participation benchmarks function as de facto racial and sex-based quotas by apportioning public benefits on the basis of protected characteristics—without any "reasonable durational limits" or "a logical end point," no less. *SFFA*, 600 U.S. at 212 (quoting *Grutter*, 539 U.S. at 342). These programs consecrate fixed, alternate tracks: presumed qualification for some demographics and either case-by-case scrutiny or extra hurdles for others. *Compare* 43 TEX. ADMIN. CODE § 9.202(15)(A) (requiring a "case-by-case" determination of an individual's "socially and economically disadvantaged" status), *with id.* § 9.202(15)(B) (listing racial and ethnic groups that are "rebuttably presumed" to qualify). This means that "[c]ontractors who are not DBEs must compete . . . under . . . actual and identifiable impediments." *Hou. Contractors Ass'n*, 993 F. Supp. at 557. Nor would expanding this "two-track system into a multitrack program" remedy the underlying constitutional flaw. *Bakke*, 438 U.S. at 315. Again, schemes like this invariably "distribute[] burdens or benefits" on the basis of protected characteristics. *Parents Involved*, 551 U.S. at 720.

Second, this preferential system also lacks the "extraordinary justification" that must underlie a compelling governmental interest. *See Feeney*, 442 U.S. at 272. The DBE framework's fixed catalogue of preferred demographics is said to represent those who have "suffered the effects of discriminatory practices or similar insidious circumstances over which they have no control." *See, e.g.*, TEX. LOC. GOV'T CODE §§ 351.1035(a)(1), 375.003(4)(A). But this glibly embraces "a generalized assertion that there has been past discrimination in an entire industry." *Croson*, 488 U.S. at 498. That is no more of a compelling interest than a professed "effort to alleviate the effects of societal discrimination." *Shaw*, 517 U.S. at 909–10. Indeed, courts have previously invalidated DBE programs for this very reason. *See, e.g.*, *W.H. Scott Const.*, 199 F.3d at 219 (rejecting a DBE-participation goal for want of "particularized findings of discrimination" in the city's construction industry); *Hou. Contractors Ass'n*, 993 F. Supp. at 556, 558 (same, Harris County's former DBE system); *Kossman Contracting Co. v. City of Houston*, No. CV H-14-1203, 2016 WL 1104363, at *5 (S.D. Tex. Mar. 22, 2016) (same, Houston's "Minority and Women Owned Business Enterprise . . . Program"); *see also, e.g.*, *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 713 (9th Cir. 1997) (observing that a minority- and women-owned business program failed constitutional scrutiny where "the legislative findings [did] not say whether the 'economically disadvantaged position' has to do with past active or passive discrimination"). Were it enough to identify "general social ills and call it a day," of course, "any race-based program could be justified considering our country's history of race-based discrimination." *Nuziard*, 721 F. Supp. 3d at 480. But our constitutional foundation "forbids the punishment of [one] generation for the wrongs of the last," *Hou. Contractors Ass'n*, 993 F. Supp. at 558, and *equal* protection is what "guarantees individuals that their ethnicity or sex will not turn into legal disadvantages as the political power of one or another group waxes or wanes." *Monterey Mech.*, 125 F.3d at 715.

Were there remaining doubt, these terminal failures are confirmed by the overinclusive scope of DBE beneficiaries. Included among the groups TXDOT "presume[s] to be socially and economically disadvantaged," for example, are all "women;" all "persons of Mexican, Puerto Rican, Cuban, Dominican, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;" all "persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians;" as well as all "persons having origins in any of the Black racial groups of Africa" or "whose origins are from Japan, China, Taiwan, Korea, Burma (Myanmar), Vietnam, Laos, Cambodia (Kampuchea), Thailand, Malaysia, Indonesia, the Philippines, Brunei, Samoa, Guam, the U.S. Trust Territories of the Pacific Islands (Republic of Palau), the Commonwealth of the Northern Mariana Islands, Macao, Fiji, Tonga, Kirbati, Juvalu, Nauru, Federated States of Micronesia, or Hong Kong" in addition to "India, Pakistan, Bangladesh, Bhutan, the Maldives Islands, Nepal, or Sri Lanka." 43 TEX. ADMIN. CODE § 9.202(15)(b)(i)–(vi). Reduced simply, these categories presume disadvantage for virtually the *entire* global population—save a narrow class of men defined by ancestry. Not only is this sweeping list lifted verbatim from the federal regulatory presumptions that were struck after the U.S. Solicitor General notified Congress in 2025 that its DBE program was "unconstitutional to the extent . . . it creates a presumption of social or economic disadvantage based on race or sex," Letter from D. John Sauer, U.S. Solicitor General, *supra* n. 27; *see also* 26 C.F.R. § 26.5 (2024) (prior categories), but it reflects the haphazard brand of overinclusion that "illustrates the undifferentiated nature of the plan," *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986). This "strongly impugns . . . [any] claim of remedial motivation" and invites "one [to] legitimately ask why [some beneficiaries] are forced to share this 'remedial relief' with an Aleut citizen who moves [in] . . . tomorrow." *Croson*, 488 U.S. at 506.

Neither does the inclusion of race- or sex-neutral mechanics redeem the DBE program's facially invalid ends. To be sure, TXDOT's regulations profess prioritization of "race-neutral means" to achieve annual DBE participation goals on federally assisted contracts. 43 TEX. ADMIN. CODE § 9.220(a). These means promote participation by all small businesses—not merely DBEs—and include avowedly demographic-neutral approaches.[29] *Id.* § 9.202(13); *see also id.* § 9.220(b) (providing examples). TXDOT may nonetheless resort to openly race- and sex-conscious measures if those neutral efforts falter. *Id.* § 9.221(a). Every three federal fiscal years, TXDOT sets overall annual DBE goals and projects the portion of each overall goal it expects to meet through race-neutral and race-conscious means. *Id.* §§ 9.213(a), .214(b), .217(b)(3). If TXDOT expects to exceed the overall DBE participation goal, it reduces or eliminates contract goals for the fiscal year's remainder. *Id.* § 9.222(a). TXDOT likewise forgoes contract goals entirely if neutral means alone will meet the goal or if the goal was achieved or surpassed using neutral methods during the prior two years. *Id.* § 9.223. Either way, these measures ultimately target DBEs—including those who qualify simply because they are owned by women or racial minorities. *Id.* § 9.202(12).

But use of ostensibly race- and sex-neutral tools becomes constitutionally infirm when subordinated to the greater pursuit of demographic-specific participation goals. Programs like

---

[29] Though we need not belabor the point, it is unclear how "ensuring distribution of the DBE directory to the widest feasible number of potential contractors" can be used to assist all small businesses rather than DBEs alone. *See* 43 TEX. ADMIN. CODE § 9.220(b)(8).

these can survive constitutional scrutiny only if founded on "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *accord* 43 TEX. ADMIN. CODE § 9.201(a)(3) (requiring TXDOT to "ensure that [its] DBE program is narrowly tailored"). But narrow tailoring is only one prong of the "daunting two-step examination known in our cases as 'strict scrutiny.'" *SFFA*, 600 U.S. at 206. A provision must also "further compelling governmental interests." *Id.* at 207. Here, of course, the manifest purpose of DBE programs is to *increase* DBE participation in transportation contracting and procurement. To that end, TXDOT sets annual goals for awarding contracts to DBEs and strives to meet them. TEX. TRANSP. CODE § 201.702(a)(1); *see also* 43 TEX. ADMIN. CODE § 9.213(a) (confirming these goals target "DBE participation in DOT-assisted contracts"). TXDOT's policies remove barriers to DBE participation in contracts, foster DBE development to promote competition, and equip recipients with tools to curate DBE opportunities. 43 TEX. ADMIN. CODE § 9.201(a)(5)–(7). Specialized measures reinforce these objectives: TXDOT mandates use of financial institutions owned by socially and economically disadvantaged individuals, encourages contractors to do the same, and offers technical assistance for DBEs to compete in highway construction. *Id.* §§ 9.207, .211, .241. Texas' DBE programs therefore reduce to nothing short of open, discriminatory exclusion of contractors that were born into one of the disfavored demographics.

Suffice it to say that race- and sex-neutral means cannot validate unconstitutional ends. A government's "preferential purpose" of increasing participation by "a particular group merely because of its race or ethnic origin . . . must be rejected not as insubstantial but as facially invalid." *Bakke*, 438 U.S. at 307; *see also Parents Involved*, 551 U.S. at 740 (stating that "using race simply to achieve racial balance would be patently unconstitutional" (internal quotations omitted)). Far from compelling, such an interest in "[p]referring members of any one group for no reason other than race or ethnic origin" represents the very "discrimination for its own sake" that "the Constitution forbids." *SFFA*, 600 U.S. at 208–09 (quoting *Bakke*, 438 U.S. at 306–07). To describe this pernicious pursuit is to condemn it under the U.S. and Texas Constitution alike.

### 3. Programs targeting minority- and women-owned businesses for government largesse also fail strict scrutiny

Yet more statutes systematically authorize preferences for minority- and women-owned businesses in public contracting and, in turn, purport to insulate race- and sex-based classifications—triggering strict scrutiny. *See infra* Part II.A.3.i. Preferential treatment for these businesses based on race and sex advances no compelling governmental interest. *See infra* Part II.A.3.ii. Likewise, the framework's avowed aspirational goals are nothing more than de facto quotas that fail narrow tailoring. *See infra* Part II.A.3.iii. The scheme also provides preferential treatment in contracting, direct assistance, and targeted forms of outreach—all on the basis of sex and race. *See infra* Part II.A.3.iv. And finally, advantaging nonprofit organizations based on these same immutable traits proves equally unconstitutional. *See infra* Part II.A.3.v. These measures violate the U.S. and Texas Constitutions by imposing burdens and benefits based on race and sex, perpetuating stereotypes and eroding the constitutional imperative of equal treatment.

### i. Texas law mandates preferences for minority- and women-owned businesses, triggering strict scrutiny

Texas law embeds pernicious demographic preferences throughout its public-contracting regime. A host of agencies are statutorily commanded to prioritize minority- and women-owned businesses. *See, e.g.*, TEX. AGRIC. CODE § 12.029 (Department of Agriculture); TEX. GOV'T CODE §§ 466.107, .151 (Department of Licensing and Regulation), 2306.6734 (Department of Housing and Community Affairs); TEX. HUM. RES. CODE § 122.019 (Workforce Commission); TEX. NAT. RES. CODE §§ 161.131–.132 (Veteran's Land Board); TEX. OCC. CODE § 2026.152 (Racing Commission). Various political subdivisions, too, shoulder similar obligations. *See, e.g.*, TEX. LOC. GOV'T CODE § 381.004 (counties); TEX. HEALTH & SAFETY CODE §§ 262.035 (municipal housing authorities), 281.051 (county hospital districts), 775.306 (county emergency services districts). Even boards of regents are commanded to make good-faith efforts in awarding contracts—with minimum targets—to women- and minority-owned businesses. TEX. EDUC. CODE § 55.03(a). Likewise, statutory preference for these preferred demographics extends to transportation authorities and other entities that are typically subject to the DBE framework. *See, e.g.*, TEX. TRANSP. CODE §§ 22.084 (joint boards for airports), 451.253 (metropolitan rapid transit authorities), 452.201 (regional transportation authorities); *compare* TEX. TAX CODE § 311.0101(a)–(c) (DBE participation in reinvestment zones), *with id.* § 311.0101(d) (authorizing "goals for the participation of minority business enterprises and women-owned business enterprises in the awarding of state contracts for professional services").

As with HUB and DBE programs, many minority- and women-owned business frameworks openly classify beneficiaries by race and sex.[30] Phrases like "minority business," "minority-owned business," or "minority enterprise" consistently refer to a business that is sufficiently owned and controlled by minority group members. *See* TEX. EDUC. CODE § 55.03(c)(1); TEX. GOV'T CODE §§ 466.107(b)(1)(A), 2306.6734(c)(1); TEX. LOC. GOV'T CODE § 381.004(a)(3); TEX. NAT. RES. CODE § 161.131(c)(1); TEX. TRANSP. CODE §§ 451.253(d)(2), 452.201(e)(2). These statutes typically identify the preferred demographics as "blacks" or "African Americans," "American Indians," "Asian Americans," as well as "Hispanics" or "Mexican Americans and other Americans of Hispanic origin." *See* TEX. EDUC. CODE § 55.03(c)(1); TEX. GOV'T CODE §§ 466.107(b)(2), 2306.6734(c)(2); TEX. LOC. GOV'T CODE § 381.004(a)(2); TEX. NAT. RES. CODE § 161.131(c)(2); TEX. TRANSP. CODE §§ 451.253(d)(1), 452.201(e)(1). *But see*

---

[30] This is true even of the statutes that leave terms like "minority" undefined. *Compare* TEX. HEALTH & SAFETY CODE §§ 262.035(b)(6), 281.051(c), 775.306 (all pairing minorities and women), *and* TEX. GOV'T CODE § 466.151(c); TEX. OCC. CODE § 2026.152(b) (all referring to minority businesses alone), *with* TEX. TAX CODE § 311.0101(d); TEX. TRANSP. CODE § 22.084(a) (combining both). An undefined term with "multiple common meanings . . . is not necessarily ambiguous," of course, and courts resolve this dilemma by "apply[ing] the definition most consistent with the context of the statutory scheme." *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016). Here, both ordinary usage and context favor construing "minority" as a "member of" a "racial" or "national" group "regarded as different from the larger group." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1151 (3d ed. 1992); *see also, e.g.*, *Loco Brands, LLC v. Butler Am., LLC*, No. 6:18-CV-69-JDK-KNM, 2020 WL 6815167, at *5 (E.D. Tex. Jan. 30, 2020) (explaining that "[m]inority ownership imbues a minority racial identity to the company itself"), *report and recommendation adopted*, No. 6:18-CV-69-JDK-KNM, 2020 WL 1536043 (E.D. Tex. Mar. 31, 2020).

*also* TEX. LOC. GOV'T CODE § 381.004(a) (also including "Alaska natives"); TEX. TRANSP. CODE §§ 451.253(d), 452.201(e) (same). Others cater to "women-owned businesses" or "women owned business enterprises," *see* TEX. EDUC. CODE § 55.03(c)(3); TEX. LOC. GOV'T CODE § 381.004(a)(4); TEX. NAT. RES. CODE § 161.132(c)(1); TEX. TRANSP. CODE §§ 451.253(d)(3), 452.201(e)(3)—though the intersection between these race- and sex- dependent groups sometimes proves inconsistent or illogical. *See, e.g.*, TEX. GOV'T CODE § 2306.6734(c)(2)(A) (defining "minority group" to include "women," unlike other definitions); TEX. NAT. RES. CODE § 161.132(c)(2) (listing racial and ethnic groups to define "minority group," despite only applying to a "women-owned business"). A final category takes a unified approach and borrows DBE language, giving preference to "minority and female-owned small business[es]" under "control[] by one or more . . . persons" whom "are socially disadvantaged because of their identification as . . . women, black Americans, Mexican Americans and other Americans of Hispanic origin, Asian Americans, and American Indians." TEX. AGRIC. CODE § 12.029(d).

At bottom, these statutory paths to favored treatment in government contracting are invariably predicated on a person's inclusion in an enumerated race- or sex-based group. Distinctions of this nature "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi*, 320 U.S. at 100, and government-sponsored priority or benefits for one protected class over another strikes at "the heart of the Constitution's guarantee of *equal* protection," *SFFA*, 600 U.S. at 223 (emphasis added) (citation omitted). It follows that Texas' preferential approach to minority- and women-owned businesses "engender[s] a presumption of discriminatory purpose." *Communities for Equity*, 459 F.3d at 694; *accord, e.g.*, *SECSYS*, 666 F.3d at 685. This scheme cannot survive the resulting degree of constitutional scrutiny and, as discussed in further detail below, the "moral imperative of racial [and sex-based] neutrality" thus demands invalidation. *See Bartlett*, 556 U.S. at 21 (citation omitted).

ii.      **Preferential treatment for minority- and women-owned businesses does not advance a compelling governmental interest**

Statutes authorizing minority- and women-owned business programs rarely contain a compelling governmental interest. Several aim "to increase the participation of minority and women-owned businesses in public contracts." TEX. TRANSP. CODE § 451.253(a); *see also id.* § 452.201 (authorizing programs to increase such participation in regional transportation authority contracts). These provisions purport no impact on objective procurement or competitive bidding rules yet provide that "prospective bidders may be required to meet uniform standards designed to assure a reasonable degree of participation by minority and women-owned business enterprises in the performance of any contract." *Id.* §§ 451.253(c), 452.201(d). Invoking "uniform standards" cannot save provisions with facially discriminatory purposes. Preferring one group based solely on race or sex embodies the very "discrimination for its own sake" that "the Constitution forbids." *SFFA*, 600 U.S. at 208–09 (quoting *Bakke*, 438 U.S. at 306–07).

Other programs mandate that agencies not only collect but report data on their obligatory, preferential treatment of businesses that meet the preferred demographic requirements. For example, the Department of Licensing and Regulation must submit legislative and gubernatorial

reports on its equally obligatory "steps" toward advancing the interests and economic opportunities of minority-owned businesses alone. TEX. GOV'T CODE § 466.107(c); *see also id.* § 466.107(a)(1)– (7) (detailing the spectrum of demographic-specific benefits). Boards of regents must also file reports with the Legislature and Governor detailing the result of their obligatory "good-faith effort" to steer awards of "contracts relating to the issuance of bonds" toward "minority-owned and women-owned businesses." TEX. EDUC. CODE § 55.03(a)(1), (b)(2); *see also id.* § 55.03(b)(1), (3) (also requiring that the report include the "total number" of contracts, bids, and proposals that inform their good-faith obligations). But obligatory accounting that serves only to amplify race- and sex-based preferences cannot, by its very nature, advance a compelling governmental interest. *See Bakke*, 438 U.S. at 307 (deeming a "preferential purpose" of increasing participation through suspect classifications "facially invalid").

To be sure, some statutes invoke legitimate governmental interests—like fostering wholesale economic development. *See, e.g.*, TEX. HEALTH & SAFETY CODE §§ 281.051(c), 775.306 (seeking to "encourage and promote participation by all sectors of the business community"). Others nonetheless shroud themselves with the pursuit of similar goals and endorse efforts to "develop and administer" governmental entities' choice of programs, which can include little more than "improv[ing] the extent to which women and minority businesses are awarded county contracts." TEX. LOC. GOV'T CODE § 381.004(b)(5). Yet the pursuit of "a worthy goal does not" invite "free[dom] to discriminate on the basis of race [or sex] to achieve" that end any more than it means these pernicious "classifications should be subject to less exacting scrutiny." *Parents Involved*, 551 U.S. at 701. Still, "the mere recitation of a benign purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme," *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975), and "only two compelling interests . . . permit resort to" programs that are predicated on a beneficiary's protected demographic alone: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *SFFA*, 600 U.S. at 207. Furthermore, race- and sex-based programs walk a nonexistent path toward advancing business interests—highlighting a terminal "mismatch between the means . . . employ[ed] and the goals" sought. *Id.* at 217. This offers no assurance that "the means chosen 'fit' [a] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493. As a result, these measures cannot survive constitutional scrutiny "as to ends" or "means." *Adarand*, 515 U.S. at 236.

### iii. Aspirational "goals" that act as de facto race- and sex-based quotas display discriminatory intent and fail narrow tailoring

Numerical quotas semantically disguised as "goals" also permeate the statutory tapestry that favors minority- and women-owned businesses. Some authorize overall percentage goals for minority and women-owned business contracts, TEX. TRANSP. CODE §§ 451.253(a), 452.201(b), while others permit governmental entities to set contract percentage goals for public contract

awards to such businesses, TEX. LOC. GOV'T CODE § 381.004(d).[31] Specificity varies. One provision, for example, permits municipalities to include lease terms subjecting municipal housing authority lessees "to any goals for hiring and contracting with minorities or women adopted by and for the municipality." TEX. HEALTH & SAFETY CODE § 262.035(b)(6). Yet more overtly impose percentage goals, like requiring housing-tax-credit recipients "to attempt to ensure that at least [thirty] percent of the construction and management businesses with which the person contracts in connection with the development are minority-owned businesses." TEX. GOV'T CODE § 2306.6734(a); *see also id.* § 466.151(c) (stating that the Department of Licensing and Regulation "shall attempt to license minority businesses as sales agents in at least [twenty] percent of the licenses issued").

Percentage goals are especially prevalent in bond-issuance contracts, typically requiring "a good faith effort" toward two benchmarks. First, for issuance-related contracts, goals target minority-owned and women-owned businesses relative to total issuance costs. *See, e.g.*, TEX. EDUC. CODE § 55.03(a)(1) (mandating "at least [twenty-five] percent of the total costs of issuing those bonds"); TEX. NAT. RES. CODE §§ 161.131(a)(1) (twenty percent), 161.132(a)(1) (ten percent). Second, for contracts on the items financed by bonds, goals target such businesses relative to bond proceeds. TEX. EDUC. CODE § 55.03(a)(2) (requiring "at least [twenty-five] percent of the proceeds of those bonds"); TEX. NAT. RES. CODE §§ 161.131(a)(2) (twenty percent), 161.132(a)(2) (ten percent). Rather than good faith efforts, some bond provisions mandate that governmental entities "shall attempt" to include a certain percentage of such businesses in bond issuance. *See, e.g.*, TEX. GOV'T CODE § 1232.104(c)(1) (requiring the Texas Public Finance Authority to "include minority-owned businesses in the issuance and underwriting of at least [twenty] percent of the obligations issued under this section"), (2) (requiring "at least [ten] percent" for women-owned businesses); TEX. TAX CODE § 351.1065(c) (requiring municipalities expending hotel occupancy tax revenues to "attempt to include minority-owned businesses in the issuance of at least [thirty-two] percent of the total dollar value of the bonds issued, and in at least [thirty-two] percent of the total fees paid by the issuer, in connection with the construction").

Yet these numerical mandates, even when hedged with aspirational language like "good faith effort" or "shall attempt," betray an unyielding commitment to racial and sex-based sorting. A quota disguised as a "goal" is no less "undeniably a [demographic] classification" and, as such, any "semantic distinction is beside the point." *Bakke*, 438 U.S. at 289; *see also, e.g.*, *W.H. Scott Const.*, 199 F.3d at 215 (describing these labels as constitutionally "irrelevant"); *Bras*, 59 F.3d at

---

[31] A previous attorney general opinion directly addressed the constitutionality of Section 381.004 in light of the Supreme Court's holding in *Croson*. *See* Tex. Att'y Gen. Op. No. DM-226 (1993) at 3. That opinion correctly observed "a majority of justices appears to have agreed that a plan of a governmental body to apportion opportunities on the basis of race is subject to strict scrutiny." *Id.* But the opinion went on to state that "Section 381.004 of the Local Government Code does not apportion county contracting opportunities on the basis of race" and, without engaging any degree of constitutional scrutiny, concluded "we do not believe that section 381.004 violates the fourteenth amendment." *Id.* Subsequent precedent has since addressed what should have been obvious at the time: "[L]aws that classify on the basis of race, alienage, or national origin trigger strict scrutiny." *Skrmetti*, 605 U.S. at 510; *accord Virdi*, 135 F. App'x at 267 (holding "strict scrutiny applies to all racial classifications, not just those creating binding racial preferences," like "set-asides or mandatory quotas"). DM-226 is thus overruled to the extent it can be read to validate Section 381.004 of the Local Government Code.

874–75 (emphasizing "the economic realities . . . rather than the label" and holding statutory preferences were not "immunized from scrutiny because they purport to establish goals rather than quotas"). Public institutions may not erect racial or sex-based quotas. *See SFFA*, 600 U.S. at 209. Nor may they divert favored groups onto privileged tracks for government largesse, shield them from competition, or rationalize unequal treatment in pursuit of predetermined group allotments. *Grutter*, 539 U.S. at 334, 329–30. Minority- and women-owned business frameworks that act as "a set-aside program" unquestionably injure nonqualifying competitors due to their "inability to compete on an equal footing in the bidding process," *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993), and "the imposition of special disabilities upon members of a particular [group] because of their [immutable characteristics] would seem to 'violate a basic concept of our system'" in that "legal burdens should bear *some* relationship to individual responsibility." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) (citation omitted). Taken together, these failings prove too great to overcome on a foundation that is insufficiently compelling or tailored.

### iv. These programs grant minority- and women-owned businesses preferential treatment in contracting, direct assistance, and other forms of targeted outreach

Beyond quotas, these provisions confer a range of benefits to minority- and women-owned businesses. Some explicitly authorize preferential treatment in contracting and procurement. The Government Code, for example, requires the Department of Licensing and Regulation, as well as lottery operators, to "take positive steps" toward awarding contracts for equipment or supplies, service contracts, and sales agent licenses to minority businesses alone. TEX. GOV'T CODE § 466.107(a)(3)–(5). Such efforts extend to requiring prime contractors to favor minority business subcontractors. *See id.* § 466.107(a)(7) (requiring positive steps to "require all bidders or contractors, when appropriate, to include specific plans or arrangements to use subcontracts with minority businesses"). Where, as here, a program involves "a process where applicants compete for a limited pool of spots, a tip for one race necessarily works as a penalty against other races." *SFFA*, 600 U.S. at 294 (Gorsuch, J., concurring) (cleaned up).

Agencies also provide targeted information and direct assistance to minority- and women-owned businesses. The Department of Agriculture, for example, assists minority- and female-owned small businesses in bidding for department contracts and open market purchases. TEX. AGRIC. CODE § 12.029(a). Metropolitan rapid transit and regional transportation authorities also assist such businesses in their service areas to boost participation in public contracts awarded by the relevant authority. TEX. TRANSP. CODE §§ 451.253(a), 452.201(a). Yet distributing benefits or burdens by race or sex fails strict scrutiny. *See Parents Involved*, 551 U.S. at 720 (applying federal equal protection to programs disbursing race-based benefits and burdens).

Other programs funnel influence, opportunities, and encouragement to minority- or women-owned businesses. The Racing Commission, for instance, must "attempt to ensure the involvement of minority-owned businesses" when approving "a concession, management, or totalisator contract." TEX. OCC. CODE § 2026.152(b). Joint airport boards may implement rules creating "contracting opportunities for minority- and women-owned businesses," which bind

constituent agencies and nonprofit airport facility financing corporations. TEX. TRANSP. CODE § 22.084(a). And metropolitan rapid transit authority boards must "establish a program to encourage participation in contracts of the authority by businesses owned by minorities or disadvantaged individuals." *Id.* § 451.252(a). All of these unjustified racial preferences violate the constitutional guarantee of equality. *See Croson*, 488 U.S. at 511 (holding that a city's "treatment of its citizens on a racial basis violates" equal protection due to the city's failure "to identify the need for remedial action in the awarding of its public construction contracts").

**v.      Advantaging nonprofit organizations because they are managed by women and members of racial minorities also violates constitutional equality guarantees**

It also merits pause to address a separate scheme that authorizes preferences for nonprofits managed by women and racial minorities, extending race- and sex-based discrimination into the nonprofit realm. For the reasons already stated, such classifications offend equal rights principles no less than in for-profit contexts. But the relevant Human Resources Code provision violates the U.S. and Texas Constitutions for an additional reason.

Chapter 122 of the Human Resources Code—entitled "Purchasing from People with Disabilities"—nobly aims to foster disabled individuals' independence through employment while ensuring compliance "with requirements of nondiscrimination and affirmative action in employment matters related to persons with disabilities." TEX. HUM. RES. CODE § 122.001. The Workforce Commission contracts with central nonprofit agencies for services, including recruiting and assisting nonprofits managed by racial minorities and women to qualify as community rehabilitation programs. *Id.* § 122.019(a)(5).

This framework implies that women and certain racial groups are somehow inherently disabled, thereby "reinforc[ing] common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth." *Bakke*, 438 U.S. at 298; *see also* TEX. HUM. RES. CODE § 122.002(5) (defining "[d]isability" for purposes of Chapter 122 as "a mental or physical impairment[] . . . that impedes a person who is seeking, entering, or maintaining gainful employment"). Regardless of the provision's intent, courts "may not accept as a defense to racial discrimination the very stereotype the law condemns." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).

**4.      Appointment and employment preferences also prove unconstitutional**

Another class of statutes impermissibly categorizes individuals by race and sex in appointed positions and employment. Some require consideration of these immutable traits in valuable government appointments to state boards, commissions, committees, and advisory bodies, triggering and failing strict scrutiny. *See infra* Part II.A.4.i. Other statutory schemes prove constitutionally problematic by advantaging applicants based on race and sex in seeking employment with state agencies. *See infra* Part II.A.4.ii. Finally, Texas law likewise requires electrical and telecommunications utilities to consider race and sex in recruiting and hiring—again

triggering and failing strict scrutiny. *See infra* Part II.A.4.iii. Our constitutional foundation forbids any government actor from considering a candidate's race or sex in determining their suitability for public service.

### i. Consideration of race and sex in government appointments triggers and fails strict scrutiny

Texas law sometimes mandates consideration of race and sex in appointments to competitive, valuable positions on state boards, commissions, and advisory bodies. Somewhat ironically, these same statutes often bar such considerations in the same breath. Consider, for example, appointments to the Texas Facilities Commission. The Governor and Lieutenant Governor are instructed that:

> (a)     Appointments to the commission shall be made without regard to the race, color, disability, sex, religion, age, or national origin of the appointees.
>
> (b)     In making appointments under this section, the governor and lieutenant governor shall attempt to appoint women and members of different minority groups, including African Americans, Hispanic Americans, Native Americans, and Asian Americans.

TEX. GOV'T CODE § 2152.052.

The term "shall" in subsection 2152.052(b) mandates that the Governor and Lieutenant Governor "attempt" to fill vacancies with women and racial minorities. *See Albertson's, Inc. v. Sinclair*, 984 S.W.2d 958, 961 (Tex. 1999) (per curiam) ("We generally construe the word 'shall' as mandatory, unless legislative intent suggests otherwise."); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 114 (2012) (explaining that "when the word 'shall' can reasonably be read as mandatory, it ought to be so read"). At least three other statutes governing appointments impose the same discriminatory mandate in materially identical terms. *See, e.g.*, TEX. OCC. CODE § 252.001(c) (State Board of Dental Examiners); TEX. HEALTH & SAFETY CODE §§ 103.002(b-1) (Texas Diabetes Council), 93.002(b) (Council on Cardiovascular Disease and Stroke).

Government appointments, including those referenced above, are inherently "zero-sum." *SFFA*, 600 U.S. at 218. A finite number of spots are available, and each vacancy yields only one appointee. *See, e.g.*, TEX. GOV'T CODE § 2152.051(a) (providing that the Texas Facilities Commission is composed of only seven members). This means that "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 219. To the degree race or sex are positive factors for some candidates, these factors are necessarily negative attributes for candidates who lack these immutable traits. *See id.* at 218 ("How else but 'negative' can race [or sex] be described if, in its absence, members of some racial [or gender] groups would be admitted in greater numbers than they otherwise would have

been?"). In short, these appointment statutes tip the scales for women over men and some races over others—triggering strict scrutiny.[32] *See id*. at 206.

Other appointment statutes utilize race and sex differently but no more lawfully. Some demand racial or sex-based balancing so that commission or board membership mirrors state demographics, imposing de facto quotas for women and minorities. *See* TEX. GOV'T CODE § 651.009(a) ("In each case in which the governing body of a state board, commission, or other state agency that has statewide jurisdiction is appointed by the governor or another appointing authority, the governor or appointing authority shall ensure that, to the extent possible, the membership of the governing body reflects the racial, ethnic, and geographic diversity of this state."); *see also, e.g.*, TEX. FAM. CODE § 264.502(d) (requiring members of the child fatality review team committee to "reflect the geographical, cultural, racial, and ethnic diversity of the state"); TEX. GOV'T CODE §§ 403.503(d) (requiring the membership of the Texas opioid abatement fund council to "reflect[], to the extent possible, the ethnic and geographic diversity of this state"), 2166.404(c) (requiring appointments to the Industry Advisory Committee on xeriscape to "reflect this state's gender and ethnic diversity"), 2306.027(b) (requiring that board appointments "must broadly reflect the geographic, economic, cultural, and social diversity of the state, including ethnic minorities, persons with disabilities, and women"); TEX. HEALTH & SAFETY CODE § 34.002(c)(3) (requiring that the composition of the Texas Maternal Mortality and Morbidity Review Committee "reflects the racial, ethnic, and linguistic diversity of the state"); TEX. HUM. RES. CODE § 40.022 (providing that "[n]otwithstanding" the requirement that appointments to the Family and Protective Services Council "be made without regard to the race, color, disability, sex, religion, age, or national origin of the appointees," such "appointments to the council must reflect the ethnic diversity of this state"); TEX. OCC. CODE § 2022.001 (requiring that the Governor "attempt to reflect the minority groups found in the state's general populace" when making appointments to the Texas Racing Commission). Such arrangements are common on the local level as well.[33] *See, e.g.*, TEX. EDUC. CODE § 12.015(b) ("The membership of the charter commission

---

[32] Notably, the Governor or Lieutenant Governor cannot simultaneously obey subsection (a) and (b) of Section 2152.052. Subsection (a) *forbids* considering race and sex, while subsection (b) *demands* it. *See* TEX. GOV'T CODE § 2152.052. As such, if subsection (b) were to survive strict scrutiny, both subsections (a) and (b) should be denied any effect. *See* SCALIA & GARNER, *supra*, at 189 (explaining that "when reconciliation of conflicting provisions cannot reasonably be achieved, the proper resolution is to apply the unintelligibility cannon (§ 16) and to deny effect to both provisions"); *see also id.* (where no "valid choice between two differing interpretations" exists, courts "are left with the consequence that a text means nothing in particular at all" (quoting E.D. HIRSCH, VALIDITY IN INTERPRETATION 251 (1967))). This outcome may seem harsh, "especially when the matter covered by the contradictory provisions is central to the document or statute in question." *Id.* at 190. But subsection (b) is unlawful, while subsection (a) merely echoes independent demands of the Texas and U.S. Constitutions. *See, e.g.*, U.S. CONST. amend. XIV, § 1; TEX. CONST. art. I, § 3a. The same contradictory commands can be found in Occupations Code subsection 252.001(c) as well as Health & Safety Code subsections 93.002(b) and 103.002(b-1)—implicating the unintelligibility cannon once more. *See* SCALIA & GARNER, *supra*, at 189.

[33] Sections 2308.255 and 2308.256 of the Government Code are noteworthy as well. *See* TEX. GOV'T CODE §§ 2308.255(b)(2) (requiring that board appointments "reflect the ethnic and geographic diversity of the workforce development area"), .256 (requiring that local workforce development boards must "reasonably represent the industrial *and demographic composition* of the business community" and that at least one-half of the representatives

(continued…)

must reflect the racial, ethnic, socioeconomic, and geographic diversity of the district.”); TEX. HEALTH & SAFETY CODE §§ 534.004(b) (requiring that those appointing a community center's board of trustees must “attempt to reflect the ethnic and geographic diversity of the local service area the community center serves”), 672.002(g) (requiring that certain members selected to serve on a fatality review team “must reflect the geographical, cultural, racial, ethnic, and gender diversity of the county or counties represented”); TEX. LOC. GOV'T CODE § 318.003(a) (requiring that county historical commission members “be individuals who broadly reflect the age, ethnic, and geographic diversity of the county”).

To satisfy these statutes, appointers must parse state demographic data, assign numerical values to various minority populations, and make appointments to roughly correspond with (or “broadly reflect”) those percentages. But the Supreme Court has made clear that race- and sex-based “balancing'” and “quota system[s]” are “patently unconstitutional.” *SFFA*, 600 U.S. at 307 (Gorsuch, J., concurring) (quoting *Grutter*, 539 U.S. at 330, 334). “[W]hat cannot be done directly cannot be done indirectly,” *id.* at 230–31, and the Legislature cannot establish a hazy quota system or require governmental bodies to “broadly reflect” the minority populations of Texas—a euphemism for approximate statistical balancing. “The Constitution deals with substance, not shadows, and the prohibition against racial [and sex-based] discrimination is levelled at the thing, not the name.” *Id.* (internal quotations omitted) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866)); *see also Ricci v. DeStefano*, 557 U.S. 557, 581–82 (2009) (explaining that a de facto quota system is one in which a “focus on statistics . . . could put undue pressure on employers to adopt inappropriate prophylactic measures”).

Other appointment statutes operate still differently, reserving board and committee seats for individuals “representing the interests of” HUBs or minority groups. *See, e.g.*, TEX. GOV'T CODE §§ 447.004(b-2)(6) (reserving state energy conservation office advisory committee seat for “one individual representing the interests of historically underutilized businesses”), 2166.305(b)(6)–(7) (reserving one seat on a committee appointed by the Texas Facilities Commission for an individual representing HUB interests and two seats for individuals representing minority contractors association interests); TEX. OCC. CODE § 1305.051(b)(4) (reserving one electrical safety and licensing advisory board seat for an individual “affiliated” with a HUB). Under these statutes, any candidate may qualify regardless of that individual's race or sex, but only to advocate for *groups* defined by these same immutable characteristics.[34] *See, e.g.*, TEX. GOV'T CODE § 2166.305(b)(7). But the Legislature cannot sanitize discrimination by shifting it from the individual appointee to a group that the appointee is to represent. Again, “what cannot be done directly cannot be done indirectly.” *SFFA*, 600 U.S. at 230.

---

must be small businesses, “including *minority* businesses” (emphases added)). An opinion from a previous attorney general determined that persons outside the relevant service area are “not, for that reason alone, ineligible to serve as a private-sector representative on the board.” *See* Tex. Att'y Gen. Op. No. JC-0298 (2000) at 5. Yet nothing in that opinion supports the notion that these provisions' racial preferences are constitutional.

[34] *See supra* Parts II.A.1 (discussing the race- and sex-based qualifications for HUB status), II.A.3 (examining the meaning of the term “minority” in statutes favoring minority-owned businesses).

Such schemes also rest on a core fallacy: A statute reserving a committee, board, or commission seat for someone "representing" the interests of a minority group "reinforces the perception that members of the same racial group" invariably "think alike" and "share the same political interests." *Shaw*, 509 U.S. at 647. The Supreme Court has repeatedly "rejected such perceptions . . . as impermissible racial stereotypes." *Id.* That odious misconception "seems based on the demeaning notion that members of the defined racial groups ascribe to certain 'minority views' that must be different from those of other citizens." *Metro Broad.*, 497 U.S. at 636 (Kennedy, J., dissenting). Texas law cannot lawfully "signal" to those holding committee, board, or commission seats that "they represent a particular . . . group" over the general population. *Shaw*, 509 U.S. at 647.

None of the appointment statutes discussed above could survive strict scrutiny. To start, they offer no justification for racial or sex-based preferences. The Supreme Court has approved only two compelling interests for racial distinctions outside the context of higher education,[35] and only one could plausibly be relevant here: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *SFFA*, 600 U.S. at 207. But establishing this interest is a heavy burden. The government must provide a strong basis in evidence demonstrating discrimination in violation of some *positive law*. *See Skrmetti*, 605 U.S. at 554 (Barrett, J., concurring) ("For purposes of the Fourteenth Amendment, the relevant question is whether the group has been subject to a longstanding pattern of discrimination *in the law*.").

This pattern must be supported by particularized evidentiary findings. *SFFA*, 600 U.S. at 258 (Thomas, J., concurring). And this showing must be made *before* the statute imposing the racial or sex-based classification is enacted. *Shaw*, 517 U.S. at 910 (explaining that "the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that the remedial action was necessary, '*before* it embarks on an affirmative-action program'" (quoting *Wygant*, 476 U.S. at 277)); *Wis. Legislature v. Wis. Elections Comn'n*, 595 U.S. 398, 404 (2022) (same). What's more, it is "well settled" that the government "must justify" such remedial efforts "with a showing of past discrimination by the *governmental unit*" that seeks to use the sex- or "race-conscious remedy." *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) (emphasis added); *accord Wygant*, 476 U.S. at 274 (same). So here, race- or sex-based preferences in appointments demand a showing of identifiable instances of past discrimination in *appointments* to the relevant *commission, board, or committee*. *See Dean*, 438 F.3d at 454. Nothing suggests the Legislature relied on such evidence when enacting these statutes. In fact, many of these race- and sex- based preferences were enacted when the relevant committees, councils, or commissions were *first* created. *See, e.g.*, TEX. FAM. CODE § 264.502(d); TEX. GOV'T CODE §§ 403.503(d), 447.004(b-2)(6), 2166.404(c); TEX. HEALTH & SAFETY CODE §§ 34.002(c)(3), 672.002(g); TEX. HUM. RES. CODE § 40.022; TEX. EDUC. CODE § 12.015(b); TEX. OCC. CODE § 1305.051(b)(4).

These provisions also fail the demands of narrow tailoring. As the Supreme Court has repeatedly instructed, "[r]acial classifications are simply too pernicious to permit any but the most

---

[35] Even in the context of higher education, whatever extent achieving "diversity" remains a compelling interest is betrayed by the reality that it evades any sense of legitimate tailoring. *See SFFA*, 600 U.S. at 218–25.

exact connection between justification and classification." *SFFA*, 600 U.S. at 217 (quoting *Gratz*, 539 U.S. at 270). And to survive narrow tailoring, the racial classification must not be under- or over-inclusive. *Nuziard*, 721 F. Supp. 3d at 480. "An underinclusive presumption excludes groups necessary to further the identified interest; an overinclusive presumption includes groups unnecessary for that interest." *Id.* Consider the Government Code provision that controls appointments to the Texas Facilities Commission. TEX. GOV'T CODE § 2152.052(b). It requires that the appointer "attempt to appoint women and members of different minority groups, including African Americans, Hispanic Americans, Native Americans, and Asian Americans." *Id.* The term "including," which precedes a list of racial minorities, indicates that the appointer must attempt to appoint members of *any* "minority group"—not just those listed in the statute. SCALIA & GARNER, *supra*, at 32 (explaining that the term "include," "does not ordinarily introduce an exhaustive list"). And because the listed examples are racial, the associated-words canon limits the term "minority" to racial minorities. *Id.* at 195 (providing that when several words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar"); *see also Fischer v. United States*, 603 U.S. 480, 487 (2024) ("[T]he canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'" (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008))). In effect, this statute embodies a preference for women over men and for *any* racial "minority" group—regardless of that group's history of discrimination in Facilities Commission appointments.[36] Casting so wide a net proves overinclusive and could not possibly serve to remediate specific instances of past discrimination.[37] *See Nuziard*, 721 F. Supp. 3d at 480.

Moreover, "race may never be used as a 'negative' and . . . may not operate as a stereotype." *Id.* (quoting *SFFA*, 600 U.S. at 218). In other words, the point of the preference cannot be that "there is an inherent benefit in race *qua* race—race for race's sake." *SFFA*, 600 U.S. at 220. Government actors may not intentionally allocate preferences to those "'who may have little in common with one another but the color of their skin." *Shaw*, 509 U.S. at 647. Yet here, many of these statutes can be satisfied by appointments of individuals of *any* minority race—presumably any race besides white. If that will do, these statutes assume that there is a "benefit in race *qua* race—race for its own sake"—in mandating racial representation unmoored from any past instance of discrimination. *SFFA*, 600 U.S. at 220.

It bears repeating once more that "[e]liminating racial discrimination means eliminating all of it," *id.* at 206, and all government-imposed racial classifications must have a "logical endpoint." *See Nuziard*, 721 F. Supp. 3d at 493–94. As explained in *SFFA*, the Supreme Court was only "willing to dispense temporarily with the Constitution's unambiguous guarantee of equal protection" in *Grutter* and its progeny because of a promised sunset. *SFFA*, 600 U.S. at 212. Indeed, *Grutter* itself recognized that "[e]nshrining a permanent justification for racial preferences would offend this fundamental equal protection principle." 539 U.S. at 342. And as the Fifth

---

[36] The U.S. Supreme Court has already determined that two of these terms are "imprecise," "overbroad," and "arbitrary." *SFFA*, 600 U.S. at 217 (explaining that the term "Asian" is "plainly overbroad," and the term "Hispanic" is arbitrary without definition).

[37] The same over-inclusive list of preferred categories can be found elsewhere. *See, e.g.*, TEX. OCC. CODE § 252.001(c); TEX. HEALTH & SAFETY CODE §§ 93.002(b), 103.002(b-1).

Circuit has emphasized, the "central theme of a duration analysis is that the shorter the lifespan of the remedy, the more likely it is narrowly tailored." *Dean*, 438 F.3d at 460. But none of these appointment statutes have endpoints, logical or otherwise.

In sum, none of these appointment statutes can survive the daunting strict-scrutiny inquiry. State actors may weigh factors like "economic" and "cultural" diversity in appointments, TEX. GOV'T CODE § 2306.027(b), but they cannot lawfully prefer one sex or race over others in appointments to commissions, boards, advisory bodies, or any other government post.[38]

### ii. Consideration of race in state-agency employment triggers and fails strict scrutiny

The Constitution likewise proscribes race- or sex-based preferences in public employment, yet several statutes purport to require just that. For example, the Texas Department of Transportation must designate a "central authority to set and monitor women and minority hiring goals." TEX. TRANSP. CODE § 201.403(b). The statute defines minority by race, to include "African Americans, Hispanic Americans, Asian Americans, Alaska natives, and Pacific Islanders." *Id.* § 201.403(d). As before, this racial classification both invites and fails strict scrutiny. *See, e.g.*, *SFFA*, 600 U.S. at 206 (explaining that all racial classifications are subject to strict scrutiny). Similarly, the Department of Public Safety must "place an emphasis on minority recruiting and hiring efforts for noncommissioned positions."[39] TEX. GOV'T CODE § 411.0076(a). This

---

[38] Recently, lawsuits across the nation have assailed such schemes. *See, e.g.*, *Do No Harm v. Sanders*, No. 4:25-cv-00282-LPR (E.D. Ark. Mar. 25, 2025) (challenging race qualifications for occupational therapist committee and counseling board); *Haile v. Hutchinson*, No. 4:23-cv-00005-KGB (E.D. Ark. Jan. 4, 2023) (challenging social work licensing board race quota); *Do No Harm v. Lee*, No. 3:23-cv-01175, 2024 WL 3730623, at *1 (M.D. Tenn. Aug. 8, 2024) (challenging mandate to "strive to ensure" board of podiatric medical examiners includes "a member of a racial minority"); *Am. All. for Equal Rts. v. Walz*, No. 0:24-cv-017848 (D. Min. May 15, 2024) (challenging social work board's race quota); *Do No Harm v. Gianforte*, No. 6:24-CV-00024-BMM-KLD, 2025 WL 399753, at *1 (D. Mont. Feb. 5, 2025) (challenging gender and racial balance for state boards, commissions, committees, and councils), *Am. All. for Equal Rts. v. Ivey*, No. 2:24-cv-104-RAH, 2024 WL 1181451, at *1 (M.D. Ala. Mar. 19, 2024) (challenging real estate board race quota); *Do No Harm v. Edwards*, No. 24-16, 2025 WL 3111601, at *1 (W.D. La. Sept. 29, 2025) (challenging medical board race quota); *Chiong v. McMaster*, No. 3:24-cv-7213-SAL (D. S.C. Dec. 11, 2024) (challenging minority affairs commission race quota); *Miall v. City of Asheville*, No. 1:23-cv-00259-MR-WCM, 2025 WL 3492825, at *1 (W.D.N.C. Dec. 2, 2025) (challenging city advisory board racial qualification); *Hurley v. Gast*, 711 F. Supp. 3d 1069, 1082 (S.D. Iowa 2024) (invalidating judicial nominating commission sex-based quota). But many have been rendered moot, dismissed, or ended with consent decrees after legislative solutions were implemented or plaintiffs received guarantees that protected characteristics would not bear on the appointment process. *See, e.g.*, H.B. 1365 (Act 938), 95th Gen. Assemb., Reg. Sess. (Ark. 2025); S.B. 264 (Act 254), 94th Gen. Assemb., Reg. Sess. (Ark. 2023); H.B. 1237, 114th Gen. Assemb. Reg. Sess. (Tenn. 2025); S.B. 1084, 114th Gen. Assemb., Reg. Sess. (Tenn. 2025); H.B. 215, 69th Leg., Reg. Sess. (Mont. 2025); S.B. 214 (Act 56), 126th Gen. Assemb., Reg. Sess. (S.C. 2025); S.F. 2096, 90th Gen. Assemb., Reg. Sess. (Iowa 2024); *Miall*, 2025 WL 3492825, at *1 (stating that the parties entered a consent decree to amend and "administer the ordinance without regard to 'race, ethnicity, color, or national origin'").

[39] Provisions sometimes focus recruitment efforts based on racial or sex-based "diversity" as well. *See* TEX. GOV'T CODE § 72.041 ("The judges of the supreme court, court of criminal appeals, and courts of appeals shall encourage the recruitment of judicial law clerks and staff attorneys that reflect the gender, racial, and ethnic diversity of this state.").

"emphasis" again triggers strict scrutiny. *See SFFA*, 600 U.S. at 218. And blanket preferences for all minorities are over-inclusive, *see Nuziard*, 721 F. Supp. 3d at 480, even assuming the entire Department was the relevant "government unit" that engaged in specific instances of past discrimination. *See Dean*, 438 F.3d at 460. Narrow tailoring therefore dooms this statutory scheme.

Sections 21.501 and 21.502 of the Labor Code fare no better. Under those provisions, each state agency must "analyze its current workforce and compare the number of African Americans, Hispanic Americans, and females employed by the agency in each job category to the available African Americans, Hispanic Americans, and females in the statewide civilian workforce to determine the percentage of exclusion or underutilization in each job category." TEX. LAB. CODE § 21.501. And failure to achieve the required race- and sex-based demographics triggers administrative burdens. If, based on the workforce analysis, an agency is underutilizing any of the statutorily preferred groups (Hispanic Americans, African Americans, and women) in any *single job category* relative to the "civilian workforce," then the agency must "develop and implement a plan to recruit qualified African Americans, Hispanic Americans, and females." *Id.* § 21.502. In other words, state agencies must engage in race- and sex-based balancing to mirror state demographics. This is the very balancing that the Supreme Court has repeatedly rejected. *See, e.g.*, *Parents Involved*, 551 U.S. at 732 ("Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply be relabeling it 'racial diversity.'").

Race- and sex-conscious recruitment demands strict scrutiny, and outreach or recruitment schemes employing suspect classifications fail if they confer advantages based on race or sex. *Connerly v. State Pers. Bd.*, 92 Cal. App. 4th 16, 46 (2001); *see also Hi-Voltage Wire Works, Inc. v. City of San Jose*, 24 Cal. 4th 537, 562 (2000) (holding a city's "race- and sex-conscious outreach" program unconstitutional because it "effectively provides an advantage to members of the targeted groups"); *Safeco Ins. Co. of Am. v. City of White House*, 191 F.3d 675, 692 (6th Cir. 1999) (holding that outreach requirements trigger strict scrutiny "where their administration 'indisputably pressures' contractors to hire minority subcontractors"). Not only do these Labor Code provisions demand race and sex-conscious recruiting but they apply to *all state agencies*, without reference to any specific episode of past discrimination. *See* TEX. LAB. CODE §§ 21.501, .502. Again, when a governmental entity uses sex- or race-conscious measures to remedy its own past discrimination, it must point to specific acts of discrimination by the particular "*government unit* seeking to use the [demographic]-conscious remedy." *Dean*, 438 F.3d at 454 (emphasis added). And the whole of Texas government cannot possibly be the relevant "government unit" for this analysis, *see id.*, so Sections 21.501 and 21.502 serve no valid governmental interest.

### iii. Consideration of race and sex in employment with public and private utilities triggers and fails strict scrutiny

State law likewise compels certain utilities to pursue workforce diversity goals through programs, activities, and initiatives—regardless of any showing of past discrimination based on race or sex. For example, the Utilities Code previously required that every electrical and telecommunications utility submit to the Public Utilities Commission "a comprehensive five-year plan to enhance the diversity of its workforce in all occupational categories and to increase contracting opportunities for small and historically underutilized businesses." TEX. UTIL. CODE

§§ 39.909(b) (electrical utilities), 52.256(b) (telecommunications utilities). These plans were to include the utility's current and historical benchmarks for workforce diversity, initiatives to improve those metrics, a listing of "programs and activities" that the utility would undertake to achieve those goals, and similar efforts to contract with more HUBs. *Id.* This meant that *whatever* the metrics for workforce diversity revealed (the then-current and historical data), utilities had to formulate detailed plans to *improve* those numbers. *Id.* That belies any constitutional tailoring. Even were we to assume these efforts were necessary to remedy specific instances of past discrimination, reflexively demanding more diversity for every entity in an entire industry—regardless of actual hiring practices or current demographic makeup—is anything but a constitutionally tailored pursuit of that end.

The demand for these five-year plans has been satisfied for nearly a quarter century and yet the Utilities Code still saddles utilities with continuing obligations to increase diversity hiring. Electrical and telecommunications utilities remain statutorily obligated to provide annual reporting that operates in the same way as the initial five-year plans:[40] detailing "its efforts to improve workforce diversity and contracting opportunities for small and historically underutilized businesses," despite what the numbers revealed in the initial five-year plan and regardless of any increased "diversity" that has been achieved since. *See id.* §§ 39.909(c), 52.256(c). These provisions also require the utility to explain what "progress" it has made in enhancing workforce diversity during the previous year in addition to detailing the "initiatives, programs, and activities" the utility will pursue the next year, both to "increase the diversity of its workforce" and contracting opportunities for HUBs. *See id.* §§ 39.909(c)(3)–(7), 52.256(c)(3)–(7). That is to say the pursuit of diversity is a one-way, statutory ratchet. No matter what, utilities are commanded to keep creating "initiatives, programs, and activities" that "*increase* the diversity" of their workforces. *See id.* (emphasis added).

These provisions leave "workforce diversity" undefined, so the term should be read in context and consistent with its ordinary meaning. *Tex. Health & Hum. Servs. Comm'n v. Est. of Burt*, 689 S.W.3d 274, 280–81 (Tex. 2024). Contemporary dictionaries offer little help; the term "diversity" is quite broad without more useful context.[41] But given the statutory scheme and the plain meaning of the term in context, "workforce diversity" likely includes racial and gender

---

[40] Data collection alone poses no constitutional harm. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 760 (2019) (noting that the census has historically collected racial data). But when the state pressures governmental or non-governmental entities to configure their workforces along racial or sex-based demographics, strict scrutiny is triggered. *See SFFA*, 600 U.S. at 218. Governments cannot enact such preferences, nor command public or private utilities to do so, without advancing a compelling interest through narrowly tailored means.

[41] The term "diversity" means "the fact or quality of being diverse" and "diverse" means to be "[m]ade up of distinct characteristics, qualities, or elements." THE AMERICAN HERITAGE COLLEGE DICTIONARY 405 (3d ed. 1997); *see also, e.g.*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 339 (10th ed. 1993) (defining "diverse" as "differing from one another"); NEW OXFORD AMERICAN DICTIONARY 498 (1st ed. 2001) (defining "diverse" as "showing a great deal of variety"). "Workforce" means "[a]ll the people working or available to work, as in a nation or a company." THE AMERICAN HERITAGE COLLEGE DICTIONARY 1554 (3d ed. 1997); *see also, e.g.*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1363 (10th ed. 1993) (defining "workforce" as "the workers engaged in a specific activity or enterprise"); NEW OXFORD AMERICAN DICTIONARY 1944 (1st ed. 2001) (defining "workforce" as "the people engaged in or available for work, either in a country or area or in a particular company or industry").

diversity. This meaning is likewise borne out by the actual reports submitted by utilities, which uniformly focus on race- and sex-based demographics.[42] To whatever extent a workforce is deemed less "diverse" under Sections 39.909 and 52.256 due to excess white (or male) employees, with remediation only possible by favoring women or non-white minorities in hiring or promotion, these statutes trigger and fail strict scrutiny.

### 5. Other programs likewise prove unconstitutional

Beyond contracting, procurement, government appointments, and employment, Texas statutes also embed race- and sex-conscious preferences throughout higher education, public parks funding, and economic development initiatives. In education, provisions mandating partnerships between underperforming high schools and institutions of higher education to boost Hispanic and African American male enrollments openly advance a discriminatory purpose without remedying any specific instance of past discrimination. *See infra* Part II.A.5.i. Parks-funding statutes are likewise facially discriminatory insofar as they prioritize funding to "underserved populations," a term defined to include racial minorities and females. *See infra* Part II.A.5.ii. Finally, economic development schemes that condition project approvals and benefits on commitments to hire minority workers and contract with minority-owned businesses impose racial classifications untethered to government-unit-specific harms. *See infra* Part II.A.5.iii. Collectively, these provisions constitute discrimination for its own sake—failing strict scrutiny.

#### i. Race- and sex-conscious higher-education programs fail strict scrutiny

Section 51.810 of the Education Code requires public high schools with substandard college enrollment figures to partner with the nearest "institution of higher education" and develop a plan for improving their statistical results. TEX. EDUC. CODE § 51.810(b); *see also id.* § 61.003(8) (defining "[i]nstitution of higher education"). Critically, the enrollment plans must target higher enrollment of Hispanic students and African American male students. *Id.* § 51.810(b)(1)(C).

---

[42] *See, e.g.*, CENTERPOINT ENERGY, ANNUAL PROGRESS REPORT ON FIVE-YEAR PLAN TO ENHANCE SUPPLIER AND WORKFORCE DIVERSITY 4 (2024), https://interchange.puc.texas.gov/Documents/36542_252_1450474.PDF (providing data on: (1) sex and race of employees and (2) historically underutilized business and small business suppliers); GRANDE COMMUNICATIONS NETWORK, LLC, ANNUAL TEXAS WORKFORCE DIVERSITY REPORT 3–4 (2023), https://interchange.puc.texas.gov/Documents/55399_74_1356205.PDF (same); SOUTHWEST TEXAS TELEPHONE COMPANY D/B/A SOUTHWEST TEXAS COMMUNICATIONS, ANNUAL PROGRESS REPORT ON WORKFORCE AND SUPPLIER CONTRACTING DIVERSITY 4–5 (2020), https://interchange.puc.texas.gov/Documents/30240_3295_1103171.PDF (same); DELL TELEPHONE COOPERATIVE, INC., ANNUAL PROGRESS REPORT ON FIVE-YEAR PLAN TO ENHANCE SUPPLIER AND WORKFORCE DIVERSITY 3–4 (2018), https://interchange.puc.texas.gov/Documents/30240_3067_1003304.PDF (same); LONE STAR TRANSMISSION, LLC, ANNUAL PROGRESS REPORT ON FIVE-YEAR PLAN TO ENHANCE SUPPLIER AND WORKFORCE DIVERSITY 4–5 (2015), https://interchange.puc.texas.gov/Documents/36542_150_877624.PDF (same); SOUTHWESTERN BELL TELEPHONE COMPANY D/B/A AT&T TEXAS, ANNUAL PROGRESS REPORT ON FIVE-YEAR PLAN TO ENHANCE SUPPLIER AND WORKFORCE DIVERSITY 4–6 (2010), https://interchange.puc.texas.gov/Documents/30240_1742_688471.PDF (same); CENTERPOINT ENERGY, ELECTRIC REPORTS AND PLANS RELATING TO WORKFORCE DIVERSITY AND BUSINESS PRACTICES 5 (2006), https://interchange.puc.texas.gov/Documents/33424_6_535160.PDF (same), https://interchange.puc.texas.gov/Documents/33424_6_535161.PDF; TXU ELECTRIC, FIVE-YEAR DIVERSITY PLAN 4–9 (2000), https://interchange.puc.texas.gov/Documents/279993.TIF (same).

Institutions must submit annual reports to the Texas Higher Education Coordinating Board detailing these plans and outcomes. *Id.* § 51.810(c). Those reports must also include demographic breakdowns of entering classes by race, ethnicity, economic status, and high school standing in addition to descriptions of recruitment and retention efforts for racial and ethnic minorities. *Id.* § 51.4032. In turn, the Coordinating Board summarizes these reports for the Governor's budget office and Legislative Budget Board, analyzes institutional compliance, and notifies those offices—plus House and Senate appropriations chairs—of any failures. *Id.* §§ 51.404–.405.

This scheme discriminates by race and sex, specifically privileging black males and Hispanics. Such facial classifications "engender a presumption of discriminatory purpose." *Communities for Equity*, 459 F.3d at 694; *SECSYS*, 666 F.3d at 685. The programs' failure to "target a specific episode of past discrimination" for remediation forecloses any claim of a compelling governmental interest, *Vitolo*, 999 F.3d at 361—effectively invoking "general social ills and call[ing] it a day." *Nuziard*, 721 F. Supp. 3d at 480. Moreover, nothing supports the tacit proposition that black males and Hispanics suffered past discrimination that spared black females; this renders the provision underinclusive at least as to black females. *Id.* at 489 (explaining that "[a]n underinclusive presumption excludes groups necessary to further the identified interest"). In fact, the programs likely suffer from broader underinclusiveness by withholding equal treatment from similarly situated students of other races attending the same low-performing high schools. Finally, the reporting mandates reinforce the illegitimate aim of marshalling government resources to achieve race- and sex-based outcomes, constituting "discrimination for its own sake, which the Constitution forbids." *SFFA*, 600 U.S. at 209 (cleaned up).

Race-based preferences also appear in accounting scholarships and internships. The Texas State Board of Public Accountancy administers scholarships for accounting students from dedicated funds. TEX. OCC. CODE § 901.653. The Board awards these scholarships in the manner it "determines best serves the public purpose." *Id.* § 901.654(a). In doing so, the Board must consider each applicant's "ethnic or racial minority status." *Id.* § 901.654(b)(2). The Board further prioritizes minority students through regulations "to encourage internships for minority and disadvantaged students." *Id.* § 901.659(a). These rules incentivize participation by accounting firms through "standards for appropriate recognition of an accounting firm for its efforts in training and hiring minority or disadvantaged students." *Id.* § 901.659(b). Notably, the Board officially publishes "the names of accounting firms providing internships or hiring two or more disadvantaged or minority students each calendar year." 22 TEX. ADMIN. CODE § 520.10.

These schemes openly and unlawfully distribute benefits and burdens by race. *See Parents Involved*, 551 U.S. at 720. They also lack the "reasonable durational limits" essential for remedial programs. *See Grutter*, 539 U.S. at 342. To be sure, a program may confer an educational benefit "to a student who overcame racial discrimination" if the benefit is "tied to *that student's* courage and determination." *SFFA*, 600 U.S. at 230–31. Group membership cannot be a substitute for individualized evaluation, as the Constitution demands that each student "be treated based on his or her experiences as an individual—not on the basis of race." *Id.* at 231. Ultimately, it bears repeating that "[e]liminating racial discrimination means eliminating all of it." *Id.* at 206. This necessarily includes the Occupations Code provisions granting preferential treatment in educational and training benefits.

ii.     **Race- and sex-based preferences in park funding trigger and fail strict scrutiny**

The Parks and Wildlife Code embeds race- and sex-based classifications in grants supporting local parks operated by counties, municipalities, and other political subdivisions.[43] Section 24.005 applies to certain smaller counties, municipalities, and political subdivisions. *See* TEX. PARKS & WILD. CODE § 24.002 (establishing the "Texas recreation and parks account"). Section 24.055 applies to large counties and municipalities. *See id.* §§ 24.051(4), .052 (establishing the "large county and municipality recreation and parks account"). While the statutory frameworks governing these provisions differ in some respects, Sections 24.005 and 24.055 function nearly identically and can thus be treated together for present purposes.

Both provisions authorize the Texas Parks and Wildlife Department (TPWD) to fund half the costs of planning, acquiring, or developing parks, recreational areas, or open spaces. *Id.* §§ 24.005(a), .055(a). Grants target "recreation, conservation, or education programs for underserved populations." *Id.* §§ 24.005(d), .055(d). Funds must be used "to encourage and implement increased access to and use of parks, recreational areas, cultural resource sites or areas, and open space areas by underserved populations." *Id.* An "underserved population" is statutorily defined to include "any group of people that is" "minority" or "female." *Id.* §§ 24.001(12)(B), (D), .051(11)(B), (D). The term "minority" is not defined, but to the extent minority refers to race, color, or ethnicity, this statutory classification triggers strict scrutiny.[44] *See Croson*, 488 U.S. at 476–77. And the preference in funding for "female[s]" likewise triggers strict scrutiny under Texas law. *Bell*, 95 S.W.3d at 257–58.

These provisions cannot survive strict scrutiny. Here again, the only plausibly compelling interest is remediation of specific past instances of discrimination. *See SFFA*, 600 U.S. at 207. But a proponent of these impermissible classifications would need to show discrimination by the appropriate government unit: TPWD itself at the broadest possible level—if not a smaller unit within TPWD. *See Dean*, 438 F.3d at 454; *see also supra* Part II.A.4. Even then, the statutes are likely overinclusive because they favor women over men and all racial minorities rather than TPWD's alleged victims of prior discrimination. *Croson*, 488 U.S. at 506 (condemning "random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination" in the relevant industry and geographic area); *see also, e.g.*, *Nuziard*, 721 F. Supp. 3d at 480 (explaining that "an overinclusive presumption includes groups unnecessary" to further the identified interest).

These provisions systematically preference women over men and some races over others in funding for public parks throughout the state, all without a remedial focus on past discrimination

---

[43] We note that grants for local parks are by no means the only awards that mandate some consideration of race or ethnicity. *See, e.g.*, TEX. GOV'T CODE § 444.024(c) (requiring the Texas Commission on the Arts to "adopt equitable procedures for the distribution of grants to recipients who reflect the geographical, cultural, and ethnic diversity of the state's population").

[44] As explained in Part II.A.3, *supra*, the term "minority" is best read to mean racial or ethnic minorities.

or another compelling interest that might justify the chosen means. Put simply, this across-the-board preference for women's and minority interests in state funding cannot survive strict scrutiny.

### iii. Consideration of race in designation for special projects triggers and fails strict scrutiny

The Texas Enterprise Zone Act establishes an extensive economic development program aimed at encouraging private investment and job creation in geographic areas suffering from severe economic distress. TEX. GOV'T CODE §§ 2303.001–.002. Based on poverty levels and other metrics, certain areas in Texas qualify as "enterprise zones." *Id.* § 2303.101. Within these special zones, qualified businesses can make requests—through local governments—to the Texas Economic Development Bank ("TEDB") to designate a business project as "an enterprise project." *Id.* § 2303.404(a). In reviewing these requests, the TEDB is instructed to assess the degree of "local effort to develop and revitalize" the municipality or county. *Id.* § 2303.405(b)(6). The TEDB must also determine a private entity's "local effort" in part by that entity's "commitments to hire minority workers and to contract with minority-owned businesses." *Id.* § 2303.405(e)(3). Only after a business demonstrates "local effort" and is designated as an "enterprise project" does it become eligible to participate in numerous incentive programs—including exemptions from state and local regulations, state contracting preferences, tax refunds, and the reduction or elimination of certain taxes and fees. *See, e.g.*, *id.* §§ 2303.501–.517.

Chapter 2310 mirrors this framework for defense readjustment zones, which aid communities hit by military base closures or defense cuts. *Id.* §§ 2310.101–.102. Areas may qualify by suffering a threshold level of defense-related job losses that are tied to base realignments, contract cancellations, or spending cuts. *Id.* § 2310.102. Businesses seek "defense readjustment project" status through zone authorities, and the TEDB assesses identical "local effort" factors. *Id.* §§ 2310.304–.305. For private entities, these factors include the entity's "commitments to hire minority workers and to contract with minority-owned businesses." *Id.* § 2310.305(e)(3). Approved projects unlock the same valuable government incentives as those enjoyed by enterprise projects. *Id.* §§ 2310.401–.413. The TEDB must further prioritize readjustment zones in grants, loans, services, and regulatory relief—coordinating with agencies on job training, small business aid, and streamlined permitting. *Id.* §§ 2310.053–.054. Accordingly, the same equal-protection and equal-rights analysis applies to both enterprise projects and defense readjustment projects.

As before, the term "minority" in these provisions is reasonably read to implicate racial and ethnic minorities. *See supra* Part II.A.3. These schemes thereby condition lucrative government benefits on race-based hiring and contracting preferences. *See* TEX. GOV'T CODE §§ 2303.405(e)(3), 2310.305(e)(3). This, of course, triggers strict scrutiny. *See SFFA*, 600 U.S. at 206. To justify any alleged remedial efforts, the government must demonstrate specific acts of discrimination by the relevant government unit, *Dean*, 438 F.3d at 454, or show that the government unit "had essentially become a 'passive participate' in a system of racial exclusion practiced by elements of [a] local . . . industry." *Vitolo*, 999 F.3d at 361 (alteration in original) (citation omitted). But neither showing is possible here because the relevant programs blanket every qualifying county, municipality, and industry across the state—precluding government-unit-specific or industry-specific findings. This form of broad, societal remediation fails as a

compelling government interest. *Shaw*, 517 U.S. at 909 ("Efforts to alleviate the effects of past societal discrimination is not a compelling interest."). Moreover, even assuming there was a valid interest, these provisions are likely overinclusive in their application to all minorities, not just those essential to any alleged remediation. *Nuziard*, 721 F. Supp. 3d at 480; *Croson*, 488 U.S. at 506; *see also supra* Parts II.A.4, II.A.5.ii.

In sum, participation in these valuable programs cannot lawfully be predicated on an employer's commitment to hire minorities or contract with minority owned businesses. *See* TEX. GOV'T CODE § 2303.405(e)(3).

### B. Private Sector

Just as the U.S. Supreme Court's higher education decisions in *Bakke* and *Grutter* inspired corporations to disguise discrimination as "diversity" within the corporate world, *see supra* Part I.F.3, the Court's recent holding in *SFFA* prompted many in the private sector to examine DEI initiatives that consider protected traits in employment decisions. *See, e.g.*, Ishan K. Bhabha et al., *One Year Later: The Implications of SFFA for Corporate America*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Aug. 6, 2024), https://corpgov.law.harvard.edu/2024/08/06/one-year-later-the-implications-of-sffa-for-corporate-america/ (referring to increase in DEI challenges and fear among employers). *See generally SFFA*, 600 U.S. at 218–25. Others struck a different cord and, at present, the private sector remains infused with a host of practices that openly discriminate based on race and sex. *See infra* Part II.B.1. But these practices raise significant liability under both federal and state law, *see infra* Part II.B.2, and run headlong into the reality that "[e]liminating . . . discrimination means eliminating all of it." *SFFA*, 600 U.S. at 2162.

### 1. Present-day DEI practices

Private-sector DEI initiatives generally resolve into five broad groups: hiring and promotion processes, compensation packages, internal groups and training programs, external commercial relationships, as well as governance structure and public goals. We thus begin by briefly detailing the present scope of each category.

### i. Hiring and promotion processes

DEI policies are routinely incorporated into recruitment and selection. Many of these initiatives center around policies, benchmarks, or numerical targets designed to increase representation of certain demographic groups. This involves demographic hiring goals or quotas and board diversity mandates. *See, e.g.*, Iris Bohnet & Siri Chilazi, *Goals and Targets for Diversity, Equity, and Inclusion: A High Leverage Point to Advance Gender Equality in the U.S. Tech Industry*, HARV. KENNEDY SCH. 9–11 (2020), https://www.hks.harvard.edu/sites/default /files/2024-01/DEI%20Goals_Bohnet%20Chilazi_FINAL%5B65%5D.pdf; Letter from Ken Paxton, Tex. Att'y Gen., to Major L. Firms at 3 (Apr. 3, 2025), https://www.oag.state.tx.us /sites/default/files/images/press/Letter%20to%20Law%20Frims%20EEOC%20Info%20Request .pdf; Letters from U.S. EEOC, to Various L. Firms at 12 (Mar. 17, 2025), https://www.eeoc .gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf; Letter from Ken Paxton,

Tex. Att'y Gen., to Major Fin. Insts. at 2–4 (Jan. 27, 2025), https://www.texasattorneygeneral.gov /sites/default/files/images/press/Updated%20Paxton%20Financial%20Institutions%20Letter.pdf. Board diversity mandates, for example, include policies adopted to require a minimum number of female or minority directors on governing boards. *See, e.g.*, Letter from Ken Paxton (Jan. 27, 2025), *supra*, at 3–4. These mandates may involve enforcement through proxy-voting guidelines or shareholder resolutions conditioning board approval on demographics. *See, e.g.*, *id.*

DEI also plays a part in employer actions leading up to a job offer. For instance, some companies require interview panels or candidate pools to include specific demographic groups, minimizing a focus on hiring based solely on merit. *See, e.g.*, EEOC, *What You Should Know About DEI-Related Discrimination at Work*, https://www.eeoc.gov/wysk/what-you-should-know-about-dei-related-discrimination-work#_edn26. Companies also tailor job descriptions and recruiting materials to appeal to individuals of specific demographics. This may be accomplished through coded phrasing, which can function as identity-based screening. *See, e.g.*, Memorandum from Pam Bondi, *supra*, at 8–9. Finally, another common DEI initiative takes shape in early-career programs that build DEI "pipelines," such as internships, fellowships, and student programs, that are limited to specific demographic groups. This includes diversity fellowships restricted to certain racial or gender populations, summer programs for law students in which race or sex are considered for eligibility, preferred application tracks and partnerships with historically black colleges and universities and minority-serving institutions, as well as mentorship initiatives exclusively available to certain racial or gender groups. *See* EEOC, *What You Should Know About DEI-Related Discrimination at Work*, *supra*; *see also, e.g.*, Letters from U.S. EEOC, *supra*, at 1–2, 16; Memorandum from Pam Bondi, *supra*, at 5.

### ii.    Pay, bonuses, and promotion goals

Many companies also incorporate DEI into compensation and promotion frameworks. These practices typically include compensation incentives tied to representation goals, DEI metrics in performance reviews, and promotion criteria with DEI targets. *See, e.g.*, SEMLER BROSSY CONSULTING GRP. LLC, *ESG + Incentives 2024 Report* 1–2 (2024), https://semlerbrossy.com/wp-content/uploads/2024/10/ESG-Report-Issue-1-2024-10-10.pdf; Natalie Norfus, *4 Steps To Integrate DEI Metrics Into Performance Reviews and KPIs*, FORBES (Mar. 5, 2025), https://www. forbes.com/councils/forbeshumanresourcescouncil/2025/03/05/4-steps-to-integrate-dei-metrics-into-performance-reviews-and-kpis/. For example, it was found that the "most prevalent" metric in incentive plans for S&P 500 companies in the 2023 fiscal year was DEI-related. *See* SEMLER BROSSY CONSULTING GRP. LLC*, supra*, at 3. These DEI measures are often implemented as discrete performance goals or as components with broader environmental, social, or governance scorecards. *See id.* at 13. For the twenty percent of S&P 500 companies that implemented short-term executive compensation tied to DEI metrics in 2021, that metric was usually part of a weighted scorecard or a weighted measure up to approximately twenty percent of compensation. *See* FARIENT ADVISORS LLC, *Use of Diversity, Equity & Inclusion (DE&I) Metrics in the S&P 500* (Feb. 2, 2021), https://farient.com/2021/02/02/use-of-diversity-equity-and-inclusion-dei-metrics-in-the-sp500/.

### iii. Employee resource groups, mentoring, and training

A variety of internal corporate programs fall within the DEI framework as well. They frequently take the form of employee resource groups (ERGs) and affinity networks. *See, e.g.*, Memorandum from Pam Bondi, *supra*, at 8; Letters from U.S. EEOC, *supra*, at 2; EEOC, *What You Should Know About DEI-Related Discrimination at Work*, *supra*. These are "voluntary, employee-led groups" typically organized around shared characteristics. Claire Hastwell, *What are Employee Resource Groups (ERGs)*, GREAT PLACE TO WORK (Jan. 7, 2023), https://www.greatplacetowork.com/resources/blog/what-are-employee-resource-groups-ergs. Common examples include groups centered around racial or gender identity. *See* Barbara DeLollis & Janelle Conaway, *Exploring Employee Resource Groups in the Age of DEI*, HARV. BUS. SCH. (June 11, 2025), https://www.hbs.edu/bigs/lumumba-seegars-employee-resource-groups. ERGs often provide mentorship, networking, professional development, and leadership exposure. *See* Hastwell, *What are Employee Resource Groups*, *supra*; DeLollis & Conaway, *Exploring Employee Resource Groups in the Age of DEI*, *supra*. Formal programs focused on curating career opportunities for employees of a certain demographic also offer similar benefits outside of the traditional ERG. *See* EEOC, *What You Should Know About DEI-Related Discrimination at Work*, *supra*; *see, e.g.*, Memorandum from Pam Bondi, *supra*, at 15, 30. Likewise, this can involve training programs that are only made available to certain demographics too. *See* EEOC, *What You Should Know About DEI-Related Discrimination at Work*, *supra*; *see, e.g.*, Letters from U.S. EEOC, *supra*, at 30.

Finally, a key component of corporate DEI programs is often found in DEI training itself—serving as part of an organization's "first-class diversity effort." *See* Jane DiRenzo Pigott, *Teaching Can Help: Diversity Training at Your Law Firm*, *in* 16 BUS. L. TODAY 11, 11 (Oct. 2006). A broad term, "[t]he concept of diversity training is to have a dialogue about diversity that sensitizes people to the issues and creates some awareness on both substantive topics and the communication skills necessary for diversity to become an integrated priority of the organization." *Id.* In other words, it "aims to boost participants' awareness about different types of diversity, appreciating differences among co-workers, and [to] provide knowledge and strategies to enhance employees' interpersonal and communication skills across diversity to help build a positive work environment." Carolyn Henzi Plaza et al., *Diversity Training in the Workplace*, PENN. STATE EXTENSION (Jan. 10, 2024), https://extension.psu.edu/diversity-training-in-the-workplace. Notably, however, it is not uncommon for these trainings to include physical segregation, stereotypes, or "[n]egative generalizations," *see, e.g.*, *Chislett v. N.Y.C. Dep't of Educ.*, 157 F.4th 172, 188 (2d Cir. 2025), in addition to compulsory affirmation of ideological positions or confessions of bias and privilege based on protected characteristics. *See, e.g.*, Memorandum from Pam Bondi, *supra*, at 9.

### iv. Supplier diversity

Some companies further extend the boundaries of DEI initiatives beyond internal employment decisions to external commercial relationships, particularly in supply chains. These practices manifest in vendor selection criteria that preferentially favor minority-owned, women-owned, or otherwise "diverse" businesses coupled with fixed numerical targets or spending

commitments. *See, e.g.*, Letter from Ken Paxton (Jan. 23, 2025), *supra*, at 4. Indeed, America's 200 largest public companies collectively pledged $50 billion to diverse suppliers before 2030. INST. FOR SUPPLY MGMT., *Supplier Diversity Programs: Boosting DEI in Procurement* (Dec. 5, 2025), https://www.ism.ws/supply-chain/dei-in-procurement/. In reality, companies may accomplish their stated goals by employing supplier scorecards that link procurement outcomes to DEI goals and implementing requirements for diverse suppliers into supplier bidding, selection, and management processes. *See, e.g.*, INTEL CORP., *2023-24 Corporate Responsibility Report* 66 (2024), https://csrreportbuilder.intel.com/pdfbuilder/pdfs/CSR-2023-24-Full-Report.pdf.

### v. Governance structures and public goals

The rise of DEI programs and initiatives has also prompted changes in corporate governance structures. Companies have created "Chief Diversity Officer" positions and formed board-level committees to monitor as well as advance DEI initiatives and programs. *See* Matteo Tonello, *DEI in Transition: 2025 Corporate Diversity Disclosure Trends*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Aug. 20, 2025), https://corpgov.law.harvard.edu/2025/08/20/dei-in-transition-2025-corporate-diversity-disclosure-trends/#:~:text=A%20growing%20number%20of%20firms,level%20commitment%20and%20strategic%20alignmentl; Anand & Winters, *supra*, at 368–69. Chief Diversity Officers, for example, "ensure DEI is at the forefront of a company's goals and missions" by "being accountable for compliance, advocacy, and education of [their] compan[ies]." Maria Minor, *Here's The Bottom Line Reason Why Companies Need a Chief Diversity Officer*, FORBES (May 3, 2021), https://www.forbes.com/sites/mariaminor/2021/05/03/heres-the-bottom-line-reason-why-companies-need-a-chief-diversity-officer/. They "guarantee[] that strategic goals, company policies, and laws surrounding DEI are . . . being followed and carried out." *Id.* These C-Suite officers can wield significant influence over a broad range of company policies, including those affecting hiring and promotions. *See, e.g.*, Buchholz, *The Rise and Impact of Chief Diversity Officers*, *supra* (referring to a CDO's responsibility to ensure a "diversifie[d]" workforce).

This shift in corporate governance structure builds on the public pledges made by companies to hit certain representation goals and are often galvanized by concrete hiring plans that aim to ensure success. *See, e.g.*, Lavietes, *'Watershed moment': Corporate America Looks to Hire More Black People*, *supra* (exemplifying corporate pledges to fill a certain percentage of positions with individuals of specific demographic groups); Feiner, *Tech Companies Made Big Pledges to Fight Racism Last Year—Here's How They're Doing So Far*, *supra* (highlighting representation metrics in hiring and board composition and one company's executive team creating a "detailed plan to meet those goals with their teams"). Meeting these targets, of course, accompanies the implementation of the initiatives discussed above.

### 2. Corporate DEI practices invite four categories of liability under state and federal law

The DEI practices discussed above beg discussion of four broad categories of liability. To start, any initiative that predicates employment opportunities on membership in a particular race- or sex-based group necessarily triggers liability under frameworks like Title VII and the TCHRA.

*See infra* Part II.B.2.i. DEI training programs may also create a hostile work environment if the underlying programs disparage certain demographics or otherwise employ troubling rhetoric that targets protected characteristics. *See infra* Part II.B.2.ii. Separately, companies risk liability under Section 1981 if contracting opportunities are not provided to all races on equal terms. *See infra* Part II.B.2.iii. This collective liability—under Title VII, the TCHRA, and Section 1981—raises a final concern with state and federal securities laws, where risk requires disclosure and fiduciary duties create tension with ideological goals. *See infra* Part II.B.2.iv.

i.   **Unlawful employment practices under Title VII and the TCHRA**

Both Title VII and TCHRA prohibit unlawful employment practices, and these statutory schemes are largely "governed by . . . identical law." *Paugh v. Lockheed Martin Corp.*, 474 F. Supp. 3d 861, 865 n.1 (W.D. Tex. 2020); *see also Prairie View A&M*, 381 S.W.3d at 507 (explaining that Texas courts "look to federal law for guidance only when the relevant provisions of Title VII are analogous" with the TCHRA). Indeed, both recognize that an "employer commits an unlawful employment practice if" he, "because of race, color, . . . religion, sex, [or] national origin" either: (1) "fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment;" or (2) "limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee." TEX. LAB. CODE § 21.051(1)–(2); *accord* 42 U.S.C. § 2000e-2(a)(1)–(2) (same, slight wording differences); *see also* TEX. LAB. CODE § 21.002(8) (defining "[e]mployer"); 42 U.S.C. § 2000e(b) (same). These frameworks also provide that "an unlawful employment practice is established when the complainant demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m); *accord* TEX. LAB. CODE § 21.125(a). Likewise, employers may limit available remedies once an unlawful motivating factor is proven by demonstrating that they "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B)(i)–(ii); TEX. LAB. CODE § 21.125(b).

But the shared text of these frameworks does not mean they prove identical in all respects and, as such, we proceed in steps.[45] To start, Title VII and the TCHRA are commonly said to bar two brands of discrimination: disparate impact and disparate treatment. *See City of Austin v. Chandler*, 428 S.W.3d 398, 406 (Tex. App.—Austin 2014, no pet.). Whereas the disparate treatment claims "involve employment actions that treat . . . employees differently based on the employee's race, gender, or other protected status" and "require proof of a discriminatory

---

[45] Certain distinctions are not relevant for the purposes of this opinion, *compare, e.g.*, 42 U.S.C. § 2000e-5(e)(1), *with* TEX. LAB. CODE § 21.202(a) (concerning a pre-suit difference), and we make no effort to catalogue all distinctions.

motive,"[46] the latter traditionally involves "employment practices or policies that are facially neutral in their treatment of . . . protected groups[] but[] . . . have a disproportionately adverse effect on such a protected group," *Chandler*, 428 S.W.3d at 406 (citation omitted).

Next are the differing causation standards. Title VII carries with it two: "but for" and motivating factor. *See Bostok v. Clayton Cnty., Georgia*, 590 U.S. 644, 657 (2020). The former is the traditional approach, based on the "because of" language in subsection 2000e-2(a), while the latter is based on subsection 2000e-2(m). *Id.* The U.S. Supreme Court has explained that under the "but for" test, disparate treatment "is established whenever a particular outcome would not have happened 'but for' the purported cause." *Id.* at 656. The test can be satisfied even if other factors contributed to the employer's decision. *Id.* at 659. In contrast, the "motivating factor" standard under subsection 2000e-2(m) is a "more forgiving standard," under which liability may be shown even if race or sex was *not* the but-for cause of the employer's challenged action. *See id.* at 657. The motivating factor standard in subsection 21.125(a), on the other hand, applies to all disparate-treatment claims—*i.e.,* claims under subsection 21.051(1). *See Quantum Chem. Corp*, 47 S.W.3d at 480; *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 607 (5th Cir. 2007). This is all to say that a disparate treatment claim may arise when an employer takes an adverse employment action because of—either but for or at least motivated by—an individual's protected status. *See* 42 U.S.C. § 2000e-2(a)(1), (m); Tex. Lab. Code §§ 21.051(1), .125(a).

It also bears emphasis that the universe of actionable adverse "employment actions" under both frameworks is quite broad.[47] Organized internal programs like employee resource groups, affinity groups, mentoring, and trainings[48] may prove unlawful under either Title VII or the TCHRA if they discriminate with an eye towards an employee's protected characteristics. Organized programs, for example, are likely "terms, conditions, or privileges of employment" under Title VII.[49] *See Firefighters Inst. for Racial Equal. v. City of St. Louis*, 549 F.2d 506, 515

---

[46] Given the nature of the DEI programs described earlier, however, we focus only on the latter. *See, e.g.*, EEOC, *What You Should Know About DEI-Related Discrimination at Work*, *supra*. *See generally* 42 U.S.C. § 2000e-2(a)(1); Tex. Lab. Code § 21.051(1). This also obviates the need to discuss recent challenges to disparate impact theories. *See generally* Exec. Order No. 14281, 90 Fed. Reg. 17537, 17537 §§ 1–2 (Apr. 23, 2025).

[47] Until recently, the Fifth Circuit imposed an additional hurdle not found in the text of Title VII: the alleged discrimination needed to constitute an "ultimate employment decision," placing a heavier burden on plaintiffs to demonstrate liability. *See Hamilton v. Dallas Cnty.*, 79 F.4th 494, 497, 501 (5th Cir. 2023). Texas courts, following the Fifth Circuit's lead, adopted this federal standard for the TCHRA. *See City of Pasadena v. Poulos*, No. 01-22-00676-CV, 2023 WL 7134974, at *10 (Tex. App.—Houston [1st Dist.] Oct. 31, 2023, no pet.). But the *en banc* Fifth Circuit reversed course—removing this atextual condition from its jurisprudence. *Hamilton*, 79 F.4th at 501–02. Texas courts have yet to do the same for the TCHRA. *See Univ. of Tex. at El Paso v. Aranda*, No. 08-25-00083-CV, 2025 WL 3164675, at *5 n.3 (Tex. App.—El Paso Nov. 12, 2025, no pet. h.).

[48] Title VII and the TCHRA also expressly address training programs, with Title VII stating that it is an "unlawful employment practice" for an employer to discriminate against an individual "in admission to, or employment in, any program established to provide apprenticeship or other training." 42 U.S.C. § 2000e-2(d); *accord* Tex. Lab. Code § 21.054 (prohibiting discrimination "in admission to or participation in the [training] program").

[49] At least one federal Texas case pre-dating *Hamilton* concluded that a denial of access to things like training, leadership courses, and mentoring was not an adverse employment decision. *See Earle v. Aramark Corp.*, 247 F. App'x 519, 523 (5th Cir. 2007). *Hamilton* nonetheless casts doubt on *Earle*'s reasoning. *See supra* n. 47.

(8th Cir. 1977) (holding that informal, non-sanctioned "supper clubs" within firehouse fell under the "terms, conditions, or privileges of employment" because even employees' "psychological as well as economic fringes" are protected under Title VII); *cf. Vaughn v. Edel*, 918 F.2d 517, 523 (5th Cir. 1990) (explaining that even a benign racial reason may still constitute "otherwise" discrimination with respect to "terms, conditions, or privileges of employment").

An employer may also incur liability for segregation that results from these programs or trainings without actively or passively promoting the resulting segregation itself. The Ninth Circuit, for example, previously concluded that an employer could be subject to Title VII liability where they "created the conditions that led to self-segregation." *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1438 (9th Cir. 1984), *modified on other grounds*, 742 F.2d 520 (9th Cir. 1984). Eight Circuit precedent confronted an even more remote situation—where the employer was aware of but did not prevent segregation in employer-provided facilities—and still endorsed liability. *Firefighters Inst.*, 549 F.2d at 514–15. Taken together, it is reasonable to conclude that private-sector DEI initiatives that either mandate or practically result in known segregation would raise liability.

DEI initiatives related to hiring or compensation—like hiring goals or quotas, diversity board mandates, structured interview requirements, internships, fellowships, pipeline programs, and targeted recruitment—may also constitute unlawful employment actions under Title VII, the TCHRA, or both. These initiatives undoubtedly relate to hiring actions. *See supra* pp. 58–59. Neither can there be question that these initiatives reflect a desire to achieve preferential demographic representation to the exclusion of others when "favoring one [demographic trait] necessarily means disfavoring those of another." *Price v. Valvoline, L.L.C.*, 88 F.4th 1062, 1068 (5th Cir. 2023) (Ho, J., concurring). *See supra* pp. 58–59. Even more, publicly professed goals are reasonably understood to increase internal pressure favoring this pernicious exclusion to meet those goals. *See supra* p. 59.

It is important to acknowledge that the "mere existence" of a DEI policy, in isolation, may not impose liability under Title VII.[50] *See, e.g.*, *Weinerth v. Talley*, No. 4:17-cv-0067, 2018 WL 2729205, at *4 (W.D. Va. June 6, 2018); *Jones v. Bernanke*, 493 F. Supp. 2d 18, 29 (D.D.C. 2007). But "evidence that such a policy was 'actually relied upon' in taking a specific employment action may support a finding of unlawful discrimination." *Weinerth*, 2018 WL 2729205 at *4 (quoting *Reed*, 174 F. Supp. 2d at 186). Indeed, courts often consider "whether a diversity policy goes beyond mere aspirational goals." *Dill v. Int'l Bus. Machines Corp.*, No. 1:24-CV-852, 2025 WL 913744, at *5 (W.D. Mich. Mar. 26, 2025).[51] This typically looks to whether the policy (1) "define[s] specific quotas for any specific position or the workforce overall," (2) "refer[s] to

---

[50] *See also, e.g.*, *McCormick v. Gasper*, No. 22-1033, 2022 WL 16586621, at *4 (6th Cir. Nov. 1, 2022) (stating that a goal to improve diversity did not constitute discrimination); *Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 185–86 (D. Del. 2001) ("Merely producing anecdotal evidence regarding the aspirational purpose of an employer's diversity policy, and its intent to ameliorate any underutilization of certain groups, is not sufficient.").

[51] This case applied a heightened standard in "reverse discrimination" cases—*i.e.,* where the plaintiff is part of the majority. *Dill*, 2025 WL 913744 at *4. But the U.S. Supreme Court recently invalidated that standard. *See Ames*, 605 U.S. at 309.

any caste system designating a hierarchical preference for certain racial groups over others," (3) "provide[s] specific plans for how its diversity goals are to be achieved," *id.* (quoting *Bradley v. Gannett Co.*, No. 1:23-cv-1100, 2024 WL 3905817, at \*5 (E.D. Va. Aug. 20, 2024), *appeal docketed*, No. 25-2190 (4th Cir. Oct. 7, 2025)), or (4) "places managers under 'pressure to increase minority percentages,'" *id.* (quoting *Atkins v. Denso Mfg. Tenn.*, No. 3:09-cv-520, 2011 WL 5023392, at \*5 (E.D. Tenn. Oct. 20, 2011)). Additionally, some courts have considered "whether a diversity policy was 'actually implemented' or 'held sway over the decision maker.'" *Id.* (quoting *Pilon v. Saginaw Valley State Univ.*, 298 F. Supp. 2d 619, 632–33 (E.D. Mich. 2003)).

One Fourth Circuit case emphasized that employers may utilize DEI programs but "cannot . . . take adverse employment actions against employees based on their race or gender to implement such a program." *Duvall v. Novant Health, Inc.*, 95 F.4th 778, 791 n.10 (4th Cir. 2024). There, the court reviewed a Title VII claim as to whether a white male presented sufficient evidence for a jury to find that his protected characteristics played a motivating factor in his termination where he was replaced, "at one point or another," with "three women, two of whom were racial minorities." *Id.* at 786, 788, 791. The jury's finding followed evidence of the employer's "widescale" diversity and inclusion initiative, which sought to "embed diversity and inclusion throughout" the company. *Id.* This was in part accomplished by the employer's efforts to develop and employ metrics, long-term financial incentive plans tied to executive bonuses, and "a system wide decision making process that include[d] a diversity and inclusion lens." *Id.* at 784, 789. Ultimately, the court agreed that the evidence "was more than sufficient for a reasonable jury to conclude that" the employer took adverse employment actions against the employee based on his race or gender to implement its DEI program. *Id.*

The Fourth Circuit is far from alone in this approach. A federal district court recently denied an employer's motion to dismiss after finding an employee's allegations that "specific percentage targets for racial and gender compensation of" an employer's workforce, coupled with "a system of financial incentives to reward [or penalize] executives" based on reaching "those targets," plausibly supported an inference that the employer improperly considered race or gender in its employment decisions. *Dill*, 2025 WL 913744 at \*1, 5. The Fifth Circuit also previously concluded a "balanced workforce" program, which "identified explicit racial goals for each job and grade level" and evaluated managers to determine their compliance, was "direct evidence" on which a jury could conclude the employer considered race in employment policies—thereby limiting employment opportunities for certain employees. *See Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003). It follows that many of the DEI initiatives discussed earlier risk disparate treatment to the extent they come to bear on an employment decision, *see Weinerth*, 2018 WL 2729205 at \*4, or "call[] for . . . particular action [or] . . . the consideration of [a protected class] to the exclusion of all other factors," *Bradley*, 2024 WL 3905817, at \*6. *See also, e.g.*, *McCormick*, 2022 WL 16586621, at \*4 (finding that a recruiting target was not discriminatory when it did not "commit to or require the hiring of more diverse applicants").

Even undertaking an employment action based on a protected class simply "because [of] lack of diversity" could trigger employer liability under both Title VII and the TCHRA. *See Castleberg v. City of Dallas*, No. 3-09-CV-1354-M-BD, 2011 WL 2559521, at \*3, 5 (N.D. Tex. June 3, 2011), *rep. and recommendation adopted*, No. 03-09-CV-1354-M-BD, 2011 WL 2559516

(N.D. Tex. June 28, 2011) (alteration in original). In *Castleberg*, a white male was passed over for a mid-level detective position that went to a different demographic group. *Id.* at *1. The evidence showed that at least one reason for his non-selection was the division's "lack of diversity," and one of the selected candidates was specifically chosen "because [of] diversity." *Id.* (alteration in original). Ultimately, this proved enough to frustrate the employer's burden to demonstrate that race was not a factor in the employment decision. *Id.* at *5. Suffice it to say that using "diversity" to favor one demographic or another, with or without a formalized program, can constitute unlawful discrimination.

Of course, liability will also depend on whether a particular initiative fits any of the limited exceptions under Title VII and the TCHRA. *See, e.g.*, TEX. LAB. CODE § 21.119 ("Bona Fide Occupational Qualification"); 42 U.S.C. § 2000e-2(e) (referencing the same), (i) (permitting preferential treatment to individuals who are "Indian[s] living on or near a reservation"). The TCHRA narrowly sanctions "consideration of race and other protected classes when 'combined with objective job-related factors to attain diversity in the workplace.'" *Democratic Sch. Rsch., Inc. v. Rock*, 608 S.W.3d 290, 309 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting TEX. LAB. CODE § 21.125(a)); *see also Hadnot v. Lufkin Indep. Sch. Dist.*, 690 S.W.3d 777, 787 (Tex. App.—Tyler 2024, pet. denied) (referring to this as an "exception" to establishing an unlawful employment practice). It also states that "[a]n employer does not commit an unlawful employment practice by developing and implementing personnel policies that incorporate work force diversity programs." TEX. LAB. CODE § 21.121. Critically, however, these exceptions cannot be taken to swallow the rule; they merely endorse the pursuit of diversity that *does not* effect actual discrimination against other, protected demographics. *See, e.g.*, *Kokes v. Angelina Coll.*, 148 S.W.3d 384, 391 n.5 (Tex. App.—Beaumont 2004, no pet.) (citing *Grutter* and *Gratz* as background for section 21.121, which correctly signals that limitations to a "diversity" justification exist). Any broader reading would impugn the constitutionality of both provisions.

Similarly, an employer who undertakes an action "in good faith, in conformity with, and in reliance on any written interpretation or opinion of the" EEOC may limit his liability. 42 U.S.C. § 2000e-12(b). This extends to the EEOC's regulations, which, at present, establish a limited exception for voluntary affirmative action plans that meet certain criteria. *See* 29 C.F.R. § 1608.1(d); *see also id.* § 1608.4(b)(3) (establishing a reasonable basis for action if employment practice results in disparate treatment). *See generally id.* §§ 1608.1–.12. But the Fifth Circuit has recognized that private employers can pursue plans designed to eliminate "manifest . . . imbalances in traditionally segregated job categories" without violating Title VII. *Sharkey v. Dixie Elec. Membership Corp.*, 262 F. App'x 598, 603, 608 (5th Cir. 2008). To this end, the court examined whether a plan "unnecessarily trammel[ed] the interests of" nonminorities by requiring "the discharge of [nonminority] workers" and replacing them with a minority "hiree[]," creating an "absolute bar to the advancement of [nonminority] employees" that goes far beyond a "temporary measure." *Id.* at 604 (quoting *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 208 (1979)).

### ii.       Hostile work environments under Title VII and the TCHRA

In addition to the unlawful employment practices described above, both Title VII and TCHRA also impose liability for a hostile work environment—that is, "[a] workplace environment . . . [that] is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment." *Alief Indep. Sch. Dist. v. Brantley*, 558 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (TCHRA); *see Hanna v. Dangshan Cutlery Co.*, 767 F. Supp. 3d 384, 389 (W.D. Tex. 2025) (Title VII, with slight wording differences). DEI training programs, at a minimum, invite such risk.

A hostile work environment claim under Title VII requires a showing that: (1) the plaintiff "belongs to a protected group;" (2) she "was subjected to unwelcome harassment;" (3) "the harassment complained of was based on" her protected status; (4) "the harassment complained of affected a term, condition, or privilege of employment;" and (5) "the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). This last element does not apply if an employee complains of harassment by a supervisor. *Poulos*, 2023 WL 7134974, at *12; *Hale v. Tex. Dep't of Crim. Just.*, No. 7:18-CV-097-M-BQ, 2019 WL 7500593, at *5 n.13 (N.D. Tex. Dec. 3, 2019). "For harassment to alter the conditions of a person's employment, 'the conduct complained of must be both objectively and subjectively offensive.'" *Price*, 88 F.4th at 1066 (quoting *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007)). This is determined by the totality of the circumstances and considers "the frequency of the discriminatory conduct;" "its severity;" "whether it is physically threatening or humiliating, or merely an offensive utterance;" and "whether it unreasonably interferes with an employee's work performance." *Id.* The TCHRA follows the same approach. *See, e.g.*, *Poulos*, 2023 WL 7134974, at *12.

Certainly, simply "[r]equiring all employees to undergo diversity training does not amount to abusive conditions." *Norgen v. Minnesota Dep't of Human Servs.*, No. CV 22-489 ADM/TNL, 2023 WL 35903, at *4 (D. Minn. Jan. 4, 2023); *see also Young*, 94 F.4th at 1253 n.4 ("[M]erely discussing 'the influence of racism on our society does not necessarily violate federal law.'" (quoting *De Piero v. Pa. State Univ.*, 769 F. Supp. 3d 329, 357 (E.D. Pa. 2025)). "But 'the way these conversations are carried out matters.'"[52] *Young*, 94 F.4th at 1253 n.4 (quoting *De Piero*, 769 F. Supp. 3d at 424); *cf. Chislett*, 157 F.4th at 191 (explaining that implicit bias trainings are not "per se racist," but "[w]hat matters is . . . the way the trainings [are] conducted"). Indeed, "race-based training programs can create hostile workplaces [under Title VII] when official policy is combined with ongoing stereotyping and explicit or implicit expectations of discriminatory treatment." *Young*, 94 F.4th at 1253; *cf. Chislett*, 157 F.4th at 188 (commenting that a "mosaic" of evidence that included "[n]egative generalizations and stereotypes" about a particular race could lead to "a rational juror . . . find[ing] that [plaintiff] experienced a racially hostile work

---

[52] Some courts have concluded that particular DEI trainings did not create a hostile workplace environment. *See, e.g.*, *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1254 (10th Cir. 2024); *Sw. Bell Tel., L.P. v. Edwards*, No. 05-09-00606-CV, 2011 WL 3672288, at *12 (Tex. App.—Dallas Aug. 23, 2011, no pet.); *De Piero*, 769 F. Supp. 3d at 357; *Diemert v. City of Seattle*, 776 F. Supp. 3d 922, 941 (W.D. Wash. 2025). But this serves only to highlight the reality that the associated inquiry is almost always fact dependent.

environment" under a Section 1983 claim). The Tenth Circuit acknowledged as much when confronted with rhetoric that included warnings regarding "exclusionary 'white norms,'" criticisms of "white exceptionalism" and "fakequity" beliefs that "white allies are an exception to white racism." *Young*, 94 F.4th at 1250–51 (observing that this was "well on the way to arriving at objectively and subjectively harassing messaging," if not "already at the destination"). Unsurprisingly, others have observed similarly. *See, e.g.*, *De Piero*, 769 F. Supp. 3d at 424 (highlighting federal liability that comes with diversity training that talks about any race "with a constant drumbeat of essentialist, deterministic, and negative language"); *Hartman v. Pena*, 914 F. Supp. 225, 227–30 (N.D. Ill. 1995) (concluding gender-driven rhetoric and exercises during a mandatory, three-day cultural workshop were objectively and subjectively hostile).

This is all to say that the nature of so-called DEI trainings can, and often do, "set[] the stage for actionable misconduct by the organizations that employ them." *Young*, 94 F.4th at 1253. Whether a particular DEI training creates a hostile work environment will ultimately depend on "content, implementation, or context." *Diemert*, 776 F. Supp. 3d at 938–41; *accord* EEOC, *What You Should Know About DEI-Related Discrimination at Work*, *supra* (embracing this position). But there can be no claim that employers are free to infuse the workplace with discriminatory rhetoric under the guise of teaching "diversity."

### iii.    Section 1981 liability

Section 1981 provides yet another point of liability for DEI practices that betray the equal "right . . . to make and enforce contracts." 42 U.S.C. § 1981(a). This watershed statute applies to private parties—including contracts with customers and independent contractors,[53] *see, e.g.*, *Crosby v. Kilgore*, 9 F.3d 104 (5th Cir. 1993); *Standifer v. Tom Thumb Store*, No. 3:22-CV-2088-M-BK, 2024 WL 816261, at *3 (N.D. Tex. Feb. 1, 2024)—and protects against intentional racial discrimination in "the making, performance, modification, and termination of contracts" as well as "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b); *see also Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982).

A plaintiff may make a claim under Section 1981 if "he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479–80 (2006). This requires "the loss of an actual, not speculative or prospective, contract interest" in the retail context. *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003) (quoting *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 752 (5th Cir. 2001)). As for proposed contracts, on the other hand, a person must have been "actually prevented" and "not merely deterred[]." *Id.* at 358–59 (quoting *Morris*, 277 F.3d at 752) (emphasis removed). Courts recognize a prima facie case under this provision if a plaintiff shows that: (1) he is a member of a "protected class," (2) the defendant "intended to discriminate on the basis of" that protected class, and (3) "the discrimination concerned one or more of the activities enumerated in the

---

[53] The statute also applies to employment contracts and racial discrimination claims resulting therefrom. *See, e.g.*, *Brown v. Old Dominion Freight Line, Inc.*, No. 21-60608, 2022 WL 313797, at *1–2 (5th Cir. Feb. 2, 2022); *see also Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 325 (5th Cir. 2020).

statute."[54] *Abdallah v. Mesa Air Group, Inc.*, 83 F.4th 1006, 1013 (5th Cir. 2023). Discrimination can be shown by disparate treatment and, as a result, the Title VII analysis proves equally relevant to Section 1981 claims. *Id.* at 1013 n.5; *see also, e.g.*, *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 341, 336–38 (2020) (highlighting parity in the but-for causation standard).

Corporate DEI initiatives that shape contracting efforts to the pursuit of racial representation face liability on this backdrop. Indeed, the Eleventh Circuit recently confirmed this reality in *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765 (11th Cir. 2024). The case arose from a lower court's refusal to enjoin a venture fund competition that was only open to businesses owned by black women. *Id.* at 769–70. Reversing, the court recognized the competition was a "contract" under Section 1981 and rejected the propriety of categorically barring non-black applicants—correctly characterizing this as "discriminati[on] on the basis of race." *Id.* at 775–79. Section 1981 thus has profound implications for many DEI initiatives: Liability could be triggered anytime an applicant is denied a job, internship, fellowship, or promotion based on race in addition to situations when an individual is treated *unequally* based on race in the "benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). This protection not only reaches the aforementioned DEI training, resource groups, advancement opportunities, and compensation programs but likewise extends to supplier relationships that may themselves be impacted by diversity goals.

### iv.    Federal and state securities liability

The foregoing liabilities under Title VII, the TCHRA, and Section 1981 raise independent concerns under state and federal securities laws, particularly where risk of antidiscrimination lawsuits and customer backlash are not acknowledged to investors. Likewise, financial advisors, who owe fiduciary duties to their clients, must be careful to place their clients' profits over ideological goals. Simply put, when corporations and financial advisors prioritize social engineering over shareholder or investor profits—they do so at great peril. DEI policies and campaigns must be adequately disclosed to investors, along with the inherent risks of those programs.

Two key federal securities frameworks include the Securities Act of 1933 and the Securities Exchange Act of 1934. *See generally* 15 U.S.C. §§ 77a–77aa (1933 Act), §§ 78a–78rr (1934 Act). Likewise, the Texas Securities Act is key in the state securities space. *See generally* TEX. GOV'T CODE §§ 4001.001–4008.105. Each of these serve to protect investors. *See id.* § 4001.002(a)(1); *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 501–02 (2017) (recognizing the 1933 Act's purpose); *All. for Fair Bd. Recruitment v. Sec. & Exch. Comm'n*, 125 F.4th 159, 169 (5th Cir. 2024) (same, for the 1934 Act). To achieve this, both federal and state

---

[54] Although the Fifth Circuit has consistently referred to membership of a "racial minority" in the first element, *see, e.g.*, *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017), the U.S. Supreme Court has long interpreted this provision to extend to discrimination "against whites," *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976). To be sure, the Supreme Court based its reasoning on the statutory language and history of Section 1981. *See id.*

frameworks require "full and fair disclosure of all relevant information concerning securities offered to the public." *Sec. & Exch. Comm'n v. Nat'l Bankers Life Ins. Co.*, 334 F. Supp. 444, 455 (N.D. Tex. 1971), *aff'd*, 477 F.2d 920 (5th Cir. 1973) (concerning the 1933 and 1934 Acts); *Bridwell v. State*, 804 S.W.2d 900, 906 (Tex. Crim. App. 1991) (en banc) (concerning the Texas Securities Act). Such disclosure enables investors to make informed investment decisions. *See, e.g.*, 15 U.S.C. §§ 77aa (registration statements), 77j (prospectuses), 78m (issuer information, documents, and reports); TEX. GOV'T CODE § 4003.052 (registration statements of securities registered by notification).

Federal securities law prioritizes this disclosure to combat fraud. *See Nat'l Bankers Life Ins. Co.*, 334 F. Supp. at 455. For example, Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act, and Rule 10b-5, together generally prohibit deceptive practices in the purchase, offer, or sale of securities. *See* 15 U.S.C. §§ 77q(a), 78j(b); 17 CFR § 240.10b-5; *see also Sec. & Exch. Comm'n v. World Tree Fin., L.L.C.*, 43 F.4th 448, 460 (5th Cir. 2022) (recognizing that Section 17(a) targets "'substantially the same' conduct as Section 10(b) and Rule 10b-5" (quoting *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 903 (5th Cir. 1980))). Though there are differences between these frameworks, *see, e.g.*, *World Tree Fin.*, 43 F.4th at 459–60, these provisions cover both untrue statements of material facts and omissions of material facts when those facts are "necessary . . . to make the statements made, in light of the circumstances under which they were made, not misleading," 15 U.S.C. § 77q(a)(2); 17 C.F.R. § 240.10b-5(b). Courts have applied the same materiality standard under Section 17(a), Section 10(b), and Rule 10b-5. That is, "[a] misrepresentation or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *S.E.C. v. Evolution Cap. Advisors, LLC*, 866 F. Supp. 2d 661, 667 (S.D. Tex. 2011) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 224 (1988)); *see also id.* at 675–78; *World Tree Fin.*, 43 F.4th at 461. "The appropriate inquiry is whether, under all the circumstances, the statement or omitted fact is one that a reasonable investor would consider significant in making the decision to invest, 'such that it alters the total mix of information available.'" *Evolution Cap. Advisors*, 866 F. Supp. 2d at 667 (quoting *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993)). A violation of Section 17(a), Section 10(b), and Rule 10b-5 could lead to criminal liability in certain circumstances. *See, e.g.*, 15 U.S.C. §§ 77x, 78ff(a).

The Texas Securities Act also seeks to protect against fraud. *See Bridwell*, 804 S.W.2d at 906. The Act contains several provisions that provide remedies for "fraud or fraudulent practice," which is statutorily defined to include "misrepresentation[s] of a relevant fact" and "an intentional failure to disclose a material fact." TEX. GOV'T CODE § 4001.058(a)(1), (3). For example, the securities commissioner may assess an administrative fine against a person or company who was found to have "engaged in fraud or a fraudulent practice" in certain circumstances. *Id.* § 4007.106(a)(1); *see also, e.g., id.* §§ 4007.102 (relating to cease and desist orders of an investment adviser concerning fraud or a fraudulent practices), 4008.101(b)–(c) (concerning civil liability of an investment adviser or representative "who commits fraud or engages in a fraudulent practice in rendering services"). Criminal liability may also arise for a person who, in connection with the sale of securities and other dealings, "engages in any fraud or fraudulent practice." *Id.* § 4007.203(a)(1)(A), (a)(2)(A). Liability can also be incurred in certain circumstances where a person instead makes "an untrue statement of material fact or omits to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." *See id.* § 4007.203(a)(1)(C) (imposing criminal liability); *see also, e.g.*, *id.* § 4008.052(a) (concerning civil liability for a similar action). When considering the materiality of an omitted fact under these provisions, Texas courts have applied the same materiality standard as that applicable to Section 17(a), Section 10(b), and Rule 10b-5. *See, e.g.*, *Bridwell*, 804 S.W.2d at 904; *Villarreal v. State*, 504 S.W.3d 494, 509–10 (Tex. App.—Corpus Christi–Edinburg 2016, pet. ref'd); *Hays v. State*, 370 S.W.3d 775, 782 (Tex. App.—Texarkana 2012, no pet.).

It follows that omissions or misstatements about liability risks from DEI initiatives could distort an investor's evaluation of a company's risk profile and expected financial performance, leading to poor investment decisions and financial losses, and violations under federal securities law, state securities law, or both. DEI initiatives, for example, may expose companies to liability under civil rights laws, such as Title VII, TCHRA, and Section 1981. *See supra* Part II.B.2.i–iii. Such exposure includes administrative actions, civil suits, monetary damages, and injunctive relief. *See, e.g.*, 42 U.S.C. §§ 1981a(b), (b)(4), 2000e-5(b), (f)(1), (g)(1), (g)(2)(B); TEX. LAB. CODE §§ 21.125(b), .204, .206, .251, .254, .258, .2585.

Other risks can result from incorporating DEI initiatives that could require disclosure, as one Florida district court acknowledged. *Craig v. Target Corp.*, No. 2:23-CV-599-JLB-KCD, 2024 WL 4979234, at *1 (M.D. Fla. Dec. 4, 2024). There, a company's DEI-linked marketing campaign triggered customer backlash, boycotts, reduced sales, and stock price declines. *Id.* The plaintiffs asserted that the company misled investors by either falsely stating or omitting the risk of the boycotts in a number of statements, including within the company's annual reports. *Id.* The court denied the motion to dismiss for a number a reasons, *see id.* at *3–14, 16, but notably, the court found that the "general warning in [the company's] risk disclosures" was potentially "materially misleading because it was not specifically tailored" to the DEI campaign's particular risks. *Id.* at *5. The court also highlighted a difference between a disclosure warning of risks from failing DEI objectives and disclosure of risks from *implementing* such objectives. *Id.* at *6. It further determined that the plaintiffs adequately alleged incomplete risk disclosures.[55] *Id.* at *7. At bottom, corporations failing to disclose (or misstating) the risks that their DEI initiatives create could lead to violations of federal and state securities law.

Investment advisors must also be careful not to prioritize DEI over investor profits. The Investment Advisers Act of 1940, which aims to "prevent fraudulent practices by investment advisers," recognizes investment advisers as fiduciaries towards their clients. *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191–92, 195 (1963); *see also Nat'l Ass'n of Private Fund Managers v. Sec. & Exch. Comm'n*, 103 F.4th 1097, 1103 (5th Cir. 2024); 15 U.S.C. § 80b-6. As part of that relationship, an investment adviser owes his clients a duty of care and loyalty. *See In re Highland Cap. Mgmt., L.P.*, No. 3:23-CV-1503-B, 2024 WL 4139647, at *5 (N.D. Tex. Sept. 10, 2024); *see also* IA–5248, 84 Fed. Reg. 33669, 33671 (July 12, 2019). Advisors are thus "to provide investment advice that is in the client's best interest" and disclose conflicts of interests. *Sec. & Exch. Comm'n v. Duncan*, No. 3:19-CV-11735-KAR, 2021 WL

---

[55] The court disagreed the risk warnings were inactionable, forward-looking statements because of pleaded facts showing they were knowingly false and misleading. *Craig*, 2024 WL 4979234 at *8.

4197386, at *9–12 (D. Mass. Sept. 15, 2021); *see also* IA–5248, 84 Fed. Reg. 33669, 33669, 33671 (July 12, 2019). This involves making investment decisions that consider the client's risk tolerance and "investment profile," consisting of "the client's financial situation, level of financial sophistication, investment experience, and financial goals." *Duncan*, 2021 WL 4197386 at *12 (citing to IA-5248, 84 Fed. Reg. 33669, 33672–674 (July 12, 2019)). Under the Act, Congress sought to also "eliminate, or at least expose, all conflicts of interest" that might incline an advisor "to render advice which [is] not disinterested." *Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. at 191–192; *see also* IA–5248, 84 Fed. Reg. 33669, 33675–678 (July 12, 2019).

Texas law also recognizes that investment advisers owe fiduciary duties to their clients. *See, e.g.*, *Izzo v. Izzo*, No. 03-09-00395-CV, 2010 WL 1930179, at *7 (Tex. App.—Austin May 14, 2010, pet. denied) (recognizing investment advisers as fiduciaries); Tex. State Sec. Bd., *In the Matter of the Investment Adviser Representative Registration of Clifton Wayne Myers*, Order No. IC23-SUS-01 at 4 & n.3 (Jan. 20, 2023) (same). Indeed, state administrative orders have made clear that financial advisors are "subject to heightened standards of loyalty and care." Tex. State Sec. Bd., *In the Matter of the Investment Adviser Representative Registration of Clifton Wayne Myers*, Order No. IC23-SUS-01 at 4 n.3. These standards include, "the duty to act in good faith and not allow personal interests to prevail; . . . the duty to avoid misleading clients; and the duty to provide full and fair disclosure to clients." *Id.*; *see also, e.g.*, Tex. State Sec. Bd., *In the Matter of the Investment Adviser Registration of Queen B Advisors, LLC and the Investment Adviser Representative Registration of Brooklynn Chander Willy*, Order No. REG20-SUS-04 at 5 (Oct. 16, 2020) (finding that an investment adviser representative owes "duty to clients to have a reasonable basis to believe that an investment or investment strategy was appropriate for the client given their financial profile, investment objectives, and risk tolerance"). Thus, advisers who incorporate DEI factors—such as racial or demographic preferences—into investment advice could risk breaching these fiduciary obligations if they disregard a client's investment profile or prioritize their own policies or commitments over their client's interests. *Cf. Duncan*, 2021 WL 4197386 at *10–12 (finding an adviser breached his fiduciary duties where he did not disclose a personal interest in an investment and ignored his client's investment profile when directing funds).

## S U M M A R Y

Our nation was founded on the radical notion that all are created equal. Though we have often failed to live up to that promise, it remains as a constitutional lodestar—both in the U.S. and Texas Constitutions. The race- and sex-based, public sector preferences discussed in this opinion cannot survive strict scrutiny and are therefore unconstitutional. Furthermore, a large body of DEI practices in the private sector triggers liability under Title VII, the Texas Commission on Human Rights Act, and Section 1981 in addition to state and federal securities law.

Very truly yours,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

LESLEY FRENCH
Chief of Staff

D. FORREST BRUMBAUGH
Deputy Attorney General for Legal Counsel

JOSHUA C. FIVESON
Chair, Opinion Committee

MICHAEL COTTON
Assistant Attorney General, Opinion Committee